# EXHIBIT 1

## PAUL F. AMORUSO, C.P.C.U.

P.O. Box 981  
8 Old Mattapoisett Neck Road  
Phone: (508) 758-3274; Fax: (508) 536-6808

34 Barstow Street  
Mattapoisett, MA 02739  
Phone: (508) 644-1074; Fax: (744) 377-3856

Email: pfacpcu@comcast.net

---

# EXPERT REPORT

---

Dated: *July 15, 2011*

*Fidelity National Financial, Inc., et al. v. National Union Fire Insurance Company of Pittsburgh, Pa.*

U.S. District Court for the Southern District California, Case No. 09-CV-140-AJB- CAB

1

EXHIBIT 1                                                      Page 02

variety of tools, including claim manuals, training, general discussions, and the like. Having a library of materials is nice, but if the claims handler is not instructed on what these materials are or how they can be used, the library ends up being little more than just a collection. Formal training ensures that the message and standards are being delivered. As for attendance at seminars regarding California Fair Claims Practices, I obviously agree that was required since it appears that the seminar attendance is needed to obtain a "certification" mandated by California law. Attendance at a governmentally compelled seminar represents a "bare minimum" and is not sufficient alone to ensure proper claims handling.

f) The consequences of a lack of formal training are predictable. A lack of understanding of what standards apply. For example, it appears that Mr. Wolin, Mr. Perry, or Mr. Breazeale answered certain questions regarding California's Fair Claim Practices inaccurately. During the 2007 seminar, various questions were asked. According to the documents produced by National Union, the answering individual initially provided incorrect answer to three questions. (Bate Stamp NU 004558). The three questions were: (1) How many calendar days does an insurer have to accept or deny a surety claim? (Bate Stamp NU 004554); (2) Communications from a claimant must be acknowledged within [how many days]? (Bate Stamp NU 004547); and (3) If there is a claim in which liability is reasonably clear, you must [take what action]? (Bate Stamp NU 004511). (The referenced bate stamps are attached here as *Exhibit 14*). All of these are fundamental questions. Formal training would have and should have addressed. This lack of training, standing alone or together with the lack of a claims manual, impacted the handling of the Claim. For example, "Proofs of Loss," which will be discussed in greater detail below, were submitted in July / August 2008 and yet even to this day, many years after they were submitted, the claims department has not accepted or denied them.

g) Outside coverage counsel for National Union, D'Amato & Lynch LLP ("D'Amato") recently confirmed that it has never issued a coverage position and purportedly will do so at some point apparently in August 2011. (*See*

10

EXHIBIT 1                                      Page 03

D'Amato letters attached as *Exhibit 15*). All claims handlers should be trained that they must either affirm or deny coverage within a reasonable time and that the failure to timely issue a coverage opinion is bad faith. Three years is more than enough time to issue a coverage opinion, and since no coverage opinion has been provided, National Union has acted in bad faith for this reason alone. Even if National Union does finally issue a coverage opinion, it would be many years too late. National Union has compounded this bad faith by obviously attempting to issue its coverage opinion after all expert reports, including supplemental expert reports, are submitted. Just this past July 7, 2011, D'Amato wrote again stating that National Union allegedly needs another thirty days to issue a coverage opinion. By my calculations, thirty days from July 7, 2011, is August 6, 2011. I understand that supplemental expert reports are due August 5, 2011.

h) Mr. Wolin did not conduct a reasonable investigation prior to the lawsuit being filed against National Union. Mr. Wolin relied on what I will call the "Formal Proof of Loss" defense. As I explain in more detail below, that defense is wrong, and an insurer must and should begin its investigation even before a formal proof of loss is filed. Mr. Wolin's apparent belief that he could simply sit and wait is part and parcel of a lack of needed formal training, as well as the lack of a claims manual. Even if the lack of training and of a claims manual is excusable, and they are not, Mr. Wolin represented to the insured he was conducting an investigation and would continue with this. When he made this statement, no proofs of loss had been submitted. (January 5, 2007 Wolin email) (Deposition exhibit 190) (attached here as *Exhibit 16*). Even when the parties agreed to a Tolling Agreement, which was agreed to in part to give National Union additional time to investigate, Mr. Wolin still did not conduct an investigation. (Tolling Agreement) (Deposition Exhibit 1106) (attached here as *Exhibit 17*).

i) Mr. Wolin also did not conduct a reasonable investigation of the Claim after Fidelity filed the lawsuit in September 2008. This too is a consequence of a lack of training. In my personal experience, I had situations where insureds sued my company over a claim and the proper response

11

**EXHIBIT 1** **Page 04**

VII. Additional Discovery:

My opinions are rendered based on currently available information. It is my understanding that additional discovery of National Union is being pursued and that I will also have the right to review and, if necessary, comment upon any expert reports submitted by National Union. Additionally, it is my understanding that National Union's outside coverage counsel will allegedly be issuing a "coverage opinion" at some unidentified point in the future. Therefore, I retain the option to modify and add to my opinion as subsequent events develop.

Paul Amoruso, C.P.C.U.
Dated: July 15, 2011

42

EXHIBIT 1                                Page 05

MARY N. ABBOTT
JENNIFER S. COHN
STEPHEN W. CUSICK
PETER C. HALEY
TUNG KHUU
JAMES C. NIELSEN * +
THOMAS H. NIENOW

NIELSEN, HALEY & ABBOTT LLP
LAWYERS

44 MONTGOMERY STREET
SUITE 750
SAN FRANCISCO, CALIFORNIA 94104

FACSIMILE (415) 693-9674
(415) 693-0900

*LOS ANGELES OFFICE*

523 WEST SIXTH STREET
SUITE 635
LOS ANGELES, CA 90014

FAX (213) 239-9007
TEL (213) 239-9009

* Certified Specialist, Appellate Law
State Bar of California Board of Legal Specialization
+ Also admitted in Nevada

### I.  INTRODUCTION / BACKGROUND / QUALIFICATIONS.

Fidelity National Financial, Inc., Chicago Title Company, and Chicago Title Insurance Company, by and through their attorneys, have requested that I provide expert opinions regarding National Union Fire Insurance Company of Pittsburgh, Pa.'s ("National Union") acts and omissions in investigating and effectively denying a claim submitted under the November 18, 2005 to November 18, 2006, Financial Institution Bond, Policy No. 494-69-89 (the "Policy" or the "FIB") issued by National Union.

I have been involved in investigating over 100 fidelity insurance and FIB claims since 1975 and have written several articles on FIB investigations and FIB coverages. I also have served as an expert or consultant in six other fidelity insurance or FIB actions and serve as a Vice-Chair of the American Bar Association's Fidelity and Surety Committee. A copy of my Curriculum Vitae is attached to this report as APPENDIX A, which also lists (a) my testimony as an expert in the past four years, (b) the articles I have authored since 2001, and (c) the materials I considered. For the work and analysis performed in this case, I have charged my normal hourly rate of $400/hour.

Throughout my career, and as an expert, I have worked and provided opinions for both insurers and insureds. In this capacity, I have been involved in several types of claims that would be considered as "mega-claims" within the insurance industry. "Mega-claims" involve more than just a large-dollar policy claim. They also typically involve on-going actions against the insured and others relating to the circumstances giving rise to the claim, other kinds of insurance

EXHIBIT 1                                                                    Page 06

NIELSEN, HALEY & ABBOTT LLP

policies that may be called upon to cover losses, and sometimes even related criminal proceedings. Some of the "mega-claims" I have been involved in are:

(1) Financial Corp of America, (Los Angeles Superior Court, 1984-89) involving 400 allegedly dishonest loans, countless third-party actions, and a shareholder action for securities fraud.

(2) Enron, (U.S.D.C. Houston, 2002-2008) a $75 million dollar fidelity claim, and subsequent lawsuit, also involving a shareholder action; criminal prosecutions; and both fidelity and D and O claims.

(3) Transamerica v. National Union, (U.S.D.C. Los Angeles, 1988-93) two actions on a Form 25 FIB involving reinsurance fraud and collateral actions in Canada and Florida.

(4) US v. Fanghella and Hillman (U.S.D.C. San Diego, 2003- 2005) involving SEC injunctions, criminal indictments, two FIB claims prosecuted by me, and several ancillary actions against accountants and banks.

I would categorize the claim at issue as a "mega-claim."

## II. SUMMARY OF CONCLUSIONS.

From all of this experience, I have become familiar with and understand ways in which insurers should and should not investigate claims. Sometimes an insurer acts properly and fairly in denying claims. Sometimes they do not. Here, based on my years of experience, and my review of various materials, including depositions, discovery responses, and correspondence, I have concluded to a reasonable degree of professional certainty, that National Union did not meet its investigative responsibilities, has acted unreasonably and in bad faith, and has failed to pay benefits that are due under the Policy. The reasons for my conclusions are set forth more fully below, but to summarize here:

==This claim has been pending for five years. Despite this length of time, National Union still has not issued a coverage position letter.== However, from the moment the claim was noticed back in July 2006, National Union had very detailed complaints from third-party actions against Chicago Title. National Union could have and should have begun to analyze and understand those actions, from which National Union could have begun preparing "inquiries and responses."

2

EXHIBIT 1     Page 07

NIELSEN, HALEY & ABBOTT LLP

involved in these matters. They were Nancy Richmond, Catalina Lewis, Michael Godwin, Diane Lindsey, Lynn Yockey, and Wayne Fong. Based on those National Union deposed in this litigation and based on its discovery responses, the bulk of National Union's discovery in this case was to simply repeat the same discovery at enormous burden and expense.

Having reviewed this information in November 2006 (a review that should have been conducted earlier than November), Mr. Wolin had to be aware of them. Yet, in his Executive Claim Summary prepared in 2007, there was no mention of Mehdi or Kaplan. Nor was there any mention of the discovery or termination provisions. As late as 2009, reports were being sent around to the most senior level executives within National Union, again with not a mention of Mehdi, Kaplan, or the Termination / Discovery provisions.

National Union, in its interrogatory responses, basically just mimics the above allegations in the Burke First Amended Complaint. Just as the Burke First Amended Complaint described a purported improper reimbursement scheme, so too do National Union's interrogatory responses. Just as the Burke First Amended Complaint describes the Mehdi situation as involving an effort to artificially inflate a sales price, so too does National Union's interrogatory responses.

Insurers under California law must make a fair evaluation of coverage. Having never raised Mehdi or Kaplan as a coverage concern in any of its internal documents for years, or brought up those concerns with its insureds, National Union appears to be engaging in eleventh-hour theorizing.

What little "new" information that has been uncovered during the depositions in this case actually cuts against National Union. ==Mr. Mehdi was not deposed in the underlying litigation. He was deposed here and he explained in detail how the situation arose and how the purchase price was actually arrived at. It was not an attempt to inflate the purchase price. The property was listed for more than $419,000 and Mr. Mehdi understood that would be the value if necessary repairs were made. An earlier purchase that fell through involved an alternative credit for the repair work or the setting of an escrow of $24,000 to do the repair work. Mr. Mehdi offered $398,000 for this property knowing the work needed to be done. The Lankfords countered for $419,000 with a $24,000 credit for the repair work, but expressed the credit as relating to closing costs in the counteroffer. Mr. Mehdi explained that the real reason for that credit was because he was agreeing to buy a unit that had not had certain upgrades, valued at==

6

EXHIBIT 1                                    Page 08

NIELSEN, HALEY & ABBOTT LLP

==roughly $24,000, but he didn't change the language from closing costs or know why it was used. Additionally, no one at Chicago Title came up with this agreement. Mr. Mehdi signed the counter-offer and then the purchase contract was submitted to escrow.==

I have also taken the time to review these underlying transactions. Mehdi did not involve forged signatures. Kaplan involved a simple missed deed of trust that had nothing to do with Ms. Nieto or Mr. Gainor. National Union has seemingly ignored actually analyzing the transactions themselves and has tried to create evidence of wrongdoing where none exists. I have been informed that at the very recent deposition of Ms. Lynn Yockey, National Union's counsel accused Chicago Title of violating the law relative to the Kaplan recoupment escrows because there was no written instruction authorizing payment to Chicago Title. This statement was made despite the fact that the United States Attorney, who has investigated the underlying matters, has never charged Chicago Title. And this statement was made even though there are documents showing that the payments were indeed authorized.

To be sure, it is now known that these authorizations on behalf of people like the Jr. Holdaways were forged. But to suggest that Chicago Title closed the escrow without what it believed to be the authorization or consent of the parties to the transaction is simply false. An insurer must evaluate all evidence fairly and evenly. An insurer cannot ignore evidence and certainly cannot try to misrepresent the evidence.

National Union's bad faith, evident even before September 2008, accelerated thereafter. During the course of this litigation, National Union has also sought to prejudice Chicago Title in its defense of third-party actions. In a January 2009 court filing, National Union stated that the insureds were pursuing a claim for employee dishonesty. National Union never once mentioned that the insureds were actually pursuing alternative coverages that (a) had nothing to do with employee dishonesty, and (b) that actually would apply only if the employees had not acted dishonestly. When this statement was made, Chicago Title was still facing underlying litigation. The counsel representing the plaintiffs in those matters quickly picked up on this filing and began using it in depositions, sought discovery of the proofs of loss, and attempted to make reference to them at trial.

This prejudiced the defense of those underlying lawsuits. This misrepresentation can be traced directly to the fact that Mr. Wolin's claim file notes and Executive Claim Summary

7

EXHIBIT 1                                                                 Page 09

NIELSEN, HALEY & ABBOTT LLP

IV. CONCLUSION.

A broad summary of my opinions is that National Union acted in bad faith: (a) in responding to the claim, (b) in investigating it, and (c) in litigating it, and that National Union has unreasonably refused to pay benefits that are due and have long been due. National Union no doubt is attempting to set up a genuine dispute defense to all of this through the curious letters from D'Amato and Lynch that the insured has been receiving since May 2011. There can be no genuine dispute when National Union still refuses to lay out its position and is obviously attempting to provide this coverage position only after discovery is completed and only after initial and supplemental expert reports are due. Perhaps this is apropos -- a last act of bad faith.

\*\*\*

I reserve the right to supplement and/or modify my opinions as discovery and developments continue.

Very truly yours,

Peter C. Haley

Dated: July 15, 2011

29

EXHIBIT 1  Page 10