UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIDELITY NATIONAL FINANCIAL, INC., CHICAGO TITLE INSURANCE COMPANY, and CHICAGO TITLE COMPANY,<br><br>　　　　　　　　　　　Plaintiffs,<br><br>　vs.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA,<br><br>　　　　　　　　　　　Defendant. | CASE NO. 09cv140-AJB (KSC)<br><br>**ORDER DENYING MOTION FOR SANCTIONS**<br><br>[Doc. No. 318.] |

　　　Before the Court is a Motion for Sanctions filed by plaintiffs against defendant. [Doc. No. 318.] Plaintiffs allege defendant improperly obtained an attorney-client privileged document, refuses to return it, and intends to use it in support of its pending Summary Judgment Motion. [Doc. No. 325]. Among other things, plaintiffs seek attorney fees and costs and a ruling that the use of the document, allegedly improperly obtained, be precluded in this litigation. Having considered the parties' briefs and attached papers, and based on the following, the Court **DENIES** plaintiffs' request.

**BACKGROUND**

　　　Fidelity National Financial ("FNF"), and its subsidiaries, Chicago Title Insurance Company and Chicago Title Company (collectively "Chicago Title") are the nation's largest title insurance and escrow service providers. [Doc. No. 327-1, (Exh. 1).] They are the plaintiffs in this case, and the

insureds of National Union Fire Insurance Company of Pittsburgh ("NU"), the defendant. (Compl. ¶ 2.)

Beginning in December 2005, Chicago Title and certain of its employees were sued by victims of a Ponzi scheme perpetrated by Rollo Richard Norton. (Motion for Sanctions ("Mot.") at 2-3.) Norton was a San Diego area investment advisor who used his clients' money and identities to forge their signatures to close hundreds of fraudulent escrows at Chicago Title. (*Id.*) FNF thereafter submitted claims to NU under two policies: (1) a $15 million Miscellaneous Professional Liability policy ("E&O Policy") that provided coverage for third party lawsuits; and, (2) a $15 million Financial Institution Bond ("FIB"). (*Id.*)

(1)  *The E&O Claim*

NU's E&O claims adjuster and its outside E&O coverage counsel asked FNF for a legal analysis of potential liability of one of the underlying claims, the "Jr. Holdaway claim." (Mot. at 3.) In response, Chicago Title's defense counsel prepared an eight page memorandum ("the Memo"), which discussed the role of FNF's escrow officer, Suzette Nieto, in Mr. Norton's scheme and stated that FNF's legal department had recommended Ms. Nieto's removal from Mr. Norton's escrow accounts based upon, among other things, "red flags" identified in audits of Ms. Nieto's files. (Opposition ("Opp.") at 4.) Further, the Memo allegedly contained Chicago Title's assessment of potential liability in the underlying claims. (Mot. at 4.) On or about June 27, 2007, the Memo was forwarded by FNF to NU's outside E&O coverage counsel. (Opp. at 4.) Because FNF sought to maintain the attorney-client privilege over the Memo, and presumably over other privileged documents contained in the E&O claim file, FNF labeled the Memo as privileged and asked NU to create a firewall between the investigations of the E&O and the FIB claims.[1] (Reply, Exh. 4.) At the time, NU had agreed to defend the lawsuits under a reservation of rights. (Mot. at 2.) Following investigation of the E&O claim, NU agreed to pay $15 million towards the defense of the underlying lawsuits and the settlement of the Holdaway lawsuit. (Opp. at 4-5.)

(2)  *The FIB Claim*

At the same time as FNF submitted its claim to NU under the E&O policy, it also submitted

---

[1] As discussed, *infra*, the parties dispute whether an agreement was reached to erect a firewall.

1  a notice of a separate claim under the FIB policy, which is the subject of the current action.  NU states
2  that despite its requests that FNF provide information and full particulars of its FIB claim, FNF failed
3  to do so, stating that production would prejudice its defense of an underlying claim.  (Opp. at 5-6.)
4  On September 15, 2008, FNF filed this lawsuit, alleging that NU breached its agreement with regard
5  to the FIB claim, and acted in bad faith when it refused to cover damages plaintiffs incurred in
6  defending the underlying lawsuits.  [Doc. No. 1, Exh. A.]  Between October 29, 2009, and August 3,
7  2010, a litigation stay was instituted in this case to allow for final and complete adjudication of all
8  underlying third-party liability actions in state court.  [Doc. Nos. 136 & 146.]

9       (3)    *Discovery*

10  Discovery commenced following the issuance of an order lifting the litigation stay.  [Doc. No.
11  146.]  FNF deposed Mike Smith and Anthony Tatulli, senior executives who supervised the E&O
12  claim.  (Opp. at 7.)  FNF claimed that NU's FIB department had received the same information as the
13  E&O department but had reached contradictory coverage positions on the two claims, which  FNF
14  contended reflected NU's "bad faith."  (*Id*.)

15  On July 15, 2011, NU served its expert's report on FNF.  (Opp. at 8.)  The report specifically
16  quoted from the Memo, which as stated, was produced by FNF upon request by NU during the claim
17  process to support the E&O claim.  (*Id*.)  On February 1, 2012, over six months later, FNF objected
18  to the use of the Memo on the basis that the document was privileged.  (*Id*.)  FNF contends that the
19  Memo was  obtained improperly from the E&O files, outside the normal course of discovery in this
20  case.  FNF thereafter filed the current Motion for Sanctions.

21  The issue before the Court is whether sanctions should be imposed against NU for improperly
22  obtaining the Memo from NU's E&O department files, knowing that plaintiffs considered it to be
23  protected by attorney-client privilege, and using it in the current litigation in support of its Motion for
24  Summary Judgment regarding the FIB claim.

25  The matter was taken under submission without oral argument on July 23, 2012.

26  **LEGAL STANDARDS**

27  In a pure diversity case, such as this case, state law governs the interpretation of substantive
28  matters, including privilege.  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-80 (1938); *see also Platypus*

1  *Wear, Inc. v. K.D. Co., Inc.*, 905 F.Supp 808, 811 (S.D. Cal., 1995) (state law governs law of privilege
2  in diversity case).
3       In California, the attorney-client privilege is a legislative creation. *McKesson HBOC. v.*
4  *Superior Court*, 115 Cal.App.4th 1229, 1236 (2004). The California Code of Evidence provides:

> As used in this article, "confidential communication between client and lawyer" means information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship.

11 CAL.EVID.CODE § 952.
12       The party claiming the privilege has the burden of establishing the preliminary facts necessary
13 to support its exercise, i.e., a communication made in the course of an attorney-client relationship.
14 *HLC Properties, Ltd. v. Superior Court*, 35 Cal.4th 54, 59-60 (2005). The privilege applies to legal
15 advice given even when no litigation is threatened. *Wellpoint Health Networks, Inc. v. Superior Court*,
16 59 Cal.App.4th 110, 120 (1997). Once a party establishes facts necessary to support a prima facie
17 claim of privilege, the communication is presumed to have been made in confidence and the opponent
18 of the claim of privilege has the burden of proof to establish that the communication was not
19 confidential or that the privilege does not for other reasons apply. CAL.EVID.CODE § 917(a).

## DISCUSSION

21       Plaintiffs claim that: (1) the Memo was protected by attorney-client privilege; (2) the privilege
22 was not waived; (3) a firewall had been created between NU's E&O and FIB departments on the
23 separate claims for the purpose of protecting the Memo; and (4) NU improperly went beyond the
24 course of normal discovery by breaching the firewall to obtain the Memo from the E&O investigation
25 files for use in this litigation.
26      A.   *Attorney-Client Privilege*
27       The Memo was prepared by Chicago Title's defense counsel in the course of the lawyer-client
28 relationship and constituted a legal opinion of Chicago Title's potential liability in the underlying

1  lawsuit. (Mot. at 4.) Thus, it was a confidential communication between client and lawyer pursuant
2  to California's attorney-client statute. CAL.EVID.CODE § 917(a).

3        B.      *Waiver of the Attorney-Client Privilege*

4  NU contends that the privilege was voluntarily waived when the Memo was provided to NU's
5  E&O claim adjuster and its outside counsel during the claim process. Further, NU asserts that it never
6  agreed to the implementation of a firewall as FNF contends.

7  FNF vigorously disputes this, arguing that the Memo was provided upon the request of NU to
8  support Chicago Title's claim for coverage under the NU E&O insurance agreement. (Reply at 4.)
9  As such, FNF contends that the production was not voluntary because FNF was obligated to produce
10 this information pursuant to statute and the insurance contract. FNF relies on § 2860(d) of the
11 California Civil Code which provides, "it shall be the duty of ... the insured to disclose to the insurer
12 all information concerning the action except privileged material related to coverage disputes." As
13 further contended, the E&O policy contained a "duty to cooperate" clause as a "condition precedent
14 to coverage for claim expenses" and one of these duties was to provide an evaluation of the case
15 discussing the insured's liability. (Reply at 4.) FNF claims that, based on this duty, coupled with the
16 "common interest" of FNF and NU to successfully resolve the underlying claims, FNF had a
17 reasonable expectation that the attorney-client privilege would continue to protect the Memo, even
18 after voluntarily producing it to NU during the E&O claim process. (Reply at 5.)

19 With regard to the duty to produce the Memo which FNF believed it owed to NU, "such duties
20 do not, as a matter of law, create an attorney-client relationship between [insured's] counsel and the
21 insurer." *Employers Ins. of Wasau v. Albert D. Seeno*, 692 F.Supp. 1150, 1158 (N.D.Cal. 1988).
22 Thus, the privilege did not automatically extend to NU's counsel simply because NU asked FNF to
23 provide the legal opinion.

24 Additionally, § 2860(d) of the California Civil Code excepts the provision of privileged
25 material from "the duty of ... the insured to disclose to the insurer all information concerning the
26 action." FNF was under a duty to cooperate but, pursuant to § 2860(d) of the California Civil Code,
27 it was *not* under a duty to provide privileged material. Pursuant to California Code of Evidence §
28 912(a), a privilege "is waived with respect to a communication protected by the privilege if any holder

of the privilege, without coercion, has disclosed a significant part of the communication or consented to the disclosure made by anyone." *See also Wells Fargo Bank v. Superior Court*, 22 Cal.4th 201, 211 (2000) (waiver occurs when there is an intentional relinquishment of a privilege). Based on California law, FNF's duty to cooperate in the evaluation of the E&O claim did not create a duty to produce the Memo to NU. Rather, the production of the Memo by FNF to NU constituted the voluntary disclosure of an attorney-client privileged document to a third party, which constituted a waiver of the privilege.

FNF asserts that it was obligated to produce the Memo because it shared a "common" purpose or interest with NU, namely, "the successful resolution of underlying claims." (Reply at 5.)[2] FNF cites *Lectrolarm Custom Systems, Inc. v. Pelco Sales, Inc., et al.*, 212 F.R.D. 567 (E.D.Cal., 2002), to support its argument. In *Lectrolarm*, the Court stated that the attorney-client privilege was not automatically waived by the insured's independent counsel when an otherwise privileged document was disclosed to the insurer who shared and provided a common defense, subject to a reservation of rights. *Lectrolarm*, 212 F.R.D. at 572. However, the Court's subject matter jurisdiction in *Lectrolarm* was based on a federal question, and the Court's analysis was thus based on federal law. The Court's jurisdiction in this matter is based on diversity, and thus, its analysis must be governed by California law. The focus therefore becomes whether the *Lectrolarm* holding is consistent with California law.

Pursuant to § 952 of the California Code of Evidence, FNF's production of the Memo to NU could be viewed as disclosure of "information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary." Also, California Code of Evidence § 912(d) provides that disclosure may be made without waiving privilege "when disclosure is reasonably necessary for the accomplishment of the purpose" for which the lawyer was consulted.[3]

The "common" interest asserted by FNF in this dispute, however, is more aligned with the

---

[2] Notably, FNF assumes and argues that a common interest existed during the claim phase, when FNF and NU were negotiating coverage. Query whether a common interest did exist during this phase, as contrasted with the common defense more typically associated in litigation, where the interests of the insurer and insured are aligned against a third party.

[3] In *McKesson*, the Court stated "we read sections 912 and 952 to permit sharing of privileged information when it furthers the attorney-client relationship; not simply when two or more parties might have overlapping interests." *McKesson*, 115 Cal.App.4th at 818.

analysis provided in the seminal case of *San Diego Navy Federal Credit Union v. Cumis Ins. Society, Inc.,* 162 Cal.App.3d 358 (1984), *superseded by Civil Code § 2860*.  Soundly rejecting the approach which FNF asks this Court to adopt, the *Cumis* Court held as follows:

> In the usual tripartite relationship existing between insurer, insured and counsel, there is a single, common interest shared among them. Dual representation by counsel is beneficial since the shared goal of minimizing or eliminating liability to a third party is the same. A different situation is presented, however, when some or all of the allegations in the [third-party] complaint do not fall within the scope of coverage under the policy. In such a case, the standard practice of an insurer is to defend under a reservation of rights where the insurer promises to defend but states it may not indemnify the insured if liability is found.

*Cumis,* 162 Cal.App.3d at 364.  Thus, under California law, where there is a reservation of rights by the insurer, there are "divergent interests" between the insured and the insurer which preclude a finding of "common interest."  *Id*. at 375.

Similarly, in *Wasau,* 692 F.Supp. 1150, 1158 (N.D.Cal. 1988), federal jurisdiction was based on diversity and, in reviewing the *Cumis* case and other California precedent, the Court stated that because of the evident conflicting interests where a reservation of rights is asserted, the law requires the appointment of independent counsel to represent the insured's interests.  *Wasau*, 692 F.Supp. at 1155-57.  Thus, where the insurer asserts a reservation of rights, as in this case, California law presumes there are "conflicting interests," thereby precluding a finding of common interest.  *Id*. "The *Cumis* rule requires complete independence of counsel when an insurance company interposes a reservation of rights, the basis of which creates a conflict of interest." *Wasau,* 945 F.2d 284, 287 (9th Cir. 1991).  Accordingly, where a reservation of rights has been made, there is no "common interest" and as such, the production of privileged information to the insurer constitutes a waiver of the privilege.

  C. *The Evidence Does Not Establish that a Firewall Was Created Between NU's E&O and FIB Departments on the Separate Claims Submitted to NU*

FNF argues that, before producing the Memo, it requested that a firewall be established by NU between the E&O and the FIB claim files "to prevent contamination between the investigations because, under California law, NU's defense under the E&O Policy obligated Plaintiffs to provide

1  certain privileged information to NU's E&O claim department." *See* Kenna Decl. ¶ 4. The Court
2  acknowledges that under certain circumstances, firewalls may be used between departments of a
3  company. *See National Union Fire Ins. Co. of Pitts. Pa v. Engineering Science, Inc*, 673 F.Supp. 380
4  (N.D. Cal. 1987) (describing "Chinese Wall" as an internal management structure which separates
5  departments of the company acting as impasse to communications between departments); *see also*
6  *Saban v. Caremark Rx, L.L.C.* 780 F.Supp.2d 700, 724-25 (N.D.Ill., 2011) (the term "firewall" refers
7  to the ability of company to compartmentalize information when necessary to prevent its disclosure
8  to another part of the business).

9  NU, however, disputes that any firewall was erected, stating that it did not agree to one. In
10 support, NU references a February 7, 2007 letter from James Stankowski, NU's counsel, to FNF's
11 counsel, Mr. Kenna, in which Mr. Stanowski advised that "National Union has no obligation to [create
12 firewalls], and such [sic] declines your request." (Opp. at 18.) In his subsequent communication to
13 Mr. Kenna dated May 23, 2007, Mr. Stanowski stated:

> National Union previously appraised the Insureds that it will make its best effort to accommodate the Insureds request that separation be maintained between and among the claims files and handlers in these matters. However, National Union also reserved its rights on the bases that there should be no double recovery by the Insureds in this matter and /or a payment under one policy may be an offset with respect to the other policy. Since National Union must know the status of the Fidelity Bond Claim in order to evaluate this matter, we request that the Insureds consent to us contacting the Fidelity Bond Claim Department for this limited purpose.

20 (Reply, Exh. 4 at 206.) Although FNF refers to this communication as confirmation of a firewall, the
21 statement does not unequivocally support this conclusion. What the communication does establish
22 is that FNF and NU never had a meeting of the minds regarding the segregation of the Memo from the
23 FIB file. Further, the May 23, 2007 communication specifically refers to the reservation of rights by
24 NU, which refutes the existence of a common interest between FNF and NU.

25 Even assuming that NU did agree to the institution of a firewall, such separation appears to
26 have been requested by FNF for the entire E&O investigation, not just to certain privileged documents
27 such as the Memo. In opposition to this Motion, NU forcefully argues that FNF has placed the entire
28 handling of the E&O investigation at issue in this litigation, thus "necessarily placing at issue *all* of

the information FNF supplied to [NU] in connection with FNF's E&O claim." (Opp. at 19) (emphasis in original). *See McKesson*, 115 Cal.App.4th at 1239 (A waiver of privilege may be occasioned by tendering certain issues, and by conduct inconsistent with claiming the privilege). NU further argues that even if a firewall had been erected, FNF waived privilege protection by it's "repeated use of selective portions of the E&O claim file to advance their own litigation objectives." (Opp. at 18.) The record appears to support this argument.

It is evident that FNF has used privileged documents other than the Memo from the E&O file to support its position in this case. (Opp. at 23; Exhs. 30 & 26 at 147.) From this perspective, NU's argument – that FNF seeks to use the firewall both as a shield and a sword – is well taken. *Columbia Pictures Television, Inc. v. Krypton Broadcasting of Birmingham, Inc.*, 259 F.3d 1186, 1196 (9th Cir. 2001) (attorney-client privilege may not be used both as sword and shield when party raises claim that requires disclosure of protected communication); *see also Tennenbaum v. Deloitte & Touche*, 77 F.3d 337 (9th Cir. 1996) (would be unfair to privilege holder to selectively disclose only privileged communications supporting holder's cause). FNF cannot selectively use certain documents from the E&O file to support its theories in the instant litigation and simultaneously object to the use of the Memo it produced to NU during the claims process which is contained in the same E&O file. The waiver of privileged communications occurs when a party puts otherwise privileged information at issue. *Mitchell v. Superior Court*, 37 Cal.3d 591591, 609 (1984). Having relied on documents from the E&O file, FNF cannot preclude the use of other documents contained in that same file.

D.   NU's Use of the Memo Which it Obtained Outside the Course of Normal Discovery

FNF further contends that NU should be precluded from using the Memo because it obtained it from the E&O file, instead of through the normal course of discovery. While there were other ways that NU could have brought its intention to rely on the Memo to the attention of FNF, this, standing alone, does not justify the imposition of sanctions, as requested. As the attorney-client privilege that once protected the Memo from disclosure was waived, NU was not precluded from using the Memo in the instant litigation. The fact that FNF still considered the Memo to be privileged did not make it so. Further, the legal authority cited by FNF to support its argument that the use of information obtained outside of the normal discovery process warrants the imposition of sanctions is unpersuasive.

# CONCLUSION

Based upon the above analysis, the Court concludes FNF waived the attorney-client privilege with regard to the Memo by voluntarily providing it to NU; that a firewall was not established; and that even if a firewall had been erected to protect the privilege from waiver, FNF's introduction of portions of the E&O investigative file constituted a waiver of the privilege. Thus, NU did not improperly obtain the Memo from the E&O investigative files, and is not precluded from using it in the instant litigation.

Accordingly, there is no basis to impose sanctions as requested and FNF's Motion to Impose Sanctions is **HEREBY DENIED**.

**IT IS SO ORDERED.**

DATED: September 25, 2012

KAREN S. CRAWFORD
United States Magistrate Judge