1

2

3

4

5

6

7

8

9

10

11

12

13

14

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

FIDELITY NATIONAL
FINANCIAL, INC., CHICAGO
TITLE INSURANCE CO., and
CHICAGO TITLE CO.,

                              Plaintiffs,

    vs.

NATIONAL UNION FIRE
INSURANCE CO. OF PITTSBURG,
PA, et al.,

                              Defendants.

CASE NO. 09-CV-140-GPC-KSC

ORDER RE: *DAUBERT* MOTIONS

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The parties challenge the admissibility of four expert witnesses.[1]

District courts act as the gatekeeper for expert testimony by carefully applying Federal Rule of Evidence 702 to ensure evidence is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 589 (1993); *accord Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (*Daubert* imposed a special "gatekeeping obligation" on trial judge); *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463-64 (9th Cir. 2014) (en banc).

The expert must be qualified by "knowledge, skill, experience, training, or education" on the proposed subject matter. *Daubert*, 509 U.S. at 592 ("an expert is

---

[1] The Court read and considered the extensive arguments in the briefs.  To the extent that the Court does not specifically address a moving parties' particular argument, the Court rejects it.  "[T]he test of *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge" because Rule 702 "is premised on the assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline").

An expert witness may testify "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702; *see Cooper v. Brown*, 510 F.3d 870, 880 (9th Cir. 2007) (proponent of evidence bears burden of proving testimony satisfies Rule 702). In undertaking this "daunting task," the trial judge "must strike the appropriate balance between admitting reliable, helpful expert testimony and excluding misleading or confusing testimony to achieve the flexible approach outlined in *Daubert*." *United States v. Cordoba*, 104 F.3d 225, 228 (9th Cir. 1997) (citation omitted).

## A. FNF's Motion to Exclude Dean Felton – Claims Handling Expert

Dean Felton is an insurance broker who wrote a text book about financial institution bonds ("FIB"). Watnick Decl., Ex. 1 at 1-2. Defendant National Union ("NU") hired Felton to give his expert opinion on a variety of topics, including the customs and "best practices" of fidelity bonds and the application of contested provisions of the insurance policy. *Id.* at 1.

Plaintiffs Fidelity National Financial, Inc., Chicago Title Insurance Co., and Chicago Title Co. (hereinafter "FNF") challenge several aspects of Felton's testimony.

### 1. Reliance on Excluded Documents

In March 2011, the Magistrate Judge held that NU could not use Christopher Money's activities as proof of NU's efforts to comply with its obligation to investigate FNF's claim. [Doc. No. 194] NU had initially retained Money as part of its coverage investigation, but NU immediately designated Money as an expert witness on damages. *Id.* at 2. NU contended it did not have to disclose evidence of

1    Money's activities until the experts exchanged their reports.   "Having taken this
2    position in discovery," the Magistrate Judge held that NU "may not offer the
3    retention and efforts of Mr. Money at some later point in this litigation as evidence
4    of its efforts to comply with its obligation to investigate Fidelity's claims."  Because
5    NU elected to offer Money's "expert analysis for purposes of defending the
6    litigation[, his] efforts cannot be offered as evidence of National's ordinary business
7    efforts to investigate and adjust Fidelity's claim."  *Id.*

8         Felton submitted his initial report four months later, in July 2011.  Watnick
9    Decl., Ex. 1 (hereinafter "Initial Report").

10        In August 2011, NU tried to produce a claims analysis letter, but the
11   Magistrate Judge excluded the coverage letter for all purposes.  [Doc. No. 297
12   (Sept. 2011)]

13        Felton submitted his rebuttal report in January 2012.  Watnick Decl., Ex. 7
14   (hereinafter "Rebuttal Report").  FNF took Felton's deposition in February 2012.
15   Watnick Decl., Ex. 2 (hereinafter "Depo.").

16        FNF contends that Felton's rebuttal report violates the Magistrate Judge's
17   orders.  First, Felton relies on Money's invoices and reports as proof that NU
18   conducted an adequate investigation of the amount of FNF's loss.  Rebuttal Report
19   at 48 (¶ 6) (opining that NU promptly investigated the claim, Felton cites "[t]he
20   'Money' invoices" and  "[t]he 'Money' Report of July 15, 2011" as evidence of "a
21   quantum investigation by NU").  Second, Felton relies on the August 2011 coverage
22   letter to support his opinion that "[t]he timing of this letter is reasonable given
23   FNF's continued modifications of its claim."  *Id.* at 3 (¶ 5), 41-42 (citing letter).
24   FNF argues that Rule 702 requires an expert to base his opinion on "the facts of the
25   case," which means he cannot rely on facts that the court excluded as inadmissible.
26   FNF argues the reliance on inadmissible documents infects Felton's opinion about
27   NU's claims investigation.

28        This argument has merit.  Felton may not rely on evidence that the Magistrate

1 Judge excluded.

2      The Court rejects NU's contention that FNF's own experts first interjected
3 Money's investigation.  NU highlights Peter Haley's statement that "[i]n October
4 2008, National Union hired an accountant to review the escrow files in order to
5 assist in quantifying the loss.  The request for escrow files and this retention should
6 have been done at least a year earlier, in October 2007."  Watnick Decl., Ex. 3 at 4,
7 5, 18.  NU also cites Paul Amoruso's observation that NU hired an "accountant."
8 Watnick Decl. Ex. 4, at 13.  Amoruso then criticizes the lack of investigation by the
9 claims adjustor, who was only involved in administrative tasks.  *Id.* at 20 ¶¶ 96-97.
10 The Court concludes that these ungarnished factual statements do not, as NU
11 argues, inappropriately interject Money's activities as an accounting expert into
12 FNF's analysis.  The Magistrate Judge issued both Orders before Felton prepared
13 his reports, and NU is obligated to comply with those decisions.

14      Similarly, NU defends its use of the August 2011 coverage opinion letter
15 because Amoruso (FNF's expert) commented that NU had promised to issue a
16 coverage letter very soon.  Watnick Decl. Ex. 4 at 10 ¶ g.  Amoruso opines that NU
17 acted in bad faith by waiting so long to issue a coverage opinion.  *Id.* at 11 ("Even if
18 National Union does finally issue a coverage opinion, it would be many years too
19 late.").  NU further contends FNF "falsely" asserted in its summary judgment
20 motion that NU "never" issued a coverage determination.  According to NU, the
21 Court should not permit FNF to use evidence for its own benefit and then challenge
22 the opponent's response.  *E.g.*, *Mitchell v. Superior Ct.*, 37 Cal. 3d 591, 609 (1984).

23      The chronology of events defeats this argument.  Felton prepared his expert
24 reports before FNF filed its summary judgment motion and the rebuttal reports were
25 exchanged on the same day.  The Court finds nothing in Amoruso's report or the
26 summary judgment motion that would open the door to NU's use of inadmissible
27 evidence.  Accordingly, the Court concludes that the experts may not testify about
28 evidence or documents that were excluded by the Magistrate Judge.

**2. "Formal Proof of Loss" Opinion Contradicts California Regulation**

As noted, Felton wrote a book about fidelity bonds in 1992. There, Felton stated that an insurance company does not have a duty to investigate *until* the insured submits a "properly executed proof-of-loss form." At his deposition, Felton defended the rule in Employee Dishonesty cases to protect against defamation claims. Depo. at 121-22.

The Court agrees with FNF that Felton's opinion requiring a "formal" proof of loss form contradicts California law. The Insurance Regulations define a "proof of claim" as "[a]ny evidence or documentation . . . that provides any evidence of the claim and that reasonably supports the magnitude or the amount of the claimed loss." Cal. Code Regs., tit. 10, § 2695.2. Felton agrees that "proof of loss" is the same as "proof of claim." Depo. at 225-26. Had Felton been the claims handler, he would have been bound to follow California's more lenient regulation. *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996) (expert cannot have a double standard for testimony versus professional work). Consequently, FNF correctly notes that Felton's opinion is not based on sufficient "data" – the governing regulation – and is thus inadmissible. Felton's conflicting standard would confuse the jury about when the duty to investigate arises.

By contrast, in other sections of the report, Felton discusses the language in the FIB and the applicable California code. That part of his opinion is admissible. *See Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016-17 (9th Cir. 2004) (expert may refer to law while discussing facts).

Moreover, the Court found no instance in which a witness ever mentioned a concern that FNF's employees might bring a defamation action if the insurance claim was processed under the Employee Dishonesty provision. Felton speculated that outside coverage counsel might have raised this issue; however, "there is simply no evidence to support Mr. Felton's opinion." Pls.' Br. at 8. In addition, Felton's concern with defamation is unwarranted. *Estate of Barabin*, 740 F.3d at

463-64.  In California, an insurance company has an absolute privilege to report alleged fraud, whether made with or without malice.  Cal. Civ. Code § 47; Cal. Ins. Code § 1872.5;  *Fremont Comp. Ins. Co. v. Superior Ct.*, 44 Cal. App. 4th 867, 877 (1996); *Doctors' Co. Ins. Servs. v. Superior Ct.*, 225 Cal. App. 3d 1284, 1295 (1990).

### 3.  Reliance on Wrong Bond for Discovery and Termination Analysis

The annual anniversary date of FNF's policies is November 18.  Felton relied on the 2003-2004 FIB to form his opinion that FNF discovered the employee's dishonesty on November 15, 2004 (the date Medhi wrote a letter to Nieto asking for a credit).  Initial Report at 29, 50.  In his next report, Felton discusses the 2004-2005 bond.  Rebuttal Report at 6 (¶ 12).  During his deposition, he explained his reasons for evaluating those policy years in relation to the Termination provision.  Depo. at 95-101.  NU relies on a similar theory in its summary judgment motion.

FNF argues this opinion must be excluded because the prior bonds are not at issue.  FNF made its claim under the 2005-2006 FIB and the language of the Discovery and Termination Riders is unique to that bond.

NU defends Felton's analysis.  Depo. at 97-101.  Felton opined that if FNF discovered Nieto's dishonesty in 2004, then no future bond could cover her conduct.  NU contends that Felton's testimony will help the jury understand that a fact can only be discovered once.  *Newpark Res. v. Marsh & McLennan, Inc.*, 691 So. 2d 208, 213 (La. App. 1997).  According to NU, once FNF discovered Nieto's dishonesty, the bond terminated as to all related conduct.  *Oriental Fin. Grp. v. Fed. Ins. Co.*, 309 F. Supp. 2d 216, 229 (D. P.R. 2004).  In any event, NU notes that other parts of Felton's reports show that he analyzed the 2005-2006 bond as well.  *E.g.*, Initial Report at 42-43 (citing language from both bonds).

The Court is troubled by Felton's reliance on the earlier bonds to analyze the Discovery provision because the language is different.  The 2003-2004 bond refers to discovery by the "Insured."  *E.g.*, *Hudson Ins. Co. v. Oppenheim*, 81 A.D. 3d 427

(Sup. Ct. App. Div. 2011).  But FNF negotiated language in the 2005-2006 bond (Rider 13) to narrow the Discovery clause to those in the "Risk Management department or Legal department."  It appears, however, that Felton actually relied only on Nancy Richmond's knowledge – a claims attorney in the legal department – to support his argument about when FNF discovered the loss.  *E.g.*, Rebuttal Report at 42, 44, ¶ 6.  Thus, FNF can explore any weakness in Felton's analysis during cross-examination.  *Daubert*, 509 U.S. at 596.

Similarly, the language in the Termination clause (Rider 25) was altered in 2005-2006.  Although the Court is concerned that the jury will be confused by reference to prior bonds, it appears that the specific changes do not impact Felton's actual analysis.  For example, the 2005-2006 policy added a $10,000 threshold, but it would be met by the $25,000  credit involved in the Medhi transaction.  Moreover, Felton explains his theory that the earlier bonds terminated coverage for Nieto.  FNF may cross examine Felton about any perceived flaws.

### 4.  Opinions Outside Expert's Area of Expertise

FNF challenges Felton's qualification to testify about two topics.

First, Felton opines that "an experienced escrow attorney" should have recognized that "bank fraud is dishonest" because the owner did not provide the rebate funds.  Initial Report at 29, 51-52.

The Court agrees with FNF that Felton is not qualified to testify that the Medhi escrow transaction was or was not fraudulent.  *Estate of Barabin*, 740 F.3d at 463-64.  NU has not shown that Felton has the necessary experience or training to give an opinion about escrow transactions, banking laws, and fraud.  Initial Report at 1 & 76-78 (resume lists experience as an insurance broker); *e.g.*, Initial Report at 29 (beginning with "To an experienced escrow attorney" and ending with "how much was involved."), 51-52 (¶ 2) ("which would have violated federal banking laws," "a violation of banking laws," and "a fraud"); Depo. at 16-35.

Second, Felton opines that NU did not have to pay the FIB claim because

FNF had other policies in its "Tower of Insurance" that contributed to the settlements of the victims' lawsuits.  Initial Report at 46-51 (¶ 10) (opining that FNF's entire claim was invalid "because any possible basis for indemnity from any peril has been satisfied by other insurance" carriers); Rebuttal Report at 45-46.

NU defends Felton's analysis that the payments made under other insurance policies for the losses described in the Proof of Loss forms show that they were made.  NU argues Felton has the experience to give that opinion because he "literally wrote the book" on fidelity bonds.

The Court is not persuaded by NU's argument.  The law governing "Other Insurance" clauses is complex.  It requires a legal analysis of the language in the various policies to determine if the clause is enforceable or whether the policies contain conflicting clauses that cancel each other.  *E.g.*, *Edmondson Prop. Mgmt. v. Kwock*, 156 Cal. App. 4th 197, 203-04 (2007) (collecting cases).  Felton did not conduct any analysis of the language in any of the primary and excess policies in the E&O or FIB tower, but instead reaches a conclusion drawn from whole cloth. Depo. at 167-69.  Thus, his opinions on this topic are unreliable.  The Court grants the motion to exclude Felton's opinions about the application of the "Other Insurance or Indemnity" provision.  *E.g.*, Initial Report at 47-50; Rebuttal Report at 45-46 (¶ 10).

**B. NU's Motion to Exclude Paul Amoruso and Peter Haley – Bad Faith Claims Investigation Experts**

FNF designated two experts concerning NU's handling of its FIB claim:  Paul Amoruso and Peter Haley.  NU attacks both of these experts on similar grounds.

Paul Amoruso gives his opinion that NU failed to conduct a reasonable investigation based on several factors.  Pls.' Opp. Ex. 2 (hereinafter "Amoruso Report").  As support for FNF's request for punitive damages, Amoruso further opines that NU acted maliciously with the intent to harm FNF.  *Id.* at 29-36.

Peter Haley's initial expert also covers NU's allegedly flawed investigation.

1    For example, Haley concludes that NU erred by treating the claim as one for

2    Employee Dishonesty despite FNF's clear explanation that other types of coverage,

3    such as Forgery, applied.  Pls.' Opp. Ex. 3 (hereinafter "Haley Report").  Haley

4    opines that NU acted in bad faith and failed to pay benefits due.  *Id.* at 5-6, 18-28.

5            **1. <u>Litigation Privilege in Bad Faith Insurance Cases</u>**

6            NU argues that Amoruso and Haley violate the litigation privilege, California

7    Civil Code § 47, by testifying about NU's conduct defending this action.[2]  *Silberg v.*

8    *Anderson*, 50 Cal. 3d 205, 212-13 (1990); *Rubin v. Green*, 4 Cal. 4th 1187, 1193-94

9    (1993).

10           This argument does not warrant a lengthy discussion as the cases cited by NU

11   do not support its contention.  In *Nies*, for example, the California Court of Appeals

12   held that the litigation privilege did not apply.  *Nies v. Nat'l Auto. & Cas. Ins. Co.*,

13   199 Cal. App. 3d 1192, 1202-03 & n.7 (1988).

14           Moreover, FNF correctly observes that the California Supreme Court held

15   that Civil Code § 47 is a limitation on liability and has "never been thought to bar

16   the *evidentiary* use" of litigation statements.  *Oren Royal Oaks Venture v.*

17   *Greenberg, Bernhard, Weiss & Karma, Inc.*, 42 Cal. 3d 1157, 1168 (1986); *White v.*

18   *W. Title Ins. Co.*, 40 Cal. 3d 870, 887-89 (1985).  "Accordingly, when allegations of

19   misconduct properly put an individual's intent at issue in a civil action, statements

20   made in the course of a judicial proceeding may be used for evidentiary purposes."

21

22           [2]NU cites instances when Amoruso states:  (1) that the victims relied on NU's
     federal pleadings to show that FNF "admitted" its employees actively participated in
23   Norton's fraud, Amoruso Report at 15 (¶ f); (2) "It can reasonably be said that National
     Union's claims department has not investigated the Claim at all either before or after
24   the lawsuit was filed, first hiding behind the 'Formal Proof of Loss Defense' and now
     apparently hiding behind its litigation attorneys," *id.* at 37 (¶ 2); and (3) "National
25   Union's claims department is effectively responsible for the conduct that National
     Union's litigation attorneys have engaged in during the course of this litigation,
26   including their attempt to prejudice the insureds as they defended the on-going
     underlying litigation," *id.* at 38 (¶ 5).
27           Similarly, NU objects to these passages in Haley's report:  (1) the heading
     "National Union Uses The Litigation To Conduct a 'Claims Investigation,'" Haley
28   Report at 5, 18; and (2) comments on the substance of NU's litigation strategy of
     "repetitive discovery" and refusing to stay or mediate this action, *id.* at 5, 8, 15.

*Oren Royal*, 42 Cal. 3d at 1168.  In *White*, the state high court held that an insured can introduce evidence of litigation misconduct to prove breach of the good faith covenant because the insurer's special duty continues after litigation commences. *White*, 40 Cal. 3d at 887-89.  The Court drew a careful distinction between (1) imposing liability "based squarely on a privileged communication," such as founding a defamation cause of action on a judicial communication, and (2) an insured using "an underlying course of conduct evidenced by the communication" to "prove liability for breach of the covenant."  *Id.* at 888-89.

*White* controls.  The litigation privilege does not bar evidence concerning aggressive litigation tactics for the purpose of trying to show an insurance company's bad faith conduct.  *Id.* (admitting evidence that insurer made unreasonable, "nuisance-value" settlement offers; failed to attempt to appraise the amount of loss; and filed a summary judgment motion despite unanimous body of case law establishing that the policy covered plaintiff's claim because the "entire pattern of conduct shows a clear attempt by defendant to avoid responsibility").  Federal courts also follow the "careful distinction" set forth in *White* to allow insureds to introduce evidence of the insurer's litigation conduct in bad faith insurance cases.  *Competitive Technologies v. Fujitsu Ltd.*, 286 F. Supp. 2d 1118, 1154 (N.D. Cal. 2003); *Evanston Ins. Co. v. OEA, Inc.*, 2005 WL 3500799, at *4 (E.D. Cal. 2005); *accord* California Practice Guide:  Insurance Litigation ¶ 12.1326 (2011); *see* John DiMugno & Paul Glad, Cal. Ins. Law Handbook § 11:143 (2013) (improper litigation tactics are admissible to show that the insurer breached the covenant of good faith and fair dealing).

Also, FNF seeks punitive damages and NU's alleged misconduct during the lawsuit bears on whether it acted with malice.

To the extent that NU contends that certain examples infringe on its right to conduct a vigorous defense against this lawsuit, NU may file an *in limine* motion.  *See Nies*, 199 Cal. App. 3d at 1200-01; DiMugno, *supra*, § 11:143 ("courts

recognize that insurers have a constitutional right to defend themselves and are therefore reluctant to impose liability on insurers for aggressive litigation tactics"). NU's concern with limited relevance and undue prejudice is more appropriately framed as a pretrial motion to exclude specific evidence than as a *Daubert* motion.

## 2.  <u>Speculative Opinions about Credibility and Motive</u>

NU argues that Amoruso and Haley overstep the role of an expert by giving opinions about the credibility of witnesses and speculating about the motives of others.  "[T]he jury must decide a witness's credibility without receiving expert testimony."  *United States v. Candoli*, 870 F.2d 496, 506 (9th Cir. 1989).

The Court reviewed the reports and finds that the experts have not bolstered or impugned the credibility of any witness.  Instead, the experts base their opinions on their knowledge of industry standards, their own work experience, and the facts of the case.  The Ninth Circuit permits an expert in a bad faith insurance case to testify to his opinion that the insurer's conduct "deviated from industry standards." *Hangarter*, 373 F.3d at 1016 (citing *Ford v. Allied Mut. Ins. Co.*, 72 F.3d 836, 841 (10th Cir. 1996) (where expert relied on industry standard that flowed from Iowa insurance law to testify about bad faith denial of claim)).

In addition, Federal Rule of Evidence 704 allows experts to testify to ultimate facts.  Fed. R. Evid. 704 (it is "not objectionable just because it embraces an ultimate issue"); *e.g.*, *Peckham v. Cont'l Cas. Ins. Co.*, 895 F.2d 830, 837 (1st Cir. 1990) (in bad faith insurance case, expert can give opinion on causation); *United States v. Gold*, 743 F.2d 800, 816-17 (10th Cir. 1984) (in medicare fraud criminal case, expert can testify to opinion that claim is covered by policy when court gives a limiting instruction) (collecting cases); *see Goldwater v. Ginzburg*, 414 F.2d 324, 343-44 (2d Cir. 1969) (before adoption of Rule 704, court held expert can discredit defendant's polling methods by comparing to good industry standards); *accord Neal v. Farmers Ins. Exch.*, 21 Cal. 3d 910, 924 (1978) (allowing expert to testify to assist lay jury assess "the conduct and motives of an insurance company in denying

1    coverage under its policy" because expert, "by profession and experience, was

2    peculiarly equipped to evaluate such matters in the context of similar disputes").

3        The examples cited by NU do not rise to the level of a *Daubert* motion.  NU

4    can test the weight of the opinion through cross examination.  NU, however,

5    identified a few examples when the expert's language may be unduly prejudicial.[3]

6    The Court will revisit the issue if NU files a motion in limine.

7        The Court, however, share's NU's concern about Amoruso's discussion of

8    the *Acacia* lawsuit.  In a prior federal action, a different insured, Acacia, prevailed

9    against NU on a breach of the covenant of good faith claim.  Amoruso reviewed the

10   federal court's findings of fact and conclusions of law and gives his opinion that the

11   same defects (by the same claims adjustor) occurred here.  Amoruso Report at 33-

12   36.  Based on the similar facts, Amoruso concludes that "National Union's conduct

13   in the handling of this claim is not an isolated incident."  *Id.* at 35 (¶ e).  He uses the

14   *Acacia* verdict to state that "the lack of a claims manual is a systemic problem

15   bound to repeat itself" and to conclude that NU "missed the teaching opportunity

16   that *Acacia* gave.  *Acacia* resulted in a $30 million verdict."  *Id.* at 36 (¶¶ 2 & 3).

17       NU argues that Amoruso improperly extrapolates the findings in a single case

18   in violation of the rule that expert testimony cannot be based on speculation and

19   conjecture.  NU argues it is an "unproven fact" that *Acacia*, "viewed in isolation as

20   a self-contained summation of National Union's nationwide claims handling

21   practices by every representative in every office" is not proper.

22

23       [3]For example, NU objects to Amoruso's statements that (1) "National Union
24   acted maliciously with the intent to injure and harm its insured in October 2009" by
     refusing to renew the FIB policy, Amoruso Report at 29 (heading format omitted); and
     (2) NU's reason for raising rates "appears to have been manufactured," *id.* at 30 (¶ b),
25   (¶ c).
         NU objects to Haley's statements that (1) "National Union appears to be
26   engaging in eleventh-hour theorizing," and describing a theory as "unconvincing,"
     Haley Report at 6, 19; (2) "National Union has always had the information it claims
27   to have now obtained," thus its conduct "makes no sense, and appears to be simple
     harassment," *id.* at 18; and (3) the Senior Executives' theory is "amazing" and "cannot
28   be made in good faith," *id.* at 21-22.

The Court is inclined to sustain NU's objection to the discussion of the prior litigation by a different insured, but for a slightly different reason. While it is possible to exclude this particular testimony as "not relevant and ergo, non-helpful," *Daubert*, 509 U.S. at 591, the Court strikes the expert testimony under the standard prejudice test of Rule 403. *United States v. 87.98 Acres of Land More or Less in Merced*, 530 F.3d 899, 904-05 (9th Cir. 2008); *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1016 (9th Cir. 2008) (citing *Daubert*, 509 U.S. at 595, for proposition that trial court has "more control" to restrict expert testimony under Rule 403). This action involves complicated facts and there is no need to confuse the jury with unrelated facts. The Court agrees with NU's observation that Amoruso's discussion of the *Acacia* verdict could "poison the well."

### 3. <u>Testimony about Legal Conclusions and Ultimate Facts</u>

NU contends that both Amoruso and Haley violate the basic rule that an expert cannot state legal conclusions. Such testimony is not "helpful" because the trial judge instructs the jury on the law. *Hangarter*, 373 F.3d at 1016; *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992). "Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards." *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997).

The Court denies the *Daubert* motion, as this issue is best left to a motion in limine or to specific instances during trial. There is a thin line between an expert witness who improperly invades "the court's authority by discoursing broadly over the entire range of the applicable law" *and* the permissible, helpful expert testimony that "direct[s] the jury's understanding of the legal standards upon which their verdict must be based." *Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988), *cited with approval in Hangarter*, 373 F.3d at 1017 ("a witness my properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms"). Federal law precludes an expert from

invading the province of the court to instruct on the law, but allows an expert to testify to the "best" practices in an industry.  Fed. R. Evid. 702, 704; *Hangarter*, 373 F.3d at 1010-11 (affirming admission of expert testimony that insured's coverage letter was "misleading, deceptive, and fell below industry standards"; its investigation was "biased"; and its adjustment process "violated the insurance industry principle" of examining each claim objectively); *Pinal Creek Grp. v. Newmont Mining Corp.*, 352 F. Supp. 2d 1037, 1046 (D. Ariz. 2005) (concluding that law professor could not interpret the law or apply to facts, but is permitted to opine on "corporate norms"); *accord Neal*, 21 Cal. 3d at 924; *Elder v. Pacific Tel. & Tel. Co.*, 66 Cal. App. 3d 650, 664 (1977) (architect may "testify to the custom and practices" but not "*applicability* to defendants of certain construction safety orders" whether based on statute or regulation).  The rule is easy to state but difficult to apply and the outcome depends upon how the expert expresses his opinion.  *E.g.*, *McHugh v. United Serv. Auto. Ass'n*, 164 F.3d 451, 454 (9th Cir. 1999) ("Although experts may disagree in their conclusions, their testimony cannot be used to provide legal meaning or interpret the policies as written.") (collecting cases); *Sancom, Inc. v. Qwest Commc'ns Corp.*, 683 F. Supp. 2d 1043 (D. S.D. 2010); *Summers v. A.L. Gilbert Co.*, 69 Cal. App. 4th 1155, 1180 (1999) (interpreting *Neal* as allowing expert to testify on "such factual issues as the promptness of the insurer's response" or "industry standards for dealing with covered claims" but "when an expert's opinion amounts to nothing more than an expression of his or her belief on how a case should be decided, it does not *aid* the jurors, it *supplants* them").

Having reviewed the passages in both reports, the Court denies the *Daubert* motion in so far as NU seeks to exclude the entire testimony.  When considered in the broader context of the experts' testimony, none of the cited comments crosses the line from permissible opinion on a fact question.  The Ninth Circuit allows an expert to refer to the applicable laws and regulations that inform his opinion. *Hangarter*, 373 F.3d at 1017 (noting that claims handling expert "relied in part on

his understanding of the requirements of state law"). Here, Amoruso couched his opinion in legal terms, but he may "refer to the law in expressing his opinion" so as to assist the jury understand the facts. *Id.* While two of Amoruso's *headings* convey strong statements of how to apply the law to the facts (*e.g.*, "NU acted in bad faith" and "acted maliciously"), the *body* of his report gives concrete information about industry customs to analyze the facts that support those opinions.

Similarly, Haley referred to the California regulations to inform the applicable guidelines, but he properly reviews the factual record to give his expert opinion that the investigation was not fair. Haley Report at 10. Haley is permitted to give his opinion that NU did not fulfill its obligations to its insured. Haley used documents in the claim file, together with his experience handling FIB claims, to support his view that NU had sufficient information to make payment in October 2007. His opinion necessarily refers to terms of art and relies on his legal experience. Finally, Haley's analysis of the FIB policy is directed at NU's allegedly bad faith refusal to cover the Norton claim. The Ninth Circuit permits this, as shown by its citation to *Ford*, the Tenth Circuit case in which the expert explained why the policy covered the claim as part of his opinion that the insurance company had acted in bad faith. *Hangarter*, 373 F.3d at 1016 (citing *Ford*, 72 F.3d at 841).

However, the Court will revisit the issue if NU decides to file a motion in limine to challenge specific testimony. *See Burkhart*, 112 F.3d at 1212; *In re MTBE Prod. Liab. Litig.*, 643 F. Supp. 2d 482, 504-05 (S.D.N.Y. 2009) ("At its essence, Rule 704 restricts how an expert may frame her opinions."). The Court will also entertain a request for a cautionary jury instruction.

### 4. Explanations of Facts

NU also contends that Amoruso and Haley explain facts that the jury is capable of understanding without an expert. For example, NU complains that they selected only the evidence that favors FNF. NU argues that the jury is capable of distilling the facts and deciding, for instance, whether NU should have had a written

1    claims manual, complied with its own standards, and discussed coverage with
2    underwriters.  NU argues that the jury has the common sense to decide on its own
3    whether NU "threatened" FNF and what the claims adjustor did and did not do
4    properly.  NU complains that FNF is using the experts to argue the theory of its
5    case, which gives it unfair weight and "gravitas" through its "mouthpiece."

6        The record does not support NU's premise.  This is not a simple case.  The
7    jurors may not be familiar with fidelity bonds.  The testimony of claims handling
8    experts, like Amoruso, Haley, and Felton, will help the jury understand the best
9    practices to handle fidelity insurance claims.  The adjustment of a complex claim
10   like the Norton fraud is not self-evident to a layperson.  *See Amadeo v. Principal*
11   *Mut. Life Ins. Co.*, 290 F.3d 1152, 1161-64 (9th Cir. 2002) (bad faith claims-
12   handling, inadequate investigation, and unreasonable interpretation of insurance
13   contacts under layman's understanding of coverage are factual questions for jury).
14   The Ninth Circuit and California Supreme Court  both recognize that an expert may
15   help the jury understand whether the claim was handled improperly in bad faith
16   insurance action.  *Hangarter*, 373 F.3d at 1016 (expert qualified to testify about
17   claims adjustment standards and practices); *Neal*, 21 Cal. 3d at 924.  Such an expert
18   can inform the jury about the industry standards based on his experience and
19   knowledge of the insurance industry.  *Id.*; *cf. Cal. Shoppers, Inc. v. Royal Globe Ins.*
20   *Co.*, 175 Cal. App. 3d 1, 66 (1985) (attorney lacked special experience to give
21   expert opinion on insurance coverage and best practices).

22   **C. FNF's Motion to Exclude Christopher Money – Damages Expert**

23       FNF's own accounting expert, Kent Barrett, analyzed thousands of
24   documents to trace the cash flow in and out of the escrow accounts.  He prepared a
25   chart for each victim and calculated a $5.2 million loss.

26       NU's accounting expert, Christopher Money, used Barrett's data and noted
27   his adjustments to the specific line items.  Money rejected most of the claimed
28   losses, however, he estimates that the Jr. Holdaways sustained a $1 million loss.

Pls.' Exs. 4-6.  Money eliminates the other victims on the theory that Safe Harbor (Norton's entity) was responsible for funding the transactions, thus, the victims did not directly contribute funds to purchase or refinance the condominium units.  Pls.' Ex. 4 (July Report at 4-15).  As to the Jr. Holdaways' transactions, Money eliminates most losses on the theory that they authorized Norton to refinance the property.  Money calculates losses only in those transactions when disbursements went to Norton.  Pls.' Exs. 4 (July Report at 17-18) & 5 (Dec. Report at 16-19).

FNF argues that Money's opinion is unreliable and unhelpful.  It argues that Money did not conduct any accounting services, but instead, applied the attorney's subjective interpretation of the FIB policy to reject certain escrow fees as losses. *De Jager Constr., Inc. v. Schleininger*, 938 F. Supp. 446 (W.D. Mich. 1996).  For example, Money used the list the attorney gave him of "quid pro quo" transactions and rejected any escrow in that category.  Depo. at 134-35.  FNF further argues that Money is not qualified to apply a coverage analysis, but that he provides one by regurgitating counsel's theory.  *In re Tri St. Outdoor Media Grp., Inc.*, 283 B.R. 358, 364 (Bank. M.D. Ga. 2002).  Moreover, FNF argues that Money's analysis is based on incorrect facts.  *DeJager Constr., Inc. v. Schleininger*, 938 F. Supp. 446, 449 (W.D. Mich. 1996).  For example, Money contends that the Jr. Holdaways signed a power of attorney to allow Norton to sign documents for them; but Money ignores the victims' deposition testimony that Norton forged all the documents used to close the Crown Point escrows.

The Court denies the *Daubert* motion.  Having read the summary judgment motions, it appears to the Court that Money's calculation of damages is based on NU's theory of its case.  FNF can pursue any perceived flaws in the expert's data and analysis during cross-examination.

## CONCLUSION

Upon due consideration of the parties' memoranda and exhibits, the arguments advanced at hearing, and for the reasons set forth above, the Court

1  hereby (1) **GRANTS IN PART and DENIES IN PART** FNF's motion to exclude

2  Dean Felton's expert opinion and testimony [Doc. No. 326]; (2) **DENIES** NU's

3  motion to exclude Paul Amoruso's expert testimony [Doc. No. 321]; (3) **DENIES**

4  NU's motion to exclude Peter Haley's expert testimony [Doc. No. 320]; and (4)

5  **DENIES** FNF's motion to exclude Christopher Money's expert opinion and

6  testimony [Doc. No. 319].

7      **IT IS SO ORDERED**.

8

9  DATED:  March 28, 2014

10

11  HON. GONZALO P. CURIEL
   United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28