1
2
3
4
5
6                    **UNITED STATES DISTRICT COURT**
7                  **SOUTHERN DISTRICT OF CALIFORNIA**
8
9    FIDELITY NATIONAL                    CASE NO. 09-CV-140-GPC-KSC
10   FINANCIAL, INC., CHICAGO
     TITLE INSURANCE CO., and            ORDER GRANTING PLAINTIFFS'
11   CHICAGO TITLE CO.,                   MOTION FOR PARTIAL SUMMARY
                                          JUDGMENT ON LIABILITY AND
12                          Plaintiffs,   DENYING DEFENDANT'S MOTION
                                          FOR SUMMARY JUDGMENT
13
                                          [Dkt. Nos. 324, 325.]
14
15        vs.
16
17
18   NATIONAL UNION FIRE
19   INSURANCE CO. OF PITTSBURG,
     PA,
20
                            Defendant.
21
22        This case involves the aftermath of the collapse of a Ponzi scheme
23   masterminded by Rollo Richard Norton which was executed with the assistance of
24   certain employees of Chicago Title.  The case raises a host of insurance coverage
25   issues relating to the losses and claims resulting from the Ponzi scheme.  The parties
26   have filed competing motions for summary judgment that raise questions regarding
27
28
                                    - 1 -                              09CV140

policy coverage, discovery of claims and the termination of coverage.[1]  The Court grants Plaintiffs' motion for partial summary judgment as the evidence leaves no doubt that Defendant breached the fidelity bond and acted in bad faith.  Plaintiffs sought a determination as to liability, but reserve the issue of compensatory and punitive damages for trial.  The Court denies Defendant's cross motion for summary judgment.

# I. Background[2]

## A. "Tower of Insurance"

Plaintiffs Fidelity National Financial, Inc., Chicago Title Insurance Co., and Chicago Title Co. (hereinafter collectively and interchangeably referred to as either "FNF" or "Chicago Title") are insured by a "Tower of Insurance."  Every year, FNF purchases several types of policies, and in each category, FNF buys a primary policy and four excess policies.  Def.'s Opp. Ex. 173 (Loverich Decl. ¶ 9).

### 1. The Financial Institution Bond

This lawsuit concerns the primary Financial Institution Bond ("FIB") issued by Defendant National Union Fire Insurance Co. of Pittsburg, PA ("NU") for the policy period of November 18, 2005 through November 18, 2006 with a policy limit of $15 million per single loss.  Pls.' Opp. Ex. 1.

The primary purpose of a fidelity bond is to protect the employer from

---

[1]The Court appreciates the patience of the parties while the Court carefully reviewed the voluminous record and considered their comprehensive arguments.

[2]The parties are familiar with the complex facts, thus, the Court summarizes the overall picture in broad strokes.

The parties left no stone unturned, and the Court has carefully considered the detailed arguments in the cross motions, even if this Order does not discuss every point.

In a separate order, the Court excluded minor parts of the experts' testimony. [Doc. No. 420].  The Court also excluded the June 27, 2007 Settlement Evaluation Memorandum, Def.'s Opp. Ex. 103, as protected by the attorney-client privilege, the *Cumis* statute, and under Federal Rule of Evidence 403.  [Doc. No. 423]

The Court cites the various exhibits to correspond to the following documents: Pls.' Ex. [Doc. No. 327]; Pls.' Notice of Errata Ex. [Doc. No. 337]; Def.'s Ex. [Doc. No. 325]; Pls.' Opp. Ex. [Doc. No. 350]; Def.'s Opp. Ex. [Doc. No. 343]; Pls.' Reply Ex. [Doc. No. 375]; Def.'s Reply Ex. [Doc. No. 378].

*dishonest conduct by an employee.  Id.* (Insuring Agreement A); *State Farm General Ins. Co. v. Wells Fargo Bank, N.A.*, 143 Cal. App. 4th 1098, 1108 & n.6 (2006); 44 C.J.S. Ins. § 9 (2013).  These summary judgment motions focus on the allegedly dishonest actions of two Chicago Title employees – Zuzzette Nieto, a Senior Escrow Officer, and her boss, Vice President and Sales Manager Craig Gainor.[3]

The FIB also covers other perils, including Forgery.  Pls.' Opp. Ex. 1 (Insuring Agreement D).  Here, the acts of forgery were allegedly committed by Rollo Richard Norton, who does *not* work at FNF.  Norton invested the victims' savings in the Crown Point condominium project; forged signatures on various escrow documents; had his associates notarize those signatures; and hired Chicago Title to process escrow transactions.  Norton subsequently testified that Nieto and Gainor watched him sign the victims' names to documents.

## 2. Errors and Omissions Policy

Although most of FNF's other insurance policies are not relevant to the instant motions, the parties mention that FNF also purchased "Errors and

---

[3]The Court may take judicial notice of entries on a criminal docket sheet, a plea agreement, and other court records. Fed. R. Evid. 201(b); *Rosales-Martinez v. Palmer*, 753 F.3d 890, 894-95 (9th Cir. 2014); *United States v. Strickland*, 601 F.3d 963, 968 (9th Cir. 2010) (en banc); *Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001).

In November 2010, the United States charged Nieto with one count of mail fraud. Def.'s Opp. Ex. 131; Case No. 10-CR-4544 [Doc. No. 1].  Nieto pled guilty to closing an escrow in October 2005 when she knew Norton's $57,000 check would bounce.  *Id.* (Information ¶ 7); Case No. 10-CR-4544 [Doc. Nos. 10, 11, 13, 19].

There is no indication that Gainor was prosecuted for his alleged role.

Two of Norton's associates pled guilty.  In August 2007, Scott Greer admitted he facilitated sham purchase transactions and refinances by inducing straw purchasers to allow Norton to place Crown Point condos in their name.  Case No. 07-CR-2291 [Doc. Nos. 1, 3, 8, 16, 33, 65].  (The factual basis of Greer's Plea Agreement tracks the Information, but because the Plea Agreement is sealed, the Court cites the Information.)  Greer also admitted that he had notarized signatures on grant deeds and other closing documents though he knew the purported signers had not in fact signed the documents.  *Id.* ¶ 8 [Doc. No. 1].  To conceal the scheme, Greer arranged for mail to be sent to Norton's office.  *Id.* ¶ 9.

Similarly, in March 2009, Todd Johnson admitted in open court that he prepared false loan applications to further the fraudulent scheme to draw equity out of the Crown Point condominiums with sham refinance transactions.  Case No. 09-CR-1207 [Doc. Nos. 1, 4, 12, 13, 17, 18, 56].

Omissions" coverage ("E&O" or Miscellaneous Professional Liability Policy).  FNF purchased a $15 million primary E&O policy from NU.  Pls.' Ex. 2.  [Doc. No. 374-4]

There are important differences between this E&O policy and the FIB.  First, the E&O policy covers any losses caused by an employee's *negligence*, and excludes claims "arising out of a dishonest . . . act."  *Id.* (§ III.A); *Century Transit Sys., Inc. v. Am. Empire Surplus Lines Ins. Co.*, 42 Cal. App. 4th 121, 127 n.4 (1996) ("'Arising out of' is a broad concept requiring only a 'slight connection' or an 'incidental relationship' between the injury and the excluded risk.") (citation omitted).  The E&O policy also obligates the insurance company to defend the insured when the third-party victim sues for damages arising from the employee's wrongful act.  Pls.' Ex. 2; 46 C.J.S. Ins. § 1298.

**B.  Norton's Ponzi Scheme**

This section outlines the facts relevant to whether the FIB covered the claimed loss. The Court outlines the facts pertaining to NU's claims handling process below, in connection with the cause of action for breach of implied covenant of good faith and fair dealing.

The Ponzi scheme victims alleged they had entrusted their savings to Norton, who had inherited his father's financial planning business.  In 1998, Norton's Safe Harbor company purchased a 116-unit apartment complex on Crown Point Drive with his own and his clients' money.  *E.g.*, Pls.' Ex. 7 ¶¶ 3, 50-51.  When the complex later converted to condominium units, Norton devised a scheme to extract equity from the property by using his clients' identities to sell and refinance individual units.

Between 2002 and 2005, Norton instigated over 300 escrow transactions to steal his clients' money for his personal use.  *Id.* ¶ 82.  The victims focused on Gainor and Nieto as willing participants in Norton's fraud, but also mentioned other Chicago Title employees.  *E.g., id.* ¶ 4, 67, 76, 81; *see id.* ¶¶ 131, 133, 136 (branch

manager and claims counsel).  Nieto, who had been hired by Gainor, was the escrow officer on each transaction.  The complaints specifically alleged that Gainor and Nieto were present when Norton "routinely forged signatures on the documents."  *Id.* ¶ 88.

As further evidence of Chicago Title's negligence in regard to the Norton scheme, the victims cited two transactions from 2004.  The victims alleged that Nieto assisted Norton by artificially inflating the price of units sold to third parties in order to create more equity for Norton and to generate higher fees for Chicago Title.  *Id.* ¶¶ 6, 92-101, 121-29.  The victims cited the Medhi transaction as an early example of an artificially inflated price.  *Id.* ¶¶ 91-101.  They further alleged that Norton was "flipping" properties so quickly that he lost track of the liens.  They cite the Kaplan transaction as an early example of this problem.  *Id.* ¶¶ 119-30.  (The Kaplan and Medhi transactions are discussed in detail below in the Discovery section.).

In July 2006, FNF submitted a claim notice to NU under the FIB when dozens of victims alleged that three Chicago Title employees actively participated in a Ponzi scheme orchestrated by Norton.[4]  Def.'s Opp. Ex. 173 (Loverich Decl. ¶ 23 & Ex. 1F); *see id*. Ex. 4 (Tolling Agreement ¶ B) (notice of claim given July 7, 2006).  FNF notified all of the carriers in its "Tower of Insurance" when this "First Wave" of lawsuits was filed in State Court.[5]

---

[4]Norton's related entities include Safe Harbor Financial, Inc., Safe Harbor II, LLC, Norton Financial Ltd., Cross Properties, LLC, and his employees include Greer, Johnson, and David Price.  *See* Pls.' Ex. 7 ¶¶ 17-26.

[5]NU paid *Cumis* counsel to defend FNF from the underlying lawsuits as required by the separate Errors and Omissions policy.  [Doc. No. 423]  A different claims adjustor (Stolzenberg) handled that E&O claim.  Def.'s Ex. 11 (Stolzenberg Depo.).  NU reserved its rights, but in September 2007, NU concluded that "coverage was triggered."  Pls.' Ex. 13 (Sept. 25, 2006 entry); Def.'s Ex. 11 (Stolzenberg Depo. at 333).  Consequently, in October 2007, NU paid $3 million defense costs and $12 million to settle the Jr. Holdaway case, *see infra* footnote 6, thereby exhausting the primary E&O policy.  Pls.' Exs. 5 (Kenna Decl. ¶ 6), 13 (May 23, 2007 to Oct. 3, 2007 entries).

(continued...)

After the litigants conducted extensive discovery, and Norton entered a guilty plea, most of this "First Wave" of lawsuits settled in 2007.[6]  This federal case, filed in 2008, is based upon FNF's  settlement with nine of those victims.[7]

Norton's guilty plea establishes the material fact that he used forged documents.  "As part of the scheme, [Norton] and others signed the names of individual investors on grant deeds and other escrow closing documents, and caused those signatures to be notarized by notaries working in [Norton's] office and elsewhere.  Pls.' Ex. 8 at 4, ¶ 9; *accord* Case No. 07-CR-2260 [Doc. No. 16 (RT at 21-28)].  In addition, the victims testified in the underlying litigation that the signatures were forgeries.  For example, Keith Holdaway confirmed that multiple documents had not been signed by him or his wife Joni but had been forged.  Def.'s Opp. Ex. 8 (Ex. A at 17-19) (citing K. Holdaway 2007 Depo.); *accord* Pls.' Ex. 44 (K. Holdaway 2011 Depo. at 169-212) ("Those look like forgeries to me. . . . Yeah, those are definitely forgeries.  The whole document is forgeries. . . . This whole document has never been signed by my wife or I, any portion of it.") (citing Escrow Transaction 38047468, Short Form Deed of Trust, and Note Secured by Deed of Trust).

Norton operated a complex scheme with many variations, but a few specific

---

[5](...continued)
FNF and NU entered into a "2008 Settlement Agreement" to resolve the third excess E&O policy.  Pls.' Ex. 14.

[6]Beginning in May 2008, many other victims sued Norton and Chicago Title in a "Second Wave" of lawsuits.  Those cases proceeded to jury trial in early 2010 and then the parties settled.

[7]FNF paid settlements in the following amounts: (1) $19.985 million to Keith and Joni Holdaway (hereinafter "Jr. Holdaway"); (2) $4 million to Robert and Cumorah Holdaway (hereinafter "Sr. Holdaway"); (3) $2.75 million to William and Stephanie Burke; (4) $19.75 million to Gemma Ramsour; (5) $3.2 million to Anthony and Janet Marino; (6) some part of $20 million to Teresita and Ferdinand Dominguez and (7) Ligaya Reyes; (8) $425,000 to the estate of Rose Ludwig; and (9) $14 million to Euro-Canadian, Inc., a company owned by Steven Lillie.  Def.'s Opp. Exs. 6, 8, 9, 11, 12, 14, 23.
FNF no longer seeks damages on the Dominguez claim because another insurance policy covered their settlement.  Pls.' Opp. Br. at 21.

examples are sufficient to analyze the pending summary judgment motions. FNF's summary judgment motion focuses on Jr. Holdaway as sufficient to establish liability. The Court briefly describes three additional victims to illustrate other arguments raised by the parties.

### 1. Jr. and Sr. Holdaway

In 2002, Jr. Holdaway inherited 85 acres of undeveloped land in Utah with a fair market value of at least $6.3 million from Sr. Holdaway. Def.'s Opp. Ex. 8 (Ex. A ¶ 16 to July 2008 Proof of Loss Form).[8]

Sr. Holdaway had deeded the land to his son in exchange for three promissory notes. Pls.' Ex. 43 (K. Holdaway Depo. at 524). Norton bundled the Sr. Holdaway investment, and promised them monthly income. *Id.* (K. Holdaway Depo. at 525). The promissory notes were initially secured by liens on the Utah acreage, but Norton convinced them to substitute three Crown Point condominiums as security. Def.'s Opp. Ex. 9 (Ex. A ¶¶ 2, 11, 41-43). "The deeds of trust against the Three Condominiums were the [Sr.] Holdaways' 'nest egg,' providing them with financial security in their later years." *Id.* (Ex. A ¶ 43). Norton "used forged signatures" and other methods "to steal the equity out of them and cheat the [Sr.] Holdaways' out of their retirement security." *Id.* (Ex. A ¶¶ 44-49) (describing fraudulent escrow transactions). Thus, Sr. Holdaway's assets can also be traced to Norton.

In April 2007, Chicago Title settled the Sr. Holdaway law suit for $4 million. *Id.* ¶ 4.

Jr. Holdaway met and hired Norton in September 2002. Pls.' Ex. 7 ¶ 58 (July 2006 First Amended Complaint from First Wave of State Court litigation); Def.'s Opp. Ex. 8 (Ex. A).

In February 2003, Jr. Holdaway finalized an exchanged of the Utah real estate

---

[8]This factual summary is based on the allegations the victims made in their State Court cases and supported by Norton's deposition and other testimony and discovery materials from the underlying litigation.
     As stated below, these factual statements are not admissions by Chicago Title. *See infra* page 45.

for interest in 26 Crown Point condominiums.  Pls.' Ex. 7 ¶¶ 2, 4, 13, 16, 53, 56, 59-61, 76 (Norton represented excellent loan to value ratio and 50% net equity in excess of $6 million).  Norton promised to manage the 26 condominiums and provide a monthly income of at least $22,000, though some funds would be reinvested by Norton.  *Id.* ¶¶ 68, 71.  Aside from this initial, consensual transaction, Norton used Jr. Holdaway's identity to process sham refinances without his knowledge, power of attorney, or consent.  *Id.* ¶¶ 79-80, 184-89; Def.'s Opp. Ex. 8 (Ex. A at pp. 17-19) (summarizing K. and C. Holdaway's depositions).  Norton co-mingled Jr. Holdaway's funds with other clients' money.  Pls.' Ex. 7 ¶¶ 50-51, 81.  Beginning in October 2003, Norton stole from Jr. Holdaway by forging signatures on several letters, deeds of trust, and other escrow documents directing that funds be deposited into Norton's accounts.  *E.g.*, *id.* at pp. 17-19 (summarizing K. Holdaway deposition in which he identified several forgeries).

In August 2007, FNF settled with Jr. Holdaway for $19,985,000.  Def.'s Opp. Ex. 8; Pls.' Notice of Errata Ex. C (Barrett Expert Report at 8) (listing 56 escrow files involving the Jr. Holdaways).

### 2. Ramsour

Like Jr. Holdaway, Ramsour initially hired Norton as a financial advisor and consented to let him manage her money.  Def.'s Opp. Exs. 8 (Ex. A ¶ 38) (Ramsour invested approximately $6 million with Norton), 12 (Ramsour's nephew, Steven Lillie, was childhood friend of Norton's; Ramsour invested in Crown Point project in 1998).

Norton followed the same pattern, and thereafter used Ramsour's identity to process sham escrows, often at inflated prices.  Def.'s Opp. Ex. 14 (Ex. A ¶¶ 21-26 & pp. 12-15) (summarizing Ramsour's deposition); Pls.' Notice of Errata Ex. C (Barrett Expert Report at 9) (listing 6 escrow files involving Ramsour).  For example, in 2001, Unit 306 was conveyed to Ramsour at a sales price of $346,000.  Three months later, Norton arranged to have the unit deeded to himself at a

purported sales price of $205,000 using Ramsour's forged, notarized signature. Def.'s Opp. Ex. 14 (Ex. A ¶¶ 17-18).  One month later, Norton arranged for that unit to be purchased in the name of another investor for $486,000.  *Id.*

The Kaplan transaction, described below, also illustrates how Norton churned individual units to redirect the equity to himself.  Def.'s Opp. Ex. 12 (Ex. A ¶¶ 8-13); *see* Pls.' Ex. 7 ¶¶ 82, 91.

In 2003, Norton forged Ramsour's signature on loans approaching $900,000 on Unit 37/39, then defaulted.  Def.'s Opp. Ex. 14 (Ex. A ¶¶ 24, 27-29 & p. 12-13) (citing Ramsour Depo. at 73-83).  Ramsour had lived in Unit 37/39 but then moved to a home on Caminito Corriente, which she believed she paid in full with the proceeds from the sale of her Crown Point condominium.  *See* Def.'s Ex. 109 (Money's Expert Report at 15).

In October 2007, FNF settled Ramsour's negligence suit for $19,750,000. Def.'s Opp. Ex. 14 ¶ 4.

### 3. Reyes

Reyes was a "straw buyer" who did not invest her own funds with Norton. She allowed Norton to use her name on a particular condominium unit in exchange for a return on the investment.[9]  Def.'s Exs. 23 (Ex. A at pp. 4-5, 23-26).  Reyes entered into a Partnership Agreement with Norton (Cross Properties).  Def.'s Ex. 57.  It purported to be a "contract . . . to purchase property" that was secured by a note and deed of trust.  *Id.* at 1.  Reyes promised to "qualify for and obtain an adequate loan" to buy Unit P6.  *Id.*  Norton, as managing partner, agreed to make the $107,800 down payment, collect the monthly rent of $1,750, pay the substantial

---

[9]Like Reyes, the Dominguez victims did not invest their own money with Norton.  Def.'s Opp. Ex. 45 at 7, 76.  Dominguez signed a partnership agreement with Norton in exchange for $10,000.  Def.'s Opp. Ex. 23 (Ex. A ¶¶ 5, 54).  Thereafter and without their knowledge, Norton continued to use their identities to process other fraudulent escrows to steal the savings of the six "Elderly Women Investors."  *Id.* (Ex. A ¶¶ 3, 56-58).  FNF is no longer seeking damages in relation to the Dominguez claim, thus, those transactions are moot.  Pls.' Opp. Br. at 21; Def.'s Opp. Ex. 45 at 7, 76. This group of victims joined forces to file the *Stout* action.  FNF settled with this group for $20 million.  Def.'s Opp. Ex. 45 at 1 ¶ 5.

"outflow" (including all closing costs, mortgage payments, management fees, property taxes Norton calculated these to total over $170,000), and then divide any gains or losses 50/50. *Id.* at 1-3.   Norton represented that Unit P6 was worth $539,000 but would increase in value by 15% to $712,827 in two years. *Id.* at 1-2.

Part of Norton's scheme involved telling the lenders that a unit was owner-occupied, which allowed him to borrow funds at a higher loan to value ratio and a lower-interest rate.  Pls.' Ex. 7 ¶ 94.

Norton then signed her name on another escrow and Reyes incurred debt without her consent. Def.'s Opp. Ex. 23 (Ex. A ¶¶ 56-58, 62).  Specifically, Norton forged Reyes' name to refinance Unit 313 and had the funds sent to one of his entities. *Id.*; Pls.' Opp. Br. at 18.  When Norton's scheme collapsed and the banks foreclosed on the sham loan, Reyes' credit was destroyed. Def.'s Opp. Ex. 23 (Ex. A ¶¶ 6, 8, 11, 63).

FNF seeks partial summary judgment of liability on (1) its breach of contract claim because it suffered a direct loss covered by the Forgery provision and (2) its tort claim because the undisputed facts establish NU never conducted an investigation, did not make a timely coverage determination, asserts unreasonable interpretations of policy language, and engaged in bad faith conduct during this litigation.  FNF defers the determination of damages for the trial in this action.

NU opposes the motion, and filed its own motion for summary judgment on all three counts.[10]  In connection with the breach of contract action, NU contends FNF cannot satisfy the direct loss requirement nor establish that it first discovered the loss during the 2005-2006 bond period.  NU also invokes the Termination provision in regard to Nieto, the escrow officer at Chicago Title.

///

///

---

[10]Because the Court concludes that NU breached the FIB's Forgery Insuring Agreement, it does not reach NU's contention that the Fraudulent Mortgage Rider does not apply.  Def.'s Br. at 20-21.

## II. **Summary Judgment Motions in Insurance Cases**

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *e.g.*, *First Am. Title Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 971 F.2d 215, 217 (9th Cir. 1991). "In ruling on cross motions for summary judgment, we evaluate each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

"Contractual terms of insurance are honored whenever possible." *Olympic Ins. Co. v. Employers Surplus Lines Ins. Co.*, 126 Cal. App. 3d 593, 599 (1981); *accord Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18-19 (1995) (insurance policy is a contract); *Truck Ins. Exch. v. Unigard Ins. Co.*, 79 Cal. App. 4th 966, 974 (2000) ("courts should not impose an obligation on an insurer that contravenes a provision in its insurance policy"); *Maryland Cas. Co. v. Nationwide Ins. Co.*, 65 Cal. App. 4th 21, 28-29 (1998) (courts enforce obligations, conditions, and scope of particular policy).

"'Interpretation of an insurance policy presents a question of law governed by the general rules of contract interpretation. We must give effect to the intent of the parties when they formed the contract and, if possible, infer this intent solely from the written provisions of the contract. In so doing, we must 'look first to the language of the [insurance policy] in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it.' The language of the policy must be read in the context of the instrument as a whole under the circumstances of the case." *Universal City Studios Credit Union v. Cumis Ins. Soc. Inc.*, 208 Cal. App. 4th 730, 737 (2012) (quotations, alterations, & citations omitted); *accord McHugh v. United Serv. Auto. Ass'n*, 164 F.3d 451, 453 (9th Cir. 1999) ("the interpretation of

1    the insurance policy is a question of law for the court").

2        "Coverage clauses are interpreted broadly so as to afford the greatest possible

3    protection to the insured, exclusionary clauses are interpreted narrowly against the

4    insurer." *State Farm Mut. Auto. Ins. Co. v. Partridge*, 10 Cal. 3d 94, 101-02 (1973).

5    Any ambiguity is resolved against the insurance company and "if semantically

6    permissible, the contract will be given such consideration as will fairly achieve its

7    objective of providing indemnity for the loss to which the insurance relates." *White*

8    *v. Western Title Ins. Co.*, 40 Cal. 3d 870, 881 (1985) (citation omitted). "'In

9    determining what benefits or duties an insurer owes his insured pursuant to a

10   contract of title insurance, the court may not look to the words of the policy alone,

11   but must also consider the reasonable expectations of the public and the insured as

12   to the type of service which the insurance entity holds itself out as ready to offer.'"

13   *Id.* (citation omitted); *id.* at 882 n.7 (" Construction of the policy, however, depends

14   not on the intent of the drafter but on the reasonable expectations of the insured.")

15   (citations omitted). "In the absence of any ambiguity, 'the courts have no

16   alternative but to give effect to the contract of insurance as executed by the parties.

17   Accordingly, when the terms of the policy are plain and explicit the courts will not

18   indulge in a forced construction so as to fasten a liability on the insurance company

19   which it has not assumed.'" *First Am. Title Ins. Co. v. XWarehouse Lending Corp.*,

20   177 Cal. App. 4th 106, 114-15 (2009) (quotations & citations omitted).

21   **III.  NU Breached its Contractual Obligations Under Forgery Insuring**

22   **Agreement D to Investigate, Evaluate, and Pay Benefits Due**

23       FNF argues that it is entitled to summary adjudication that NU breached the

24   FIB policy.  In its cross motion, NU argues the FIB does not cover the claim.

25   Resolution of the motions requires a step-by-step analysis of several provisions of

26   the FIB.

27       **A.  Overview**

28       NU's arguments are framed in such broad strokes that it often blurs critical

distinctions that exist in the written contract.  *Maryland Cas.*, 65 Cal. App. 4th at 28-29.  Many of the FIB provisions were drafted specifically for Chicago Title's escrow business.  *Universal City Studios*, 208 Cal. App. 4th at 737.  In an attempt to bring some clarity to the flurry of NU's overlapping contentions, the Court outlines its analysis of the language of the FIB.  *McHugh*, 164 F.3d at 453.

NU promised to indemnify "[l]oss resulting directly from Forgery or alteration of, on, or in any . . . transferring, paying or delivering any funds or Property . . . on the faith of any written instructions or advices directed to the Insured and authorizing or acknowledging the transfer, payment, delivery or receipt of funds or Property, which instructions or advices  . . . purport to have been signed by or endorsed by any customer of the Insured . . . but which . . . bear a signature which is a Forgery . . . ."  Pls.' Opp. Ex. 1 at 7 & 47 (Rider 25 to Insuring Agreement D).  "Forgery means the signing of the name of another person or organization with the intent to deceive . . . ."  *Id.* at 12, § 1(g).

The Forgery provision was triggered by Norton's conduct in signing the victims' names to escrow documents.  <u>Norton was not an employee of FNF or Chicago Title</u>.  Nothing in the Forgery Insuring Agreement ties its application to any other Insuring Agreement.  It is a peril separate and apart from the standard fidelity bond coverage for Employee Dishonesty.

The insured, FNF, incurred a direct loss because the victims' property was misappropriated while in its legal possession and control.  *Vons*, 212 F.3d at 490 (fidelity bond would cover a claim arising from the theft of property for which the insured was legally liable).  Chicago Title held funds and title to real property that belonged to the victims and other creditors in its capacity as an escrow company.

FNF relied on notarized documents in its possession.  The Forgery Insuring Agreement did not impose an additional "in good faith" requirement.

Later, it was revealed that an employee (Nieto) knew that Norton forged the signatures because she watched him.  This fact bears on the "discovery of loss"

element.  The legal department did not have knowledge, at the relevant time, that Norton forged documents.

The Court now turns to NU's contract arguments.  NU argues that FNF cannot satisfy the FIB policy requirements of (1) direct loss; (2) "instructions or advices"; and (3) "on the faith of."  These arguments raise questions of law about the interpretation of the Forgery Insuring Agreement.  *Century Transit*, 42 Cal. App. 4th at 125 ("Absent any factual dispute as to the meaning of policy language, the interpretation, construction and application of an insurance contract is strictly an issue of law.").

### B. Direct Loss and Ownership

In opposition, NU emphasizes the FIB is an indemnity bond that protects the insured's assets (*i.e.*, first party coverage).  NU states that "[a] fidelity bond is a first party policy that does not cover third party settlements."  Def.'s Br. at 6 n.3.  NU contends that FNF errs by seeking coverage for third party losses.

NU relies on *Vons Cos. Inc. v. Fed. Ins. Co.*, 212 F.3d 489, 491 (9th Cir. 2000).  This case, however, supports FNF's position.

In *Vons*, the insured was a retail grocery store.  To state the obvious, it sold products to customers in exchange for money.  It did not have a fiduciary duty toward its retail or wholesale customers.

The employee (Gene Shirley) diverted products to another entity (Premium Sales Co.).  *Id.* at 490.  The mechanics of the legitimate practice of diversion are not relevant to our case; it is sufficient to state that the insured was selling products to another retailer.  The problem arose because Premium was itself a Ponzi-scheme. The investors had entrusted funds to Premium.  Premium invested in the diversion market.  The fraud occurred when Premium paid Shirley (Vons' employee) to falsely confirm 500 fictitious transactions, thereby defrauding its own investors of over $40 million.  *Id.*

The investors sued Premium for their losses, and named Vons as a defendant

1  on theories that the employee had actual or apparent authority to act for Vons and

2  that Vons had negligently supervised its employee. *Id.* at 491. Vons settled with

3  the investors for $10 million and submitted an Employee Dishonesty claim to its

4  fidelity bond.

5  The Ninth Circuit held that the insured had not shown a "direct loss."

6  "Vons, for its part, lost no money." *Id.* at 490. Rather, the employee took bribes to

7  assist an entity that stole money from its own investors. "Under the insuring

8  clauses, Vons is covered only for direct losses to Vons caused by its employee's

9  dishonesty, not for vicarious liability for losses suffered by others arising from its

10  employee's tortious conduct." *Id.* The Ninth Circuit enforced the basic rule that a

11  fidelity bond does not cover an insured's vicarious liability to a third party. *Id.*;

12  *accord Simon Marketing v. Gulf Ins. Co.*, 149 Cal. App. 4th 616 (2007) (insured did

13  not incur a direct loss when it lost customers after employees stole property).[11] An

14  indirect loss is outside the obligation of indemnity owed the insured. *Vons*, 212

15  F.3d at 491 ("'direct' means 'direct'").

16  Importantly, the Ninth Circuit went on to state that: "A direct loss to Vons

17  may, of course, be caused by its employees theft of property for which it is legally

18  liable, the typical case being where the insured is a bailee or trustee of property."

19  *Id.* (citing *Alberts v. Am. Cas. Co. of Reading, Pa.*, 88 Cal. App. 2d 891 (1948) and

20  *Ins. Co. of N. Am. v. Gibralco, Inc.*, 847 F.2d 530, 533 (9th Cir. 1988)).

21  For our purposes, the critical distinction is that the bailee exception did not

22  apply to the facts in *Vons* because the employee did not steal property that Vons was

23  holding for the benefit of Premium's investors (the third parties). Not only were the

24

25  [11]The Ninth Circuit held that Vons' claim was similar to *Lynch Properties, Inc. v. Potomac Ins. Co.*, 140 F.3d 622 (5th Cir. 1998). In *Lynch*, the Fifth Circuit narrowly

26  construed the term "hold" in compliance with restrictive industry standards. 140 F.3d at 627. The Court concluded the precise language did not cover an employee's theft

27  of money from a customer's personal bank account. The Court noted, however, that the insured's loss would have been covered if the policy used the phrase "held by the

28  Insured in any capacity, and whether or not the Insured is liable therefore." Here, FNF's FIB policy uses the broader language, thus, *Lynch* does not apply.

1  diversion transactions fictitious, but they were sales transactions.

2      NU's reliance on *Vons* fails because it ignores the firmly-established bailee

3  exception.  A fidelity bond covers a loss that occurs while the insured is legally

4  responsible for holding another's property.  Scott L. Schmookler, The

5  Compensability of Third-Party Losses Under Fidelity Bonds, 7 Fidelity L. J. 115,

6  115 (Oct. 2001) ("It is important to distinguish between claims based upon the

7  insured's liability for damages caused by an employee's perpetration of fraud on a

8  third party, and claims based upon the employee's misappropriation of a third

9  party's property while the possession of the insured."); H. Walter Croskey, et al.,

10  Cal. Prac. Guide Ins. Litig. Ch. 6J-B ¶ 6:4108 (2014) (fidelity bond covers insured

11  who acts in capacity of a bailee and is legally liable (directly) to a customer).

12      The *Vons* decision recognized that the bailee exception applies when a direct

13  loss is caused by theft of property for which the insured is legally liable, as when

14  the insured acts as a bailee to a third-party's property.  *Vons*, 212 F.3d at 491.

15  When the insured holds a third person's property as a bailee or trustee, a fidelity

16  bond covers the loss of that property "not because the insured may be liable to the

17  owner for the misappropriation of its property, but rather because the ownership

18  provision in standard form fidelity bonds extends coverage to the property itself

19  while [in] the possession and control of the insured."  Schmookler, *supra*, at 7

20  Fidelity L.J. at 115, 156.

21      In *Vons*, the Ninth Circuit cited two cases to illustrate the bailee exception.

22  The first case, *Gibralco*, 847 F.2d at 533, arose in the Ninth Circuit.  There, the

23  insured physically held the client's bearer bonds, but the trader sold them and kept

24  the proceeds from "the rightful owners."  The Ninth Circuit held that the loss was

25  caused by the employee's dishonesty and therefore covered.

26      The second case applied California law.  In *Alberts*, 88 Cal. App. 2d 891, the

27  insured was a hotel.  The hotel manager held a guest's money for "safekeeping,"

28  then disappeared.  The California Court of Appeal concluded that the insured

1   suffered a direct loss because its employee stole the guest's property and the guest

2   had sued the hotel to recover the funds.  *Id.* at 897-98.

3     This line of bailee cases – *Vons*, *Gibralco*, and *Alberts* –  supports FNF's

4   claim for benefits under the FIB.[12]  Here, Chicago Title, an escrow company, held

5   title in real property and monies for safekeeping until the buyer, seller, and banks

6   settled the account and closed the sale of each condominium.  The purpose of an

7   escrow company is to "hold" property.  Schmookler, *supra*, 7 Fidelity L.J. at 139-40

8   & n. 115 (collecting cases when insured takes possession of a third party's property

9   in the normal course of business and using escrow as an example).  The dictionary

10  defines "escrow" as  "[m]oney, property, a deed, or a bond *put into the custody of a*

11  *third party* [*i.e.*, FNF or Chicago Title] for delivery to a grantee only after the

12  fulfillment of specified conditions."  Webster's II New College Dictionary 383

13  (1995) (emphasis added).  The FIB broadly defines "property" to include the

14  interest held in escrow.  Pls.' Opp. Ex. 1 at 13, §1(m).  The funds in escrow

15  represent the value of the Crown Point condominiums.  Chicago Title was

16  responsible for those assets at the time Norton wrongfully diverted them to his

17  criminal enterprise by forging the victims' signatures.

18    Furthermore, the Court agrees with FNF's observation that its claimed loss is

19  consistent with the ownership provision of the FIB.  "This provision ensures that the

20  insured has an insurable interest in the property that is the subject of the claimed

21  loss."  Croskey, *supra* Ch. 6J-D ¶ 6:4250.  Section 10 of the FIB, as amended by

22  Rider 23, states that:

23     This bond shall apply to loss of Property (1) owned by the Insured, (2)
   held by the Insured in any capacity, or (3) for which the Insured is

24

_____

25    [12]NU cites several other cases, but they are distinguishable on the facts because
the insured was not "holding" any "property" of the third party in a bailment or trustee
26  sense at the time the fraud in those cases occurred.  *Universal Mortg. Corp. v.*
*Württembergische Versicherung AG*, 651 F.3d 759, 762 n. 1 (7th Cir. 2011)
27  (recognizing distinction that "fidelity bonding covers the loss of property owned by the
insureds or held by the insureds, as a consequence of employee dishonesty") (collecting
28  cases and treatises); *RBC Mortg. Co. v. National Union Fire Ins. Co. of Pittsburgh*, 812
N.E.2d 728 (Ill. App. 2004).

09CV140

1
2

legally liable.  This bond is for the sole use and benefit of the Insured named in the Declarations.

3
4
5
6

However, coverage provided under the Insuring Agreement of this bond shall be deemed to include amounts which the Insured is legally liable to pay a third party as a direct result of loss otherwise meeting the conditions and limitations of this bond.  It is understood by the Underwriter and the Insured that the addition of this Rider to the bond is not an admission that such coverage did or did not already exist under the bond.

7

Pls.' Opp. Ex. 1 at 45 (Rider 23) (emphasis added).  The FIB defines "Property"

8

broadly to include "[m]oney, . . . deeds and mortgages on real estate, . . . and other

9

records." *Id.* at 13, § 1(m).

10

The undisputed facts clearly satisfy two components of the first paragraph of

11

this provision.  Chicago Title "held" the victims' "Property" in its "capacity" as an

12

escrow company at the time forged documents diverted the victims' equity to

13

Norton.  As such, Chicago Title is "legally liable" for the "loss of Property."  As

14

stated by FNF, "the entire claim arises out of liability for the loss of property of the

15

third party claimant over which Chicago Title exercised dominion and responsibility

16

as the escrow agent."  Pls.' Opp. Br. at 15; Schmookler, *supra*, 7 Fidelity L.J. at

17

133-35, 156.

18

Moreover, the Court agrees with FNF that the second paragraph applies.

19

Upon settlement of the underlying lawsuits, FNF was "legally liable to pay a third

20

party" for a "loss otherwise meeting the conditions and limitations of this bond."

21

This language can be read to provide coverage for any portion of a settlement

22

payment to a third party that is "attributable to a loss directly resulting from one of

23

the insuring agreements."  Pls.' Opp. Br. at 16.  As set forth above, Insuring

24

Agreement D(5), as amended by Rider 25, covers Chicago Title's transfer, payment,

25

or delivery of "any funds or Property" based on specified forged documents.

26

Chicago Title relied on forged signatures to close escrows that stole equity from the

27

victims and transferred that wealth to Norton.

28

FNF satisfied the direct loss element because it was legally liable for the

funds held in escrow.  FNF's loss is covered, and the ownership clause of the FIB further clarifies that the policy covers the third-party settlement.

Next, NU argues that three types of transactions do not satisfy the direct loss definition of the FIB.  NU argues that Chicago Title did not hold assets of the victims who "never contributed funds to a FNF escrow" nor those transactions characterized as "no cash-out refinances" and "contingent loan liabilities."

### 1. Contribution of Funds into Escrow Accounts

NU contends that eight victims did not contribute or lose their own assets. NU argues that some "were straw buyers who never contributed assets to a FNF escrow."  Def.'s Opening Br. at 8; Def.'s Exs. 53 (L. Reyes Depo. at 6), 61 (J. Marino Depo. at 15).[13]  These investors "permitted Norton to use their name and

---

[13]In its reply brief, NU argues that judicial estoppel prevents FNF from changing its position about straw buyers. *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782-83 (9th Cir. 2001).  NU asks the Court to take judicial notice of six verdict forms from the Second Wave of underlying lawsuits.  [Doc. No. 379.]

During trial in State Court, FNF argued that those victims who permitted Norton to use their names and credit were "straw purchasers" who never suffered a loss because "they didn't invest a dime."  NU argues that the jury agreed with FNF's theory because it found *Norton* liable to certain victims, but not Chicago Title.  Req. for Jud. Notice Ex. 1 (verdict forms of "Non-Prevailing Plaintiffs").  By contrast, other victims in that Second Wave prevailed on their claims against Chicago Title.  *See* Agati Decl. to Opp. to Jud. Notice Ex. 1 (Settlement Agreement at 3, ¶ E).

The Court denies the request for judicial notice.  The verdict forms are not self-evident, adjudicative facts.  *Cf.* Fed. R. Evid. 201(a).  A general verdict does not disclose the specific reason for the jury's decision.  *Stout v. Pearson*, 180 Cal. App. 2d 211, 216 (1960); *see Glass v. U.S. Rubber Co.*, 382 F.2d 378, 384 (10th Cir. 1967) (jury could have decided state court action on several distinct issues; this uncertainty as to precise point litigated precludes applying res judicata in federal case).  Moreover, the verdict forms were never entered as a final judgment because all parties disputed the accuracy and promptly settled.  Agati Decl., *supra*, (Settlement Agreement at 3, ¶ F); *Franklin & Franklin v. 7-Eleven Owners for Fair Franchising*, 85 Cal. App. 4th 1168, 1174 (2000) (California requires either appeal or expiration of time to appeal before judgment considered "final"); *cf.* Fed. R. Evid. 201(b)(2). "In order for judicial estoppel to apply, a court must have adopted the position advanced by the party."  *First Nat'l Ins. Co. v. FDIC*, 977 F. Supp. 1051, 1057 (S.D. Cal. 1997).  Even if the Court were inclined to accept NU's speculation about the jury's underlying fact finding, judicial estoppel does not prevent FNF "from arguing different legal opinions or conclusions from one set of facts."  *Id.* at 1058 (issue of whether loss was covered by policy is legal conclusion; in context of consolidated actions that were severed for trial, "as long as FDIC does not take any factually inconsistent positions, it may argue a different legal interpretation of those facts in the instant case.").  In sum, the Court denies the request to take judicial notice of the verdict forms from the Second Wave

(continued...)

credit to purchase condominiums and secure loan financing."  Def.'s Br. at 8, 22-24;

Def.'s Exs. 53 (L. Reyes Depo. at 23-24), 54 (W. Burke Depo. at 13-14), 60 (A.

Marino Depo. at 22, 29, 113).  NU relies on the terms of the Partnership

Agreements that the victims signed when they invested their savings with Norton.

*E.g.*, Def.'s Br. at 23 (citing Def.'s Ex. 66 (Ramsour Depo. at 21, 24, 28, 44, 49)).

The Partnership Agreements specify that the condominium units were assets of Safe

Harbor or Cross Properties, and that Norton would distribute profits from the rents

and appreciation to the investors.  Def.'s Br. at 25; Def.'s Exs. 56-58 (sample

Partnership Agreements); *e.g.*, Def.'s Ex. 54 (W. Burke Depo. at 11-14).  NU

contends that a shareholder's failure to receive profits is not a direct loss.  Def.'s

Reply Br. at 7.

NU's argument blurs the distinction between the victims who invested money

with Norton by hiring him as their financial advisor, and the victims who did not

personally invest with Norton but did sign a Safe Harbor Partnership Agreement.

The Court finds it useful to discuss these two groups separately.  In the end,

however, the result is the same because Norton forged their signatures to process

other escrows.

### a. <u>Victims who Invested Money with Norton</u>

As to the victims who hired Norton to manage their personal investments, the

Court rejects NU's argument for the reason stated by FNF.  "While [the victims]

obviously did not deposit the monies [into escrow] themselves, Norton's scheme

often involved debiting his investors' account and making purchase deposits with

those investors' monies."  Pls.' Opp. Br. at 18 (citing Norton's Depo.).  Though

Norton co-mingled monies, "it is reasonable to conclude that deposits were made on

---

[13](...continued)
of underlying litigation.  They do not reveal any self-evident fact that would stop FNF
from arguing in this separate lawsuit  against the insurer that it suffered a direct loss
under the terms of the FIB by settling with the nine victims from the First Wave of
underlying litigation.  The FIB was not at issue in the underlying tort suits, and the
verdicts in State Court do not shed any light on the meaning of the insurance contract.

behalf of [the victims] using their money" based upon their investments. *Id.* (citing Barrett Expert Report). The victims lost their funds through Norton's sham escrow transactions. *E.g.*, Def.'s Exs. 55 (W. Burke invested his $348,816 retirement account with Safe Harbor in 2002), 59 (S. Burke letter describes investment in Crown Point with Safe Harbor); Def.'s Opp. Exs. 11 (Ex. A at 1) (alleging Norton convinced his childhood friend, Steven Lillie to invest "personal funds and the assets of Euro-Canadian into the Crown Point condo project"), 13 (Ex. A at 1) (alleging that "Marino moved funds from his annuities, teachers' retirement funds, and other monies" with Norton). In any event, the guilty pleas by Norton and Greer conclusively established the material facts that Norton defrauded his investors by forging their signatures on escrow documents. *United States v. Cazares*, 121 F.3d 1241, 1246-47 (9th Cir. 1997) (collecting cases).

Furthermore, the Court finds that NU's argument muddies the analytical waters. NU suggests that FNF must show that *the victims* suffered a direct loss from forgery, but that was an issue in the underlying tort litigation between the victims and FNF. The liability question was resolved by the settlement of the victims' lawsuits. By contrast, in this breach of insurance contract action, NU must honor its promise to indemnify if *the insured* suffered a direct loss from forgery. As discussed above, FNF satisfies this term of the FIB by holding a third party's "funds or Property" when it was misappropriated by forgery.

Gemma Ramsour's case illustrates the flaw in NU's logic. NU contends that Ramsour "admitted" she did not have a personal financial interest in Crown Point after she sold her residence, Unit 37-39. Pls.' Opp. Ex. 28 (Depo. at 44). Her testimony does not change the fact that she invested $5.7 million with Norton's Safe Harbor partnership and that Norton drained the equity from the condominiums using her identity to process fraudulent escrows. *E.g.*, Pls.' Opp. Ex. 18 (Kenna Decl. Ex. H, Second Am. Compl. ¶ 83) (alleging that Norton wrongfully diverted $300,000 in equity from unauthorized refinance of Unit 37-39 to his own use).

1    Ramsour testified that she never authorized Norton to sign any documents for her –

2    "No, never."  Pls.' Opp. Ex. 28 (Ramsour Depo. at 75).  When asked if she

3    voluntarily sold a particular condominium unit, Ramsour answered, "No, Rick

4    [Norton] stole it."  Pls.' Opp. Ex. 29 (Ramsour Depo. at 37).  Thus, the record

5    shows that "Ramsour may have wanted Norton to sell Unit 37-39, but that cannot be

6    stretched into an admission that Unit 37-39 was no longer her 'asset' such that

7    Norton could sell it without her knowledge and then keep the proceeds to himself."

8    Pls.' Opp. Br. at 19.

9        NU's argument incorrectly focuses on the source of the funds held in

10    escrow.[14]  The fact that the victims personally did not write checks to fund

11    individual escrows does not change FNF's role as a bailee or trustee of the

12    "Property."  Pls.' Opp. Ex. 1 at 13, § 1(m).  The FIB defines "Property" broadly to

13    include, among other things, money, evidence of debt, letters of credit, abstracts of

14    title, and "deeds and mortgages on real estate."  *Id.*  The undisputed facts establish

15    that the escrow company held "Property" in trust while the seller, buyer, lien

16    holders, and lenders sort out the proceeds.  The direct loss requirement focuses on

17    the insured's relationship to the "Property."  It does not  matter whether title was in

18    the name of Safe Harbor, Norton, or Ramsour.  The fact that FNF, the insured, was

19    holding funds at the time Norton used forged documents to steal the victims'

20    investments satisfies the direct loss requirement of the FIB.  Like the hotel in the

21    *Alberts* case or the broker in *Gibralco*, FNF had possession and control over a third

22    person's property at the time it was misappropriated.  The identity of the rightful

23    owner of the property is a separate matter.

24        NU's flawed logic also assumes the validity of Norton's transactions based

25    on the terms of the partnership agreements.  But the evidence is clear that escrow

26    _____

27    [14]NU's expert report does not support its case.  The expert did not analyze coverage but instead accepted NU's definition of which losses were covered.  Def.'s Ex. 109 (Money Expert Report § E).  The expert's assumptions and analysis of the

28    amount of loss contradict the Court's interpretation of the FIB's direct loss as governed by the bailee exception.

1  funds were improperly diverted to various Norton-controlled entities.  For example,

2  Norton diverted the proceeds of the sale of Unit 319 to Norton Financial Ltd.  *See*

3  Def.'s Ex. 50 (Barrett Expert Report at 27-29).  Ramsour testified that the escrow

4  instructions on Unit 319 bore a forgery of her signature.  Pls.' Opp. Ex. 28

5  (Ramsour Depo. at 47-48, 73).  In short, the victims authorized Norton to invest

6  their retirement savings in the Crown Point project, but they did not authorize theft

7  through forgery.  *See generally Cunningham v. Brown*, 265 U.S. 1 (1924)

8  (describing scheme of Charles Ponzi, the namesake of this type of fraudulent

9  venture), *cited by Donell v. Kowell*, 533 F.3d 762 (9th Cir. 2008).

10                              **b. <u>Straw Buyers</u>**

11        A straightforward reading of the Forgery Insuring Agreement shows that NU

12  promised to cover FNF for loss caused by transferring a customer's "funds or

13  Property" in reliance on a forged document.  NU also promised to indemnify FNF

14  for " amounts which the Insured is legally liable to pay a third party as a direct

15  result of loss otherwise meeting the conditions and limitations of this bond."  Pls.'

16  Opp. Ex. 1 at 45 (Rider 23).

17        Reyes was injured when Norton used her name, identity, and credit, without

18  her consent or knowledge, in the second escrow transferring a condominium to

19  another entity.  Norton defaulted on the loan, which damaged Reyes' credit rating.

20  Chicago Title processed the escrow on that unit by relying on a forged document.

21  Reyes sued Chicago Title for its role in the transaction, and Chicago Title settled

22  her claim in State Court.

23        NU's contention focuses on the question of whether Reyes, the purported

24  customer, was the rightful owner of the "funds or Property" transferred on the

25  authority of a forged document.  It is as if the insurer in the *Alberts* case challenged

26  whether the hotel guest had stolen the money that he deposited in the insured's safe.

27   *Cf.* 88 Cal. App. 2d 891.  The Court concludes that it does not matter.  As between

28  NU and FNF, the question is whether FNF held the property when the forgery

occurred.  The concern is whether the insured has insurable interest in the property at the time of the loss, and here, that concern is met by Chicago Title's function as an escrow company.  Croskey, *supra*, Ch. 1 ¶ 1:15 ("The insurable interest requirement prevents persons from gambling on the lives or property of others or profiting from their misfortune.") (citations omitted).  For purposes of applying the FIB to FNF's insurance claim, the loss may be properly measured by the amount of the settlement payment in the underlying action.  Any dispute about who owns the property held in safekeeping was between FNF and Reyes (or in the hypothetical, the hotel and the guest) in the underlying litigation.  FNF determined that it was wiser to settle with Reyes than to proceed to trial and face the jury's likely assessment of damage to an elderly cancer survivor.  Def.'s Ex. 23 (Ex. A ¶¶ 1, 8, 11).  Consequently, FNF was legally liable to pay Reyes (a third party) for a loss that "otherwise meets the conditions and limitations" in the Forgery Insuring Agreement.   Pls.' Opp. Ex. 1 at 45 (Rider 23).  NU contracted to indemnify FNF for the amount of that loss.

## 2. No Cash-Out Refinances

In a related argument, NU challenges transactions that it describes as "no cash-out refinances."  In fifteen of the Jr. Holdaways' escrows, one lender was substituted for another but no cash was disbursed upon funding.  Def.'s Ex. 109 (Money Expert Report at 18) (opining that "loan fees, broker fees, and related loan costs . . . do not represent a loss of underlying claimant assets.").  NU contends that an "actual withdrawal of cash" or "an actual pecuniary loss" is required to establish a direct loss.  *Fletcher Jones Co. v. United Pacific Ins. Co.*, 181 Cal. App. 2d 202, 206 (1960); *Cincinnati Ins. Co. v. Star Fin. Bank*, 35 F.3d 1186, 1191 (7th Cir. 1994).  NU argues that a theoretical loss of equity does not qualify.

The Court rejects this argument for the reasons stated in FNF's opposition brief.  Pls.' Opp. Br. at 16-18.  The record establishes that Norton refinanced thirteen of the Jr. Holdaways' units to relieve himself of over $1 million dollars in

liabilities at the expense of the Jr. Holdaways, who lost that same amount in equity when they became personally liable for the new loans. *Id.* at 17. "Thus, Norton diverted to his benefit well over $1 million of Jr. Holdaway equity just as if 'cash' had gone directly to him." *Id.* Moreover, the FIB policy is not restricted to "cash" or "assets." Pls.' Opp. Ex. 1 at 13, § 1(m). Consequently, FNF correctly states that "at the time these escrows closed and the more than $1 million in equity was taken from the Jr. Holdaways, Chicago Title was 'holding' the Jr. Holdaways' 'Property' and funds." Pls.' Opp. Br. at 17. A similar analysis of two other purported "no cash" refinances establishes that Chicago Title held the property for the benefit of a bailee when Norton misdirected the funds to his own benefit. *Id.* The Court concludes that the undisputed facts concerning these Jr. Holdaway escrow transactions satisfy the direct loss requirement of the FIB policy. The loss was actual and realized, not merely potential. The Court rejects NU's interpretation of the bond language.

### 3.  Contingent Loan Liability

NU objects to another category of escrow transactions involving a contingent loan liability. A fidelity bond does not cover a loss that is "contingent on the occurrence of a series of events that were not inevitable." *Direct Mortg. Corp. v. National Union Fire Ins. Co. of Pittsburgh, PA*, 625 F. Supp. 2d 1171, 1178 (D. Utah 2008). NU characterizes this type of alleged loss as "theoretical" "since it was contingent on, among other things, the real estate market, the status of the loans, and Norton's breach of his agreement to repay the loans." Def.'s Reply Br. at 7. Similarly, NU contends that another victim suffered only an "indirect" loss because "it was contingent on the condominium sales yielding a net profit." *Id*. at 8. The real estate market is not guaranteed. NU speculates that "Norton's subsequent failure to fully pay the loans and expenses was a contingent event that was not inevitable." NU notes that none of the lenders foreclosed on the Crown Point condos or sought money from either the victims or Chicago Title to repay the

1  mortgages.

2      This argument fails.  NU's "contingent loss" argument is mistakenly premised

3  on a unrelated concern about the likelihood of foreclosure.  The undisputed facts

4  show that Norton operated a Ponzi scheme that, by definition, will inevitably

5  collapse from its own weight.  *United States v. Treadwell*, 593 F.3d 990, 992-93 n.2

6  (9th Cir. 2010).  Even apart from legitimate fluctuations in San Diego's real estate

7  market, the Crown Point project eventually would run out of inflated equity to

8  satisfy Norton's greed.  Ultimately, loss to the Ponzi scheme victims and to FNF

9  was inevitable.

10      The Court concludes that FNF acted as a trustee to hold property that

11  belonged to the nine victims underlying its breach of contract claim, and FNF relied

12  on forged instructions to divert the monies to Norton.[15]  Thus, the facts satisfy the

_____

14      [15]Though dozens of victims sued Chicago Title in State Court, FNF narrowed its breach of contract case to focus on nine victims.  In its own motion, FNF used Jr. Holdaway as the sole example that coverage was triggered by the Forgery Insuring Agreement.  Initially, NU objected to this truncated procedure.  It argued that Chicago Title should submit evidence on the other eight victims.  NU also requested a document trail for *every* forged transaction.  *E.g.*, Def.'s Opp. Br. at 15-16 (citing Jr. Holdaway escrows).

The Court overrules this objection.  When FNF opposed NU's separate summary judgment motion, FNF cited the evidence pertaining to each victim.  *E.g.*, FNF's Opp. Br. at 14-22.  The Court is satisfied that the evidence supports FNF's breach of contract case because Chicago Title held the victims' property as a bailee or trustee and Norton used forged documents to divert escrow funds to his personal use.  Def.'s Opp. Ex. 60 (list of documents with forged signatures).  Norton's fraudulent scheme operated in a similar manner as to each of his victims, thereby triggering coverage for forgery.

Even assuming that the Jr. Holdaways signed a power of attorney form at the beginning of their relationship with Norton in 2003, FNF established that none of the claimed transactions were closed by power of attorney.  Def.'s Opp. Ex. 106 (Holdaway Aff. ¶¶ 11, 13, 18); Pls.' Notice of Errata Ex. D (Barrett Rebuttal Report at 8-9).  The escrow forms and instructions purported to bear the signatures of investors, and Keith Holdaway testified that they were all forgeries.  Pls.' Ex. 43 (2007 K. Holdaway Depo. at 526, 534-35); *id.* Ex. 44 (2011 K. Holdaway Depo. at 160-61, 170-73, 180-207, 211) (testifying that his triplets were born on July 29, "and I can tell you that we don't do anything on those days rather than celebrate birthdays because the day is not long enough to do three of them.  And so, anything with July 29th on it, we found a lot of them in this case, that was a bad day for anybody to try to forge my name because they're all forgeries.").

In any event, NU's concern relates to the amount of damages.  With regard to the question of liability, FNF established that NU breached the $15 million FIB policy by failing to contribute to the $19,985,000 Jr. Holdaway settlement.  Three months later,

(continued...)

09CV140

1  direct loss element of this insurance policy.  *See First Am. Title*, 971 F.2d 215 (title

2  insurance company incurred a direct loss when an employee fraudulently closed

3  escrow accounts).

4  ## C. "Instructions and Advices"

5  Turning to language in separate Forgery Insuring Agreement D(5), NU

6  contends that the phrase "written instructions and advices" only applies to

7  commercial paper like checks and not to the escrow instructions involved here.

8  Def.'s Opp. Br. at 16; *e.g., Universal Bank v. Northland Ins. Co.*, 8 Fed. Appx. 784

9  (9th Cir. 2001) (unpub. slip op.) (in context of bank bond, the forged signature of

10  bank customer was covered but not a signature in a real estate transaction).

11  This argument lacks merit.  The broad language in the FIB refers to "any

12  written instructions," and the term is not otherwise defined.  Pls.' Opp. Ex. 1 at 47

13  (Rider 25).  The Court is not persuaded by NU's citation to cases involving banks

14  which use a different standard form than the fidelity bond issued to title insurance

15  and escrow companies.  *Cf. Universal Bank*, 8 Fed. Appx. at 785-86 (holding that

16  bank bond did not cover purchase agreements and escrow instructions) (collecting

17  cases in context of commercial banks); *First Union Corp. v. U.S. Fid. & Guar. Co.*,

18  730 A.2d 278, 283 (Md. Ct. Spec. App. 1999) (same); *KW Bancshares, Inc. v.*

19  *Syndicates of Underwriters at Lloyd's*, 965 F. Supp. 1047, 1052-53 (W.D. Tenn.

20  1997) (same).  The Court agrees with FNF that it is illogical to apply this particular

21  concept from the banking industry involving "commercial paper" to Chicago Title's

22  escrow business.  *KW Bancshares*, 965 F. Supp. at 1052-53 (distinguishing between

23  commercial papers used by banking industry and the loan instructions used by

24  business of real estate mortgages); *Universal City*, 208 Cal. App. 4th at 737; *see*

25  *Garza v. Marine Transport Lines, Inc.* 861 F.2d 23, 27 (2d Cir. 1988) (ordinary

26  _____

27  [15](...continued)
28  FNF  settled Ramsour's action for $19,750,000.  Payments to the other seven victims exceeded $25 million.  Thus, any one or two of the First Wave settlement payments could have exhausted the primary FIB policy.

meaning of contract encompasses "the customs, practices, usages and terminology as generally understood in the particular trade or business."). The business context is distinct. *Garamendi v. Mission Ins. Co.*, 131 Cal. App. 4th 30, 42 (2005) (each term "must also be interpreted in the context and with regard to its intended function and the structure of the policy as a whole"). NU's interpretation would render the coverage illusory since FNF necessarily processes documents captioned as "Escrow Instructions" or "Closing Instructions." *E.g.,* Pls.' Opp. Ex. 16 (Lindsey Decl., Ex. B) (Ramsour and Burkes purportedly signed "Amendment to Escrow Instructions" forms); Def.'s Opp. Exs. 60; *see Garza*, 861 F.2d at 27. The forged escrow documents involved here plainly satisfy the common dictionary definition of either "instructions" as an "order or direction," or "advice" as "a formal or official notice sent by one person or office to another concerning a business transaction." *KW Bancshares*, 965 F. Supp. at 1052 (citing Webster's New World Dictionary (2d ed. 1984)); Webster's Third New Int'l Dictionary 32 (1986).

### D.  "On the Faith of" Requirement

NU contends that FNF cannot show that it acted "on the faith" of the forged documents. The "on the faith of" requirement refers to an insured's "complete confidence, belief or trust" in the documents. *Continental Bank v. Phoenix Ins. Co.*, 24 Cal. App. 3d 909, 913 (1972). NU contends that Chicago Title's employees did not take any steps to verify the signatures. As a factual matter, NU contends that Nieto's supervisors were on "actual notice that Norton was submitting forged signatures." Def.'s Opp. Br. at 17; Def.'s Opp. Exs. 82, 83, 85 (Ray's and Lindsey-Slover's emails dated Aug. 2004 and Jan. 2005). NU points to Norton's testimony that Gainor and Nieto watched him sign numerous escrow documents. *See* Def.'s Opp. Ex. 6 (Burke Proof of Loss Form, Ex. A ¶¶ 28, 29, 59). According to NU, FNF's "reliance amounts to blind faith, not good faith." Def.'s Opp. Br. at 17 (citing *Bank of Bozeman v. BancInsure, Inc.*, 404 Fed. Appx. 117, 119 (9th Cir. 2010) (unpub. slip op.)).

In so far as NU's argument concerns the meaning of the contract language, the Court rejects NU's interpretation of the FIB.  Case law establishes that the phrase "on the faith of" means reliance on a specified document in the normal course of business.  *Continental Bank*, 24 Cal. App. 3d at 913.  The Court agrees with FNF's interpretation that "on the faith of" requires the insured to possess and rely on a document used in the ordinary course of business.  The insured can meet its burden by showing it relied on an original signature.  Here, <u>the signatures were notarized</u>.  The FIB language does not require further steps such as verifying.  Pls.' Opening Br. at 20 (citing *Peoples State Bank v. Progressive Cas. Ins. Co.*, No. 10-CV-86, 2011 WL 2748441, *3-4 & n. 9 (W.D. La. 2011)); Michael Keeley, Michele L. Fenice, & J. Will Eidson, Insuring Agreement (E) – Revisited, 17 Fidelity L.J. 203, 266 (Dec. 2011) ("Courts generally do not consider reliance to be synonymous with review or verification, and will not read this heightened burden into the bond where it is not stated.").

The Ninth Circuit's slip opinion is consistent with this interpretation because the facts are distinguishable.  In *Bozeman*, 404 Fed. App. at 118, the bank did not have "'actual physical possession' of the original security documents" but relied on an oral representation.  The Ninth Circuit held that an insured could not have relied upon a document that it had not seen.  *Id.* at 119.  The *Bozeman* decision cited two cases to illustrate the physical possession requirement.  *Republic Nat'l Bank of Miami v. Fidelity & Deposit Co. of Maryland*, 894 F.2d 1255, 1262 (11th Cir. 1990); *Nat'l City Bank of Minneapolis v. St. Paul Fire & Marine Ins. Co.*, 447 N.W.2d 171, 176 (Minn. 1989).  The bonds in those cases specifically required actual physical possession of a forged document as a condition precedent to the insured's having relied on the faith of or acted upon a document.  *Id.*  Coverage was properly denied when those insureds, like the insured in the *Bozeman* case, made financial commitments *before* receiving the original documents.  *Id.*; *accord Valley Cmty. Bank v. Progressive Casualty Ins. Co.*, 854 F. Supp. 2d 697, 706 (N.D. Cal.

1  2012).

2      NU's argument confuses the term "on the faith of" with the concept of "good

3  faith." *E.g.*, Def.'s Br. at 20.  "An insured bank's 'good faith' is a completely

4  separate requirement from reliance 'on the faith' of documents." *Nat'l City Bank*,

5  447 N.W.2d at 177 (citations omitted); *Peoples State Bank v. Progressive Cas. Ins.*

6  *Co.*, 2011 WL 2748441, at *4 (W.D. La. 2011) (refusing to read in a heightened

7  burden of verification into "on faith of" requirement, which means reliance on a

8  specified document).  Some policies will only cover the insured who relied on a

9  forged document "in good faith." *E.g.*, *Beach Cmty. Bank v. St. Paul Mercury Ins.*

10 *Co.*, 635 F.3d 1190, 1193 (11th Cir. 2011); *Republic Nat'l*, 894 F.2d at 1262

11 (same); *First Union*, 730 A.2d at 281, 283-84 (same); *Continental Bank*, 24 Cal.

12 App. 3d at 909 ("in good faith" requirement).  When a bond includes that additional

13 requirement, the court may examine whether the facts demonstrate that the insured

14 took reasonable steps to verify the authenticity of a signature. *E.g.*, *Beach Cmty.*

15 *Bank*, 635 F.3d at 1200 (negligence is not the equivalent of bad faith).  The Forgery

16 Insuring Agreement in FNF's FIB contract does not include the additional

17 requirement of "good faith" reliance.[16]  Thus, Chicago Title has satisfied this

18 element to the extent that it relied on notarized escrow instructions and other loan

19 documents in its physical possession.

20     To the extent that NU discusses the facts concerning the insured's knowledge

21 that Norton was using forged documents, the Court concludes that its arguments are

22 more appropriately addressed in the section that addresses the Discovery Provision.

23 **IV.  Did FNF Discover the Loss During the 2005-2006 Bond Period?**

24     FNF alleges that NU breached the FIB that commenced on November 18,

25 2005.  For its case-in-chief, FNF contends that it discovered the loss during the

26 Bond Period when several victims named FNF as a co-defendant in their State Court

27 ―――――――――――――――

28      [16]By contrast, FNF purchased additional coverage for fraudulent mortgage
    instruments or deeds of trust.  Coverage under Rider 16 is only available if the Insured
    relied on the document "in good faith." Pls.' Opp. Ex. 1 at 38.

actions against Norton. The victims began suing Chicago Title in mid-2006 after Norton's Ponzi scheme collapsed in December 2005.[17] FNF relies on "Prong 1" of the Discovery Provision, providing in part, that discovery occurs when the "Risk Management or Legal department receives notice of an actual or potential claim in which it is alleged that the Insured is liable to a third party under circumstances which, if true, would constitute a loss under this bond." Pls.' Opp. Ex. 1 at 35 (Rider 13). In July 2006, FNF notified NU of the Norton claims, and in December 2006, FNF listed several perils covering the loss. Pls.' Exs. 3 ("Based on the allegations of the pleadings there is the potential for the application of forgery coverage."), 17; Def.'s Opp. Exs. 52, 55 (July 19-24, 2006 entries), 173.

In its cross motion, NU argues that it did not breach the contract because the facts show that Chicago Title discovered the employee dishonesty a year before the Bond Period commenced. NU argues that FNF "discovered" the loss in 2004 when problems arose in the Kaplan and Medhi escrow transactions.[18] As noted above, NU also argues that Nieto's supervisors knew about forgeries in Norton escrows as early as August 2004 or January 2005. NU emphasizes that the "'discovery' threshold is low." *Cal. Union Ins. Co.*, 948 F.2d at 563.

---

[17]In August 2006, FNF sent NU the voluminous complaints from the "First Wave" of lawsuits. *E.g.*, Pls.' Ex. 17. The lengthy complaints are extremely detailed in their allegations against Chicago Title's role in Norton's scheme. They accuse Gainor, Richmond, and Nieto of active, knowing participation. *E.g., id.* ¶¶ 5, 78-96. For example, among the 200 paragraphs of facts in the Burke's FAC, the victims allege in regard to the Kaplan settlement that:

> The Chicago Title Defendants never received one inquiry or complaint in any of the escrows about the borrower's or seller's personal funds being paid in $25,000 increments to Chicago Title to repay the $253,900 to Chicago Title. The reason not one complaint or objection was raised was obvious, particularly to the Chicago Title Defendants: **every one of those escrows was fraudulent and involved forged documents.**

Pls.' Ex. 7 ¶ 155. The victims specifically allege that Chicago Title knew that forged documents were used because it never followed the standard practice of having the seller and buyer appear in person and show identification to a notary before signing documents at the escrow office. *Id.* ¶ 141.

[18]Both Kaplan and Medhi are strangers to Norton's investment enterprise. They bought Crown Point condominiums as personal residences. The sellers, however, had connections to Norton. The parties abbreviated their names to protect their privacy.

1   FNF disputes NU's theory on the law and facts.[19]  FNF contends that Chicago

2   Title's  investigation of the Kaplan and Medhi transactions in late 2004 showed, at

3   best, negligence by its escrow officer (Nieto), and "mere suspicion" of fraud by

4   Norton (a non-employee).  Similarly, FNF argues that Chicago Title did not have

5   sufficient facts to accuse Norton of forging documents.  In addition, the vast

6   majority of Jr. Holdaway escrows closed months before the supervisors in the

7   Escrow Department questioned a signature.  *See* Pls.' Notice of Errata Exs. C

8   (Barrett Expert Report at 8), D (Barrett Rebuttal Report at 11-13).

9        Rider 13 replaces the discovery limitation of the 2005-2006 FIB policy with

10  this language:

> This bond applies to <u>loss discovered</u> by the Risk Management
> department or <u>Legal department during the Bond Period.</u>  Discovery
> occurs when the Risk Management department or Legal department
> first becomes aware of facts which would cause a reasonable person to
> assume that a loss of the type covered by this bond has been or will be
> incurred, even though the exact amount or details of loss may not then
> be known.
>
> Discovery also occurs when the Risk Management department or Legal
> department receives notice of an actual or potential claim in which it is
> alleged that the Insured is liable to a third party under circumstances
> which, if true, would constitute a loss under this bond.

18  Pls.' Opp. Ex. 1 at 35 (emphasis added).[20]

19  **A.  <u>FNF Has Burden of Proof on Loss Discovery Provision</u>**

20       Here, the fidelity bond "applies to loss discovered . . . during the Bond

---

[19]The Court summarily rejects two other arguments raised by FNF.  First, FNF relies on a notation by the claims handler (Wofin) that the date of discovery was February 23, 2006.  FNF contends this firmly establishes that the loss arose during the 2005-2006 Bond Period. Def.'s Opp. Ex. 55 (July 10, 2007 entry).  Second, in one email, NU quoted that notation as the date of discovery. FNF argues that NU waived its right to argue otherwise at this late date.  NU knew about the allegations against Nieto, Gainor, and Norton from the victims' complaints; thus, FNF argues NU should have asserted the discovery provision at the outset of the litigation.  There is no evidence NU intended to waive this issue.  *USLIFE Sav. & Loan Ass'n v. Nat'l Surety Co.*, 115 Cal. App. 3d 336, 348 (1981).

[20]Both the Discovery and Termination provisions examine *when* an insured learned of a loss.  Despite the similar purpose, the two provisions have distinct features.  The Court discusses those differences below.

Period."  Pls.' Opp. Ex. 1 at 35 (Rider 13).  The Discovery Provision applies to all perils covered by the FIB – whether the insured seeks indemnity under any one of Insuring Agreements A through E (*e.g.*, Employee Dishonesty, Loss of Property on the Premises, Forgery, Fraudulent Real Property Mortgage Coverage, etc.).

FNF argues that discovery is an affirmative defense, thus, NU carries the burden of proving the policy excludes coverage.

NU has the better argument.  The Ninth Circuit interpreted identical language and held that the Discovery Provision relates to whether an event falls with the scope of basic coverage, thus, the insured has the burden of proof.  *FDIC v. N.H. Ins. Co.*, 953 F.2d 478, 482-83 (9th Cir. 1991).  This rule makes sense because the insurance company does not have access to "facts within the personal knowledge of the insured."  *Id.* at 483.  Placing the burden on the insurer would require it to prove a negative – that the insured did not discover the loss within a certain period.  *Id.*

Thus, to secure a partial judgment of liability, FNF must show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

**B.  <u>Meaning of "Legal department"</u>**

A threshold issue is whether the category of persons who knew the facts were within FNF's "Legal department."  Unlike the standard provision that examines the insured's knowledge, the Discovery Rider was written especially for FNF.  The FIB limits the class of people whose knowledge counts to those in the "Risk Management department or Legal department."  Pls.' Opp. Ex. 1 at 35 (Rider 13); *Eaglepitcher Mgmt. Co. v. Zurich Am. Ins. Co.*, 640 F. Supp. 2d 1109, 1121 (D. Ariz. 2009).  There is no evidence that the Risk Management department was involved, but the parties dispute whether Chicago Title employees Nancy Richmond and Jeffrey Dondanville fall within the definition of "Legal department."  The FIB does not define the term.

FNF argues that the term "Legal department" refers only to General Counsel.

FNF argues that it negotiated narrow language to ensure that the Discovery Provision would be triggered only by the knowledge of someone with the authority and responsibility to report an insurance claim to NU.  Neither Dondanville nor Richmond were responsible for submitting claims to FNF's insurance carriers.  Pls.' Ex. 48 (Dondanville Depo. at 179-80).  Indeed, FNF states that the broker made a mistake in the 2005-2006 FIB because the term "Legal department" should have been changed to "General Counsel."  Pls.' Opp. Ex. 8 (Leggett Decl. ¶ 2 & Ex. A). FNF notes that this change was made in the 2006-2007 bond, thus showing the mutual intent to further limit the class of people who can discover a loss.  Pls.' Opp. Exs. 9 (Rider No. 13), 4 & 8 (Ex. A) ("We need to tighten" this language).  General Counsel is located at FNF's national headquarters, while Richmond and Dondanville work at a regional office.  Pls.' Opp. Ex. 6 (Depo. at 9-10) (Dondanville identifies title as Western Regional Manager of Claims Department).

NU argues that there is undisputed evidence that Richmond is a member of the "Legal department."  *E.g.* Def.'s Ex. 84 (Richmond's title listed as "Assistant Vice President, Claims Counsel").  NU relies on Richmond's own deposition testimony that "the claims department is within the legal department."  Def.'s Opp. Ex. 108 (Depo. at 239).  She testified that the legal department has three parts – claims, litigation, and recoupment – and that claims counsel was "one part of the legal department."  *Id.*  NU also argues that Dondanville is a member of the "Legal department" based upon Richmond's affirmative answer to the question that he was her boss in the "Fidelity legal department."  Def.'s Opp. Ex. 120 (Depo. at 724-25).

FNF responds by arguing that Richmond's status as an attorney is not sufficient.  FNF contends that NU twists her testimony out of context.  Both Richmond and Dondanville were employed by the "Claims department" in a regional office of a subsidiary.  Pls.' Opp. Exs. 2 (Richmond Depo. at 6), 3 (Richmond Decl. ¶ 2), & 6 (Dondanville Depo. at 9-10).  Neither of them had the responsibility of submitting insurance claims to NU.  Pls.' Ex. 48 (Dondanville

Depo. at 179-80).

The Court rejects FNF's argument, which is largely based on a bond that is not relevant to its breach of contract suit. The Discovery Provision in the 2005-2006 bond is narrower than a traditional bond using the term "Insured," but it is not as narrow as the definition that FNF advances. If FNF wanted to prove that Richmond incorrectly characterized her job position, it could have submitted an organizational chart or a clarifying declaration from her. The Court concludes that Richmond's and Dondanville's knowledge is relevant to the Discovery Provision because the undisputed facts show they work in the Legal department. *Hudson Ins. Co. v. Oppenheim*, 81 A.D.3d 427, 428 (N.Y. App. Div. 2011); *Diebold Inc. v. Continental Cas. Co.*, 430 Fed. Appx. 201, 207-08 & n.6 (3d Cir. 2011) (unpub. slip op.) (discussing which employees were encompassed by term "Risk Management Department" based upon practical considerations of the employee's job duties).

**C. <u>Reasonable Person Standard</u>**

In the context of fidelity bonds that cover Employee Dishonesty, "[i]t has long been established, under authority declared by the Supreme Court, that a loss is discovered once an insured has obtained facts that would cause a reasonable person to charge that there has been dishonesty or fraud resulting in loss." *Gulf USA Corp. v. Federal Ins. Co.*, 259 F.3d 1049, 1058 (9th Cir. 2001). The United States Supreme "Court held that the insured was required to give notice to the insurer one it 'had knowledge – not simply suspicion – of the existence of such facts as would justify a careful and prudent man in charging another with fraud or dishonesty.'" *Id.* (citation omitted). "In other words, 'discovery of loss does not occur until the insured discovers facts showing that dishonest acts occurred and *appreciates the significance of those facts*; suspicion of loss is not enough." *Id.* (citing *Cal. Union Ins. Co. v. Am. Diversified Sav. Bank*, 948 F.2d 556, 563 (9th Cir. 1991) (applying California law)).

In the *Gulf USA* decision, the Ninth Circuit described the standard as

knowledge that "would justify a reasonable and prudent person to believe that an act of dishonesty [or theft] and loss within the coverage of the policy had taken place." *Id.* (citation to treatise omitted); *accord Pacific-Southern Mortg. Trust Co. v. Ins. Co. of N. Am.*, 166 Cal. App. 3d 703, 709, 713 (1985) ("There must be discovery of both the loss and the dishonesty.").

It is not sufficient if the insured reasonably believes the employee's conduct is the result of careless inefficiency, negligent dereliction of duties, or failure to conform to strict business-like methods.  Edward Etcheverry & Guy Harrison, Employee Dishonest – When Does Your Bond "Automatically Terminate"?, 6 Fidelity L.J. 71, 77-78 (2000).  The act must be deliberate dishonesty.  *Id.* (quoting Justice Cardoza's measure of "an infirmity of purpose so opprobrious or furtive as to be fairly characterized as dishonest in the common speech of men") (citation omitted).  The test for discovery blends a subjective standard (*i.e.*, the insured's actual awareness and knowledge of facts and circumstances) and an objective one (*i.e.*, would a reasonable person conclude that fraud occurred).  *Id.* at 85-86. "Mere suspicion" of wrongdoing is not sufficient.  *Id.* at 91.

The cases show that this standard for discovery of loss is well-settled in California jurisprudence.  *USLIFE*, 115 Cal. App. 3d 336 (examining the conduct of the employees and whether insured knew those facts).

NU cites cases from other jurisdictions for the proposition that the insured had a duty to investigate suspicious facts.  *Royal Trust Bank v. Nat'l Union Fire Ins. Co of Pittsburgh, PA*, 788 F.2d 719, 721 (11th Cir. 1986) (applying Florida law); *Utica Mutual v. Fireman's Fund*, 748 F.2d 118, 123-24 (2d Cir. 1984) (applying New York law).  These out-of-Circuit cases hold that the suspicion triggers the duty to investigate, and then considers what the insured would have known had it inquired further.

To date, however, California has not adopted this controversial requirement that the insured has a "duty of inquiry" to investigate its suspicions.  Paul R. Devin

& Allen N. David, *Discovery under Fidelity Bonds:  The Emerging Concept of the Insured's Duty of Inquiry*, 21 Tort & Ins. L. J. 543 (1986); *see Employee Dishonesty, supra*, 6 Fidelity L.J. at 91-92; *USLIFE*, 115 Cal. App. 3d at 344-45. The "should have known" standard advanced by NU is implicitly inconsistent with California and Ninth Circuit law that "mere suspicion" does not constituent "discovery."  California law permits the employer to trust its employees by presuming they made an innocent mistake rather than jumping to the conclusion that they intended to defraud their employer.  *See also Fidelity & Deposit Co. of Maryland v. Hudson United Bank*, 653 F.2d 766, 774 (3d Cir. 1981) ("employer may be commendably slow to be convinced of the depravity of the person whom he has implicitly trusted").  Public policy favors this strong presumption against fraud, which "approximates in strength that of innocence of crime." *Farmers Auto. Inter-Ins. Exch. v. Calkins*, 39 Cal. App. 2d 390, 393 (1940) (internal quotation marks and citation omitted); *Gulf USA*, 259 F.3d at 1059 ("a careful and prudent person does not lightly charge another with committing fraud or an act of dishonesty"); *Mid-Am. Bank of Chaska v. Am. Cas. Co. of Reading, PA*, 745 F. Supp. 1480, 1483 n.2 (D. Minn. 1990) ("rule effects sound public policy" that "employers should not be required to rush to a conclusion of employee dishonesty").

California's definition of discovery does not permit the insured to bury its head in the sand.  The standard examines the subjective knowledge of the insured to determine the actual facts known.  *USLIFE*, 115 Cal. App. 3d at 342-45 ("employer need not act on a hunch or suspicion, but may wait until there are concrete facts"). But the test also includes an objective component that asks whether a reasonable person would understand that those acts were fraudulent.  *Id.* at 342-45 (Court rejected as "untenable" the insured's argument that it did not understand significance of acts established in the record; no triable issue of reasonableness on the facts presented); *accord  FDIC v. Oldenburg*, 34 F.3d 1529, 1542 (10th Cir. 1994) (citations omitted) (cease and desist order by federal and state regulators

09CV140

1    established dishonesty as matter of law when officers "were well aware of the facts

2    surrounding the [] transaction"); *Fidelity & Deposit Co. of Maryland*, 653 F.2d at

3    775 ("trier of fact must find the pertinent underlying facts known to the insured and

4    must further determine subjective conclusions reasonably drawn therefrom")

5    (quotation marks and citation omitted).

6            **D.  Facts Construed in Light Most Favorable to NU**

7            Both parties seek summary judgment on this element of the breach of contract

8    claim. The question is "whether there is a need for a trial – whether, in other words,

9    there are genuine factual issues that properly can be resolved only by a finder of fact

10   because they may reasonably be resolved in favor of either party." *Anderson v.*

11   *Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  Because FNF bears the burden of

12   proving it first discovered the loss after November 18, 2005, it must demonstrate the

13   absence of a genuine issue of material fact and entitlement to judgment as a matter

14   of law. *Celotex*, 477 U.S. at 323.  When making this determination, all inferences

15   drawn from the underlying facts must be viewed in the light most favorable to NU.

16   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

17   "Credibility determinations, the weighing of the evidence, and the drawing of

18   legitimate inferences from the facts are jury functions, not those of a judge, [when]

19   he is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

20           Several aspects of NU's presentation of the evidence are problematic.  One

21   flaw is that NU combines the knowledge of all those working at Chicago Title.  The

22   Discovery Provision in this case, however, is limited to actual facts known by the

23   Legal department.  For all practical purposes, the relevant evidence pertains to

24   knowledge of the Claims Counsel, Richmond, and to a lesser extent, her boss,

25   Dondanville.  Yet, NU often cites the testimony of Nieto's immediate supervisors,

26   Kimberly Ray and Diane Slover-Lindsey, in the Escrow Department.  But unless the

27   managers gave that information to the Legal Department, their knowledge of events

28   is not relevant to the Discovery Provision.

Second, the discovery standard examines the facts actually known at the relevant time. *Resolution Trust Corp. v. Fidelity and Deposit Co. of Maryland*, 205 F.3d 615, 630 (3d Cir. 2000). Later acquired knowledge is not relevant. *Id.*; 46 C.J.S. Ins. § 1301 ("Facts must be viewed as they would have been at the time discovery is asserted and not in light of knowledge that was subsequently acquired.") (footnote & citation omitted); Etcheverry, *supra*, 6 Fidelity L.J. at 85-86 (test is subjective to extent it considers insured's subjective knowledge of facts). An insured, however, may point to new facts learned during the bond period to support its argument that it did not previously appreciate the significance of the earlier incident. *Gulf USA*, 259 F.3d at 1060; *USLIFE*, 115 Cal. App. 3d at 341-42, 346.

NU repeatedly relies on evidence developed during the underlying litigation (*e.g.*, victims' testified their signatures were forgeries) as well as more recent evidence (*e.g.*, allegations in Nieto's 2010 Information). *E.g.*, Def.'s Reply Br. at 4 & n.7 (citing Def.'s Opp. Ex. 6 (Ex. A, ¶ 24 & pp. 14-17 to Burke 2008 POL is based on depositions of Cora and William)); Def.'s Br. at 5. A proper analysis of NU's Discovery provision examines the facts available to the insured in 2004, but does not consider information that the co-conspirators hid until 2007.

The most notable example of the problem is NU's use of revelations from Norton's deposition. Following Norton's guilty plea in August 2007, the victims deposed him over seven days from July 31 to September 7, 2007. (NU also deposed Norton in July 2011. Def.'s Opp. Ex. 140.) Norton implicated Chicago Title employees Gainor and Nieto in his scheme. *E.g.*, Def.'s Opp. Ex. 23 (Ex. A, pp. 19-22 to Dominguez & Reyes 2008 POL cites Norton's deposition for accusations about Nieto). For example, Norton testified that Nieto watched him sign the victims' names to stacks of escrow documents. *E.g.*, Def.'s Opp. Ex. 6 (Ex. A, ¶¶ 28-29 & pp. 10-14 to Burke 2008 POL is based upon Norton's deposition). To the extent that the "non-wrongdoing employees" at Chicago Title were unaware of this

1    conduct at the time the wrongdoers assisted Norton, it is not relevant to the

2    Discovery Provision. *Cal. Union*, 948 F.2d at 564.

3        Similarly, NU frequently cites the summaries that FNF prepared and

4    submitted in 2008 and 2011 with its Proof of Loss forms. *E.g.*, Def.'s Br. at 11 &

5    17 (citing Sr. Holdaway POL); Def.'s Opp. Br. at 19, 22; Def.'s Reply Br. at 4 & n.7

6    (citing 15 POL forms). Statements in the proof of loss form do not necessarily

7    reflect the date the Legal Department discovered the facts. *See FDIC v. N.H. Ins.*,

8    953 F.2d at 484. The POL forms were compiled *after* the victims' conducted

9    extensive discovery in State Court. NU exacerbates the problem by characterizing

10   statements in those exhibits as "admissions" by FNF. *E.g.*, Def.'s Br. at 11 (stating

11   that "Richmond discovered" and "Richmond knew" facts by quoting allegations

12   from Sr. Holdaways' second amended complaint and citing the POL); Def.'s Opp.

13   Br. at 19 (stating that "FNF's proofs of loss confirm" discovery). The POL forms

14   summarize allegations made; they are not admissions. Pls.' Reply Exs. 1-2 (Exs.

15   A).

16       Third, NU's brief relies on a confidential legal memorandum prepared by

17   *Cumis* counsel for the separate Errors and Omission policy concerning whether or

18   not to settle the Jr. Holdaway action. *E.g.*, Def.'s Br. at 11, 15, 17 (citing Def.'s

19   Opp. Ex. 103); Def.'s Opp. Br. at 21-22; Def.'s Reply Br. at 4, n.7. The Court held

20   that this June 27, 2007 memorandum is protected by the attorney-client privilege,

21   and, in the alternative, the Court excluded the document under Rule 403. [Doc. No.

22   423] NU can not use *Cumis* counsel's interpretation and analysis of facts.

23       Fourth, NU often overreaches. For example, NU insists that the letters from

24   Medhi and his lawyer (Henein) show that FNF knew "that Nieto had fraudulently

25   induced Medhi" to commit fraud. *E.g.* Def.'s Opp. Br. at 18; Def.'s Reply Br. at 4;

26   Def.'s Opp. Ex. 88. But Medhi simply reported to Chicago Title that he did not

27   receive the credit that he had negotiated with the sellers. Pl.'s Ex. 46 (Medhi Depo.

28   at 73-74, 102) (Dave Price, an associate of Norton's, arranged for $24,000 as

"closing costs").  Medhi never accuses Chicago Title of fraud; instead, he thanks Nieto for her help in trying to solve the problem.  *Accord* Pls.' Opp. Ex. 14 (Medhi Depo. at 105) ("Chicago Title did its best. . . . I have nothing against Chicago Title").  Medhi's attorney threatens to pursue breach of contract remedies. Inferences must be reasonable.  *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987) (speculative inferences do not defeat summary judgment); *Mayweathers v. Terhune*, 328 F. Supp. 2d 1086, 1092-93 (E.D. Cal. 2004) ("inferences are not drawn out the air").

The Court now summarizes the evidence relating to the Kaplan and Medhi transactions based on its careful examination of the record.  NU relies on these two transactions by "bona fide" buyers to show Discovery in 2004.

## 1.  **Kaplan Transaction and Settlement**

In May 2004, Kaplan bought Unit P2 in the Crown Point condominiums.  *See* Def.'s Opp. Ex. 69.  Kaplan was a "bona fide purchaser," that is, a stranger to Norton, as compared to a Safe Harbor investor.

Nieto was the Escrow Officer on the transaction.  *See* Def.'s Opp. Ex. 84 (Richmond's Nov. 5, 2004 memo).

Soon after escrow closed in June 2004, Kaplan received a notice of default on a loan had not been paid from the proceeds in escrow.  *See* Def.'s Opp. Exs. 69-70 (referencing WaMu loan).  Kaplan contacted Nieto.  Nieto reported that the computer did not show that loan.  Def.'s Opp. Ex. 69 (Ex. A, Nieto email dated July 13, 2004).  The Manager of the Escrow Department  (Frank Gregory) examined the file and told the Claims Manager (Dondanville) that a deed of trust had been "missed."  *Id.*; *see* Pls.' Opp. Ex. 2 (Richmond Depo. at 9).  Gregory noted the connection to Norton, as the prior deed holders included a client of Norton (Ramsour) and affiliated parties (Plan B, Inc. and Kim Secor).  Def.'s Opp. Ex. 69.

Dondanville asked Richmond to handle Kaplan's claim.  Richmond described the problem as "Title Search mistakenly asserted property as Free and Clear – and

two Deed of Trust loans did NOT get paid off."  Def.'s Opp. Ex. 70 (Brief dated July 21, 2004); *accord id.* Exs. 84 (Nov. 5, 2004 memo describes the problems as: "Title search missed Deed of Trust signed by Ramsour on a previous conveyance," and Chicago Title "also missed a Deed from previous transfers to an entity also associated with Norton"), 123 (Richmond Depo. at 55-56) (confirming that claim involved a missed deed of trust); Pls.' Opp. Ex. 2 (Richmond Depo. at 9-10).

After obtaining the files and investigating, Richmond contacted Norton to resolve who was responsible for paying the loan.  Def.'s Opp. Exs. 70-72, 78 (notes from Aug. 12, 2004 telephone call); *id.* Ex. 73 (Depo. at 18, 24, 29).  During their August 2004 conversation, Richmond and Norton accused each other of committing bank fraud.  Def.'s Opp. Ex. 77 (Norton Depo. at 387) (Norton relied on sales contract for proposition that Medhi could not ask Cross Properties for a credit outside escrow, and said if Chicago Title pursued that theory, it was bank fraud); Pls.' Opp. Ex. 12 (Norton Depo. at 333-336); Pls.' Reply Ex. 3 (Richmond Depo. at 384-87) (Richmond accused Norton of committing seller's fraud by inflating price of condominium).  Norton testified that Richmond threatened to sue him and to "shut you down."  Def.'s Opp. Ex. 77 (Norton Depo. at 280); *see id.* 78 (Richmond's note of Aug. 2004 conversation states Norton was angry "so many people had called" threatening to sue, but Richmond said no one from legal department said that).

When Gainor stepped in and made other arrangements for Chicago Title to recoup the funds, Richmond arranged for Chicago Title to pay the outstanding $283,000 loan to extinguish the cloud on Kaplan's condominium.  *See* Pls.' Opp. Ex. 2 (Richmond Depo. at 54-64, 74-86); Def.'s Opp. Exs. 75-76.  By January 2005, Gainor and Michael Godwin (Branch Manager, Vice President for San Diego County, and Gainor's supervisor) negotiated a Settlement Agreement with Norton (Safe Harbor) to resolve the Kaplan situation.  Norton "authorized" Chicago Title to recoup $253,000 by taking $25,000 from eleven other Norton-escrows.  *See* Def.'s

1    Opp. Ex. 80 (Godwin Depo. at 120).

2          Toward the end of 2004, Chicago Title decided it should "ratchet down" its

3    dealings with Norton by handling only those escrows between Norton and a bona

4    fide purchaser.[21]  Def.'s Opp. Ex. 80 (Godwin Depo. at 120).  Godwin denied that

5    the decision was based on a belief that Norton was untrustworthy.  *Id.*  Aside from

6    the eleven escrows related to the Settlement Agreement, Chicago Title decided it

7    would *not* handle Norton's investor-to-investor escrows.  *Id.*; Def.'s Opp. Ex. 101

8    (Godwin Depo. at 1410-15); *see* Def.'s Opp. Ex. 120 (Richmond Depo. at 724).

9    Chicago Title would rely on Nieto, the Escrow Officer who was most familiar with

10   Norton, to determine which transactions satisfied that distinction.  Def.'s Opp. Ex.

11   102 (Godwin Depo. at 119-20).

12         By July 2005, the escrow department had concerns that Norton was still

13   submitting investor-to-investor transactions, which violated the spirit of the

14   Settlement Agreement.  Def.'s Opp. Ex. 115 (email dated July 14, 2005 from

15   Slover-Lindsey to Godwin & Gainor).

16                        **2.  Medhi Transaction**

17         In July 2004, Medhi, a bona fide buyer, agreed to buy Unit 215.  The sellers

18   were clients of Norton (the Lankfords), and their realtor, David Price, worked for

19   Norton's Cross Properties.  *See* Def.'s Opp. Ex. 88.  Medhi stated that:  "After a few

20   phone calls with Mr. Dave Price the price was finalized on July 27, 2004 at

21   $395,000 but the sellers requested that [the] selling price should be shown as

22   $419,000 and they would pay a $25,000 [sic, $24,000] credit back to me at the time

23   of escrow."  *Id.*  Price explained "that the sellers have other condos in the complex

24   and they want the selling price to reflect the higher price for future potential

25   buyers."  *Id.*  Medhi states that Price told him "not to worry since they have had a

26   number of similar escrow closings with the Chicago title Company [that] knows

27   what to do."  *Id.*  Medhi agreed but had "misgivings."  Pls.' Opp. Ex. 14 (Medhi

28   _____

[21]It is unclear whether Richmond or Godwin first made this recommendation.

Depo. at 79-81, 124).  The purchase agreement reflected the inflated sales price and listed $24,000 "for closing costs."  Pls.' Opp. Exs. 15 (p. 7) & 16 (Ex. A).

Nieto served as the Escrow Officer on this transaction.  Escrow closed in August 2004.

The lender approved Medhi's $168,000 loan, but objected to the $24,000 credit being categorized as "closing costs."  Pls.' Exs. 16 (Ex. A), 46 (Medhi Depo. at 100-04).  Nieto's supervisors (Ray, Lindsey-Slover, and Gainor) intervened to remedy the situation and determined that the check would come from the sellers, outside of escrow.  *See* Def.'s Opp. Ex. 88 (Medhi's letter).

On September 21, 2004, Medhi wrote to Nieto for help because he had not received the money that he had been promised at closing.  *Id.*  There were dozens of telephone conversations about the situation.  Pls.' Ex. 46 (Medhi Depo. at 43).  Medhi also reported that *Norton* had promised to send a check but never followed through.  Def.'s Opp. Ex. 88.  A few days later, Norton's attorney (Cavanagh) said "they do not owe me anything."  *Id*.  Medhi was concerned with any plan that required Norton's company to return the funds.  *Id.*; Pls.' Ex. 46 (Medhi Depo. at 101-04).

On November 5, 2004, Medhi's attorney (Samy Henein) wrote a demand letter to Chicago Title offering to settle for $22,000.  Def.'s Opp. Ex. 89.  According to that letter, both Nieto and Norton had assured Medhi that the credit arrangement was "common."  *Id.*  The lawyer accused Chicago Title of breaching the escrow instructions and "falsely" promising that the funds would not be paid through the seller.[22]  *Id.*

Richmond, Claims Counsel, responded to the letter by telephoning Medhi's

---

[22]Medhi's attorney accuses Nieto of "falsely" representing that Chicago Title would not return the funds to Norton's entity.  This refers to a conversation between Medhi and Nieto concerning how to fix the problem after escrow closed.  Medhi did not trust Norton (or his associates Price and Cavanagh) and he did not want Cross Properties to process the funds.  Eventually, however, all agreed the solution involved the seller returning the funds to Medhi.  Pls.' Ex. 46 (Medhi Depo. at 103) ("That's correct.  I had no other choice.").

attorney.  Her notes of the conversation indicate that she expressed "dismay" about Nieto's comments.  *See* Def.'s Opp. Ex. 87.  Richmond viewed the problem as breach of promise; she did not view Medhi's letter as an accusation of fraud or employee dishonesty.  Pls.' Opp. Ex. 2 (Richmond Depo. at 105-12, 121).

Two weeks later, Richmond believed the matter had been resolved.  In a letter to Medhi's attorney, Richmond wrote that Medhi had erred in his judgment in agreeing to credit and acknowledged that the arrangement was not standard practice at Chicago Title.  Def.'s Opp. Ex. 92 ("your client was in error in signing the Addendum and placing himself in a problematical position"; "we question his agreeing to such an arrangement"; "Chicago Title's standards do not support the actions demonstrated in the closing").

On December 9, 2004, Medhi's attorney informed Richmond that he had <u>not</u> received a check.  Def.'s Opp. Ex. 93.

Richmond wrote to Norton's attorneys (Mary Cavanagh for Cross Properties) expressing her "shock" that the funds had not been returned to Medhi.  Def.'s Opp. Ex. 96; *accord id.* Exs. 73 (Richmond Depo. at 142-44, 151), 97, 116 (Richmond also wrote a demand letter to the Lankfords, as she believed the sellers were liable to Medhi); Pls.' Opp. Ex. 2 (Richmond Depo. at 138-44).

Ultimately, Chicago Title paid Medhi on the belief that Norton (through Cross Properties) would soon reimburse the company.  Def.'s Opp. Ex. 98-100; *id.* Ex. 73 (Richmond Depo. at 155-57).

By December 2004, Richmond had significant concerns about Norton's integrity.  Def.'s Opp. Ex. 90 (Richmond Depo. at 491); *accord id.* 73 (Depo. at 144).   Richmond knew that Norton had "a history of using various condos for borrowing and transferring title."  Def.'s Opp. Ex. 84 (memo dated Nov. 5, 2004); *accord id.* Ex. 72 (informing Kaplan that Norton "orchestrates the investments" at Crown Point and that sellers were "connected with Mr. Norton in some way").  She testified that this was not necessarily done to take equity from the property for other

1   businesses.  Pls.' Opp. Ex. 2 (Richmond Depo. at 66-71, 89-92) ("I did not see

2   flipping, no.").

3   However, at his deposition in 2011, Dondanville interpreted Richmond's

4   comment about Norton as indicating that "[t]here's a scheme going on here

5   apparently . . . of trying to steal money . . . [from] anyone they can get their money

6   from I assume."  Def.'s Opp. Ex. 74 (Dondanville Depo. at 65-66).[23]

7   Richmond carefully distinguished between her concern about how Nieto

8   processed the escrow *and* any belief that there was fraud *by the employee*.  Def.'s

9   Opp. Ex. 95 (Richmond Depo. at 87) (In response to attorney's question that the

10  Medhi credit was "fraudulent, Richmond answered, "It was incorrect."), 104.

11  Nonetheless, Richmond had concerns about Nieto because she had assured Medhi

12  that Chicago Title regularly handled escrows with credits to the buyer.  Pls.' Opp.

13  Ex. (Richmond Depo. at 116-18, 122) ("It gave me pause with the Escrow Officer.";

14  "She said she would give him the funds and she did not."); Def.'s Opp. Ex. 95

15  (Richmond Depo. at 87, 115); Def.'s Opp. Ex. 108 (Richmond Depo. at 381-83).

16  Richmond knew that Medhi's $24,000 credit did not reflect closing costs, thus, the

17  structure violated company standards.  Def.'s Opp. Ex. 94 (Richmond Depo. at

18  104).  Because she knew that customers could obtain credits for legitimate reasons,

19  she did not believe that the Medhi transaction was fraudulent.  Pls.' Opp. Ex. 2

20  (Richmond Depo. at 119-21).  In about January 2005, Richmond shared her

21  concerns with Nieto's supervisor, Diane Slover-Lindsey, that Nieto should not be

22  involved "in any of Norton's escrows."  *Id.* (Depo. at 116); Pls.' Reply Ex. 3 (Depo.

23  at 384-86).  Richmond feared that Nieto was being "intimidated" by Norton and that

24  she lacked the experience to handle his accounts.  Pls.' Opp. Ex. 2 (Depo. at 135-36,

25

26   [23]NU contends this is an "admission" that Dondanville knew about Norton's
    fraud as of the dates of the July 2004 email and Richmond's November 4, 2004 memo.
27   FNF states that Dondanville first saw those documents at his 2011 deposition.  Def.'s
    Opp. Ex. 74 (Depo. at 28-32 & Errata Sheet); Pls.' Opp. Br. at 8.  Dondanville clarified
28   that there were other, legitimate explanations for the same conduct.  Pls.' Opp. Ex. 6
    (Depo. at 180-81).

188-89, 194).

In addition, Richmond also had concerns about Gainor's close relationship to Norton. *See* Pls.' Opp. Ex. 2 (Richmond Depo. at 156-60).

### 3. <u>Applying Discovery Standard to Facts and Reasonable Inferences</u>

It is clear to the Court that NU is *not* entitled to judgment as a matter of law that FNF's Legal department discovered the loss in 2004. *ACLU*, 333 F.3d at 1097.

It is a closer question whether the evidence on the discovery element "is so one-sided" that FNF "must prevail as a matter of law." *Anderson*, 477 U.S. at 251. In regards to Nieto, the Chicago Title employee relevant to the Employee Dishonest Insuring Agreement, FNF presents a strong case that Richmond only knew facts in 2004 indicating that Nieto was negligent, incompetent, or used bad judgment on the two Norton-escrows.[24] *Cal. Union Ins. Co.*, 948 F.2d at 564-65 (awareness of "infractions of banking regulations, and perhaps that internal banking procedures were not followed" did not amount to knowledge of dishonest acts by employee); *Fidelity & Deposit Co. of Maryland*, 653 F.2d at 774 (discrepancies and irregularities can have innocent explanations; "the employer may be commendably slow to be convinced of the depravity of the person whom he has implicitly trusted") (citation omitted); *Mid-Am. Bank of Chaska*, 745 F. Supp. at 1483 (employer attributed the employees' acts "which were not entirely in line with accepted banking practice" to "negligence or bad business judgment"). Nonetheless, the Court concludes that NU would be entitled to have a jury evaluate the credibility of Richmond's explanations about her view of Nieto's conduct and draw its own inferences whether Nieto knowingly processed an escrow with an artificially-inflated sales price. *Resolution Trust*, 205 F.3d at 629-33; *Hanon v.*

---

[24]FNF objects to the use of Medhi's attorney's rendition of what Nieto told Medhi as inadmissible hearsay. A Court can rely only on admissible evidence when deciding a summary judgment motion. *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002) (citing *Beyene v. Coleman Sec. Services, Inc.*, 854 F.2d 1179, 1181-82 (9th Cir. 1988). The objection is well-taken.

*Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992) (issues that turn on credibility should not be resolved at summary judgment stage); *Bieghler v. Kleppe*, 633 F.2d 531, 533 (9th Cir. 1980) (when non-moving party's evidence would support a favorable inference, "it is sufficient to defeat summary judgment even if it is not highly convincing or persuasive") (citation omitted).

But the Court need not resolve the fact question as it relates to the Employee Dishonesty Insuring Agreement because FNF is entitled to judgment as a matter of law on the separate Forgery Insuring Agreement. The two perils are separate and independent. *State Farm*, 10 Cal. 3d at 101-02 (coverage clauses are broadly construed). NU does not cite any language or case law to support its view that they overlap. *White*, 40 Cal. 3d at 882-83 (exclusion must be plain).

In so far as FNF's breach of contract claim relies on the Forgery Insuring Agreement, the Court concludes that the evidence supports only one reasonable conclusion: FNF's Legal department did not discover that Norton was forging escrow documents when Chicago Title handled the Medhi and Kaplan claims in 2004. Importantly, the Legal department did not have any facts in 2004 regarding Norton's use of forged documents on these or other escrows.[25] In other words, forgery did not cause the Medhi or Kaplan loss. *See Valley*, 854 F. Supp. 2d at 709.

The only evidence bearing on the Legal department's discovery of forged

_____

[25]The Discovery Provision examines facts known by the Legal Department. *Eaglepitcher*, 640 F. Supp. 2d at 1121 (a policy may limit the class of persons whose knowledge counts).

There is evidence that Nieto's direct supervisors in the Escrow Department were suspicious of a few signatures in Norton's escrows. Def.'s Opp. Ex. 83, 85. The emails were sent to [Dean McGill] but were not shared with the Legal department. In any event, Nieto's supervisor testified, "[w]e didn't have any facts" in January 2005 to conclude they were forgeries. Def.'s Opp. Ex. 82 (Lindsey-Slover Depo. at 67).

Similarly, Nieto's supervisors knew Nieto had mailed notary fees to herself in 2003, but there is no evidence that the Legal Department knew this information. Def.'s Opp. Ex. 146 (email forwarded to Godwin, Branch Manager). NU relies on these incidents in connection with the separate Termination Provision, discussed below.

The Court rejects the evidence of the supervisors' knowledge for purposes of applying the Discovery Provision, which depends upon the knowledge of persons in the Legal department. *Eaglepitcher*, 640 F. Supp. 2d at 1121.

documents is found in Richmond's declaration, dated April 12, 2012.  Pls.' Opp. Ex 3 (Richmond Decl.).  Richmond states that "on or about November 10, 2005, the daughter of Anthony and Janet Marino called alleging that her parents' signatures on certain trust deeds that had been recorded and that had related to certain escrow transactions that closed at Chicago Title Company were forged." *Id.*  This phone call occurred during the 2004-2005 FIB, which is not the bond at issue in this litigation.  The 2005-2006 bond commenced on November 18, 2005.  Richmond investigated the "escrow data over the weekend of November 19th and 20th, 2005." *Id.*  Richmond states that she first formed "the opinion concluded that Mr. Norton was a crook" on November 20, 2005, two days into coverage under the 2005-2006 FIB.  Sometime after November 20, a Sunday, Richmond advised Dondanville of her investigation into the Marino forgery.  NU has not contested these facts, which at best, show the Legal department knew that a customer's daughter alleged forgery by someone.  This evidence does not establish that a reasonable person would have accused Norton of forgery before November 18, 2005.  *Gulf USA*, 259 F.3d at 1058. "Suspicion of loss is not enough."  *Id.*; *Pacific-Southern*, 166 Cal. App. 3d at 709, 713.

### E.  A Type of Loss Covered by the Bond

As an alternative, FNF argues that the undisputed facts establish that the FIB did not cover either the Medhi or Kaplan transactions.  The Discovery Provision is not triggered by the discovery of *any* dishonesty.  The policy requires an "aware[ness] of facts which would cause a reasonable person to assume that <u>a loss of the type covered by this bond</u> has been or will be incurred."  Pls.' Opp. Ex 1 at 35 (Rider 13) (emphasis added).

The Court agrees that NU has failed to present evidence showing that either the Kaplan or Medhi transaction involved a type of loss covered by the FIB.  *Cal. Union Ins. Co.*, 948 F.2d at 564-65 (discovery hinges on "specific facts to indicate knowledge beyond suspicion on the part of the Insured that *covered losses*

1    *occurred*”) (emphasis added); *Pacific-Southern*, 166 Cal. App. 3d at 711 (It is not

2    sufficient that the reasonable person concludes a “potential” loss “could be”

3    incurred.); *see Gulf USA*, 259 F.3d at 1059 (citing treatise for proposition that

4    discovery takes place when insured learns of employee’s dishonesty “and loss

5    withing policy coverage”).

6         FNF correctly identifies the direct cause of the Kaplan claim as a missed deed

7    of trust.  Kaplan’s escrow closed without paying off all outstanding loans because

8    the title search did not report the WaMu loan.  The FIB expressly excludes coverage

9    for “an incorrectly or dishonestly prepared title search.”  Pls.’ Opp. Ex. 1 at 14, §

10   2(f); *see* NU Answer ¶ 17; Def.’s Opp. Ex. 157 (2009 letter at 6-7) (declining

11   coverage to title search claims involved in other victims’ cases).

12        There is no evidence that anyone at Chicago Title thought Nieto acted

13   dishonestly, as opposed to negligently, in the Kaplan escrow.  *See Mortgage Assoc.,*

14   *Inc. v. Fidelity & Deposit Co. of Maryland*, 105 Cal. App. 4th 28, 34 (2002).  NU

15   cites allegations from the underlying complaints that Nieto relied on Norton’s office

16   (Todd Johnson) to conduct title searches.  But even if this were common

17   knowledge, the FIB excludes coverage for a “dishonestly prepared title search.”

18   Pls.’ Opp. Ex. 1, § 2(f)(i).

19        Regardless of who caused the Medhi’s $24,000 loss or how his claim is

20   characterized, it was not covered by the FIB because it was far below the $250,000

21   deductible. Pls.’ Opp. Exs. 1 (Decl., Item 4); Pls.’ Opp. Ex. 10 (Answer ¶ 9); *see*

22   Def.’s Opp. Ex. 73 (Richmond Depo. at 154-55).  The policy limits NU’s indemnity

23   obligation to the declarations, which contains the deductible amount.  *See* David D.

24   DiBiase & Jacqueline Kirk, Riders on the Storm:  An Examination of Industry

25   Trends Relative to Special Fidelity Bond Riders and Endorsements, 3 Fidelity L.J.

26   115, 116 (1997) (declarations are the “baseline from which all policy claims must be

27   analyzed” because the state the limits for each peril).  A loss less than the deductible

28   cannot be covered.

In sum, there is no need for a jury to resolve any facts concerning the Discovery Provision as applied to the Kaplan and Medhi escrows because the policy, as a matter of law, did not cover either transaction.

## V.  **Termination of Coverage as to Dishonest Employee Nieto**

Section 12 states that "[t]his bond <u>terminates as to any Employee . . . as soon as any insured</u>, or any director or officer not in collusion with such person, <u>learns of any dishonest or fraudulent act committed by such person</u> involving a value of more than Ten Thousand ($10,000) Dollars or which occurred within three (3) years from the Insured's discovery or knowledge or which occurred during employment by the Insured, <u>whether or not of the type covered under Insuring Agreement (A)</u>," the coverage for Dishonest Employee.  Pls.' Opp. Ex. 1 at 39 (Prior Dishonesty Waiver; Rider No. 17) (emphasis added).

### A.  **Requirements of Termination Provision**

As mentioned, the Termination Provision is similar to the Discovery Provision in that both examine what and when the insured learned about a dishonest act.  Both apply a reasonable person standard to the known facts.  Termination occurs when the insured becomes aware of facts which would cause a reasonable, prudent person to charge the employee of committing a specific dishonest or fraudulent act.  *Gulf USA*, 259 F.3d at 1058-59; *FDIC*, 953 F.2d at 485.  "[A]n employer need not act on a hunch or suspicion, but may wait until there are concrete facts."  *USLIFE*, 115 Cal. App. 3d at 344.

There are three important differences.  First, the parties agree that the Termination Provision is an affirmative defense on which NU bears the burden of proof.  23 Williston on Contracts § 63:14 (2014).  Similar to a cancellation provision, the burden is on the insurer seeking to avoid performance of a covered loss.  *See* 2 Couch on Ins. § 30:19 (3d ed. 2013); 2 Ins. Claims & Disputes § 9.1 (6th ed. 2014).

Second, the Termination Provision considers the knowledge of "any insured,

09CV140

1  or any director or officer not in collusion" with the dishonest employee.  By

2  contrast, the Discovery Provision narrowed the category to persons in the Legal or

3  Risk Management Departments (*i.e.*., Richmond and Dondanville).  The language

4  used in the Termination Provision broadens the class of persons knowledge to "any

5  insured."  As suggested by the reference to corporate officers and directors, the term

6  "insured" refers to high level employees.  It includes any honest person at FNF with

7  authority to control the employee's conduct, including senior executives and branch

8  managers.  *See Employee Dishonesty, supra*, 6 Fidelity L.J. at 79-84; cite 9th Cir.

9  (wrongdoer not considered).

10      Godwin's position as Branch Manager and a Vice President for San Diego

11  County satisfies this standard.[26]

12      It is unclear if Richmond's job as Claims Counsel satisfies the definition.  She

13  recommended that Nieto not handle anymore Norton escrows, which suggests she

14  had some control over employees; however, Richmond was overruled by Godwin,

15  who assigned Nieto to continue working on the Norton account.

16      NU assumes, but does not show, that Nieto's direct supervisors (Ray and

17  Slover-Lindsey) in the Escrow Department had the level of authority to qualify as

18  the "Insured."  FNF does not challenge the classification.

19      For purposes of deciding the summary judgment motion, but without

20  deciding, the Court assumes that Richmond, Dondanville, Godwin, Ray, and

21  Lindsey-Slover satisfy the definition of "insured" in the Termination Provision.  *See*

22  *Cal. Union*, 948 F.2d at 563 (parties agreed that term "insured" applied to "general

23  counsel or some other person in a position of responsibility).

24

_____

25      [26]Many victims named Godwin as an individual defendant.  This motion does not contain evidence that Godwin colluded with Norton.

26      By contrast, the victims alleged that Assistant Vice President and Sales Manager Gainor helped Norton.  Gainor was not indicted, though he allegedly was a long time

27  personal friend of Norton and business associate on the Crown Point project.

      In 2010, Nieto pled guilty to one count of mail fraud for accepting a check from

28  Norton's  check in October 2005 when she knew that the account did not have sufficient funds.  Def.'s Opp. Ex. 131; Case No. 10-CR-4544; *see supra* footnote 2.

1   A third difference concerns the nature of the act.  The Termination Provision

2   applies to "any dishonest or fraudulent act . . . involving a value of more than Ten

3   Thousand ($10,000) Dollars . . . whether or not of the type covered under Insuring

4   Agreement (A)."  Pls.' Opp. Ex. 1 at 39 (Rider 17).

5   The $10,000 requirement renders irrelevant the three or four incidents when

6   Nieto paid herself $50 to $125 for notary fees without permission.  Def.'s Opp. Exs.

7   125 (Ray Depo. at 180-82) (small loss statement forms), 146 (Ray's Nov. 2003

8   email reports "finding more files where Zuzzette charged fees and paid herself"),

9   148-51 ($125 loss).

10   Medhi's credit of $24,000, however, would satisfy the dollar threshold for the

11   purpose of applying the Termination Provision. Unlike the Discovery Provision

12   discussed above, the deductible would not come into play because the type of loss

13   need not be "covered" by the FIB to trigger the Termination Provision.  A

14   termination clause may apply when an employer learns that an employee engaged in

15   a dishonest act, regardless of whether the dishonest act resulted in an actual loss.

16   *Ciancetti  v. Indemnity Ins. Co. of N. Am.*, 168 Cal. App. 2d Supp. 785, 786 (1959)

17   (employer knew employee stole money from petty cash, even though she later

18   returned the funds).

19   **B.  Interpretation of Contract Language**

20   NU relies on Nieto's involvement in the Medhi transaction in 2004.  The

21   Medhi escrow occurred *before* the 2005-2006 Bond Period commenced.[27]  FNF

22   argues the policy's use of the present tense verb "terminates" and the phrase "as

23   soon as" the insured "learns of" dishonest conduct means that the clause applies to

24   knowledge obtained *"while* the policy is in effect."  FNF relies on a line of cases

25   interpreting similar language. *E.g.*, *Waupaca Northwoods, LLC v. Travelers Cas. &*

26   *Sur. Co. of Am.*, 2011 WL 1563278 (E.D. Wash. 2011) (a reasonable person would

27

28   [27]The Court agrees with FNF that NU's analysis of prior bonds is irrelevant. FNF's claim is based on the 2005-2006 FIB.  NU's affirmative defense depends upon the interpretation of the Termination Provision in the contract at issue.

09CV140

1    expect a "termination" provision to apply to "knowledge that is gained after the

2    effective date of the policy, not before"); *Home Savings Bank v. Colonial Am. Cas.*

3    *& Sur. Co.*, 598 S.E.2d 265, 269-70 (N.C. Ct. App. 2004); *C.A. White, Inc. v.*

4    *Travelers Cas. & Sur. Co. of Am.*, 2009 WL 121891, at *12-13 (Conn. Super. Ct.

5    2009).

6         Pointing to a split of authority, NU argues that a California decision,

7    *Ciancetti*, 168 Cal. App. 2d Supp. at 786,[28] implicitly adopted the interpretation that

8    "the policy never applied to [Nieto] when it took effect" on November 18, 2005 if

9    the employer knew she had committed a prior dishonest act.  *Cooper Sportswear*

10   *Mfg. Co. v. Hartford Cas. Ins. Co.*, 818 F. Supp. 721, 725 (D.N.J. 1993); *e.g.*, *C.*

11   *Douglas Wilson & Co. v. Ins. Co. of N. Am., Philadelphia, PA*, 590 F.2d 1275,

12   1277-79 (4th Cir. 1979); *RTC v. Aetna Cas. & Sur. Co.*, 873 F. Supp. 1386, 1388

13   (D. Ariz. 1994); *Capital Bank & Trust Co. v. Gulf Ins. Co.*, 91 A.D.3d 1251, 1252-

14   54 (N.Y. App. Div. 2012).

15        The parties' public policy debate about who should bear the risk of

16   employing a person with a prior record of dishonesty is interesting, but immaterial.

17   *Employee Dishonesty*, *supra*, 6 Fidelity L.J. at 71 (arguing "common sense" and

18   "fundamental fairness" require that "[a]n employer who discovers an individual's

19   dishonesty should continue to employ that individual only at the employer's own

20   peril as to further losses, not at the peril of the insurer.").  The language of this FIB

21   addresses the problem with the additional conditions that termination applies when

22   the employee's dishonest act "occurred within three (3) years from the Insured's

23   discovery or knowledge" *or* "which occurred during employment."  Pls.' Opp. Ex. 1

24   at 39 (Rider 17).

25

26        [28]The Court rejects NU's assertion that the *Ciancetti* decision adopted a hard
27   rule one way or the other.  The insurance policy in *Ciancetti*, 168 Cal. App. 2d Supp.
     at 786, required the insured, its partners, and its directors to declare to the best of their
28   knowledge that no officer had committed fraud.  The officer knew that the employee
     had taken the money after being forbidden to borrow from petty cash.  The FIB in this
     case does not contain that additional requirement.

09CV140

1    The Court interprets this language, assuming all other conditions are met, as

2    precluding coverage under Insuring Agreement A if NU shows that FNF had

3    sufficient facts to accuse Nieto of committing a dishonest act that predated the

4    2005-2006 Bond Period but satisfies either the three-year rule or "during

5    employment" rule. *Waupaca Northwoods*, *supra*, at *2 ("If an insurer intends to

6    exclude losses caused by any of its insured's employees who have a prior record of

7    dishonesty, including dishonest that precedes the effective date of the policy, from

8    its theft coverage, it may certainly do so. But it must use language that makes its

9    intent clear to its insured."). NU's reliance on the Medhi transaction in 2004

10   qualifies. Pls.' Opp. Ex. 64 (July to Nov. 2004).

11   **C. <u>Application of Termination Provision to Facts</u>**

12   NU argues there is no triable issue of fact that coverage for Nieto terminated

13   because Chicago Title knew she directly participated in a fraudulent scheme to

14   artificially inflate the purchase prices of Crown Point condominiums, even if the

15   Medhi transaction was not itself a covered loss. *First Nat'l Bank of Louisville v.*

16   *Lustig*, 961 F.2d 1162, 1168 (5th Cir. 1992); *Ciancetti*, 168 Cal. App. 2d Supp. at

17   786-87 ("borrowing" money from petty cash triggered termination clause when

18   employer admonished employee not to do so).

19   NU relies on the some of the same evidence discussed in connection with the

20   Discovery Provision. The Court applies the same limitations on admissible,

21   relevant evidence set forth in that section. As such, the evidence shows that

22   Richmond learned that Nieto violated company standards by closing an escrow that

23   gave Medhi a credit. Assuming for the moment that NU is able to overcome FNF's

24   valid hearsay objection, Nieto assured Medhi that it was a common structure at

25   Chicago Title.

26   On the other hand, FNF points out that Richmond's concern about fraud

27   related to Norton, a non-employee, because of his response to Richmond's effort to

28   resolve deal that Medhi had made with the seller of the condominium.

1    On this record, the Court cannot weigh the evidence to resolve the
2  Termination issue in either party's favor. *Anderson*, 477 U.S. at 250, 255.

3        As set out in the next section, even if the Court were to find that Nieto, the
4  dishonest employee, was not covered by the 2005-2006 fidelity bond, the Court
5  concludes that the FIB is written to cover loss caused by Norton, a non-employee,
6  under the separate Forgery Insuring Agreement.

7        **D.  Impact of Termination of Nieto as Dishonest Employee on Separate**
8  **Forgery  Insuring Agreement**

9        NU argues that the Termination clause impacts more than the Dishonest
10  Employee Insuring Agreement to exclude coverage under all other perils, including
11  Forgery.  NU argues that there is no language limiting its application to coverage
12  for a Dishonest Employee (Insuring Agreement A). *See* Perry Depo. at 229 [Doc.
13  No. 327-6, p. 13]. NU argues that Nieto could not have relied in good faith on any
14  forged documents because she knowingly participated in the scheme to artificially
15  inflate the sales price of Crown Point condominiums.

16        In so far as this argument concerns the interpretation of the insurance policy,
17  it raises a question of law. *Universal City Studios*, 208 Cal. App. 4th at 737;
18  *Century Transit*, 42 Cal. App. 4th at 125.

19        The Court concludes that the language of the FIB supports FNF's position
20  that it is independently covered by the Forgery Insuring Agreement.   The
21  Termination Provision of coverage for an employee is not relevant to coverage
22  under the Forgery Insuring Agreement by a non-employee.

23        While some fidelity bonds may only cover the traditional Employee
24  Dishonesty claim, FNF purchased an FIB that covers other perils. The FIB covers
25  perils such as robbery and forgery.  These perils can be triggered with or without a
26  dishonest employee.  If NU intended to limit its risk on these other perils whenever
27  a dishonest employee participated, then it was required to include clear language to
28  exclude claims "arising out of" an employee's dishonest  act. *Continental Cas. Co.*

1  *v. City of Richmond*, 763 F.2d 1076, 1080-81 (9th Cir. 1985) (California law
2  broadly construes "arising out of" to include notion of "incident to or having
3  connection with") (citations omitted); *Acceptance Ins. Co. v. Syufy Enters.*, 69 Cal.
4  App. 4th 321, 328 (1999) (collecting cases). NU has not pointed to any language in
5  the FIB policy that binds the separate provisions together.

6      "Under California insurance law, when two different risks concur in
7  proximately causing a loss, coverage will be upheld if either risk is covered,
8  notwithstanding the exclusion of the other." *Continental Cas.*, 763 F.2d at 1081-82
9  & n.1 (citations omitted). Applying that doctrine here, Nieto's alleged dishonest
10  conduct to close an escrow with an artificially-inflated value is unrelated to and
11  independent of Norton's use of forged signatures to steal his clients' savings. The
12  Court agrees with FNF's reasonable interpretation of the plain language that
13  employee involvement is irrelevant to Forgery coverage. "The exact manner of
14  causation did not matter, since coverage in this case exists for losses caused by
15  forgery regardless of employee dishonesty." Pls.' Br. at 23.

16      Further, the Termination Provision excludes losses caused by the employee's
17  dishonest conduct. *Eaglepitcher*, 640 F. Supp. 2d at 1120. An employee's
18  "involvement" or "participation" is not sufficient. If NU wanted to eliminate
19  coverage for forgeries when the insured's employees facilitated the transactions, it
20  could have drafted the Termination provision to extend to any other loss arising out
21  of the dishonest employee's conduct. Under the plain terms of the 2005-2006 FIB
22  as written, FNF's claim satisfies the requirements of the Forgery Insuring
23  Agreement (Rider 25), but NU has not identified language that makes an
24  employee's collusion relevant to that covered peril.

25  **VI.  Breach of the Implied Covenant of Good Faith and Fair Dealing**

26      FNF's second cause of action alleges that NU breached its duty to investigate
27  and make a coverage determination under all available Insuring Agreements in the
28  FIB policy. FNF argues NU compounded its failures by misconduct during this

litigation as well as when NU maliciously pressured FNF to drop the lawsuit by threatening not to renew the package of insurance policies.  FNF moves for partial summary judgment on the issue of liability, but requests a trial on the amount of compensatory and punitive damages.  NU opposes the motion.  It seeks summary judgment in its favor that it did not breach the implied covenant because FNF could not explain its claim and there was a "genuine dispute" about coverage.

## A. **Factual Background of NU Claims Process**

NU assigned Mark Wolin, a Complex Claims Analyst, to the FIB claim. Wolin's diary notes describe each step and communication of the claims process. Pls.' Ex. 4 (Wolin Depo. at 35-36, 50, 182, 227-28); Def.'s Opp. Ex. 55 ("Tool Kit Notes").  After reviewing the initial complaints, Wolin identified issues about when FNF discovered the loss, how Norton was connected to FNF, and how to calculate the amount of loss.   Def.'s Opp. Ex. 55 (July 24, 2006 entry); Def.'s Opp. Ex. 53 (July 26, 2006 letter).  NU acknowledged receipt of the FIB claim subject to a full reservation of rights.  Def.'s Opp. Ex. 53 (July 26, 2006 letter).

In August 2006, FNF sent NU the First Amended complaints from the First Wave of underlying litigation.  Pls.' Ex. 17.  These lengthy complaints contain extremely specific details about the role that Chicago Title's employees allegedly played in Norton's fraudulent scheme.  *E.g.*, Pls.' Ex. 7 ¶ 155 (Burke and Jr. Holdaway allege that Chicago Title recognized that the "obvious" fraud of the Kaplan settlement to deduct funds from 11 other Norton escrows because  "every one of those escrows was fraudulent and involved forged documents") (bold text omitted).  For example, the victims alleged that Chicago Title knew that forged documents were used because the employees failed to follow the standard procedure of having the seller and buyer appear in person at the closing and show identification to a notary before signing escrow documents.  *Id.* ¶ 141.  Instead, Norton sent notarized documents to Chicago Title.

The victims described Norton's scheme with specificity.  They alleged that

1   Norton would "knowingly and intentionally induce persons (hereafter 'straw

2   purchasers') to allow Norton and others to place condominium units in the straw

3   purchasers' names." *E.g.*, Def.'s Ex. 23 (Ex. A at 2) (summarizing the Hamilton

4   complaint which includes Reyes). Norton did not disclose this arrangement to the

5   lenders, and submitted false loan applications. *Id.* "It was a further part of the

6   scheme that Norton and others would, and did, sign the names of individual

7   investors on grant deeds and other escrow closing documents, and would cause

8   those signatures to be notarized by notaries working on [sic] Norton's office and

9   elsewhere." *Id.*

10      The victims sued Chicago Title under theories of breach of fiduciary duty,

11  negligence, fraud, conversion, and unfair competition, among other torts; and

12  because many victims were elderly, they alleged claims under California's Elder

13  Abuse statute. Pls.' Ex. 7 ¶¶ 14, 143, 287-89.

14      Wolin spent one day reviewing these complaints. Def.'s Opp. Ex. 55 (Nov. 6,

15  2006 entry).

16      As discovery progressed in State Court, the victims amended their pleadings

17  with additional allegations about employees who participated in Norton's fraud.

18  Significantly, the victims alleged that "CTC, through Gainor and Nieto, had actual

19  knowledge that these signatures were forgeries" because they watched Norton sign

20  "a stack" of documents "on numerous occasions." Def.'s Opp. Ex. 7 (Ex. A ¶¶ 36,

21  40-41) (quoting Burke/Holdaway Second Amended Complaint). In one instance,

22  Nieto allegedly faxed a grant deed to Norton's office in Ramona, and quickly

23  received the notarized signature of the owner, who lived in Utah. Def.'s Opp. Ex. 9

24  (Ex. A ¶ 28) (citing Sr. Holdaway's second amended complaint); *id.* (Ex. A ¶ 46)

25  (signature obtained in 30 minutes). When Norton needed more capital, the victims

26  alleged that Nieto helped devise "Loop de Loop" transactions, deceive investors,

27  and inflate the price of the condominiums. Def.'s Opp. Ex. 7 (Ex. A ¶¶ 37-39, 42-

28  49). The complaints quote from a letter that Medhi's lawyer wrote to Chicago Title,

as well as reciting the terms of the Kaplan Settlement (discussed above).  *Id.* (Ex. A ¶¶ 52, 68).  Nieto also allegedly assisted Norton by relying on his office to verify liens instead of conducting an independent title search.  *Id.* (Ex. A ¶ 58).  They also alleged that Norton co-mingled their money.  Def.'s Opp. Ex. 7 (Ex. A ¶ 34); *accord id.* Ex. 9 (Ex. A ¶ 20) (alleging Nieto knew Norton was misappropriating funds from his elderly clientele).

Over the next few months, FNF gave NU voluminous information about the underlying litigation, including the above-mentioned amended pleadings and multiple volumes of deposition transcripts by several Chicago Title employees and each victim.  *E.g.*, Pls.' Ex. 5 (Kenna Decl. ¶¶ 11, 15 & Exs. G-P & V-CC); Pls.' Opp. Ex. 18 (Kenna Decl. ¶¶ 5-9) (listing dozens of deposition transcripts and sworn statements).  Many Chicago Title employees testified.  *Id.* (deposition lists include Godwin, branch manager; Richmond, claims counsel; and Ray and Slover-Lindsey, Nieto's supervisors).  However, Gainor and Nieto invoked their Fifth Amendment rights.  There is no indication in the claims adjustor's log to indicate that NU reviewed these documents.  *Cf.* Def.'s Opp. Ex. 55 (Oct. 23, 2007 entry).  NU merely indicated that "Insured alleges it may have suffered a loss due to Employee Dishonesty" because three Chicago Title employees allegedly conspired with Norton to "steal funds held in escrow."  *Id.*  (Oct. 11, 2007 entry).

On August 22, 2007, Norton tendered a guilty plea to one count of mail fraud.  Case No. 07-CR-2260 [Doc. Nos. 1 & 8].[29]  Norton admitted that his scheme "drew equity out of the Crown Point condominiums through a series of sham purchase transactions and refinances involving numerous escrows for the transfer, financing and refinancing of the individual condominium units."  Pls.' Ex. 8 at 3, ¶ 4. Norton

---

[29]The Court takes judicial notice of Norton's criminal case. Fed. R. Evid. 201(b); *Rosales-Martinez*, 753 F.3d at 894-95; *Strickland*, 601 F.3d at 968; *Lee*, 250 F.3d at 689-90.  A magistrate judge presided over the plea colloquy.  After several continuances, the district court accepted Norton's plea and imposed sentence in accordance with the written plea agreement.  Case No. 07-CR-2260 [Doc. Nos. 26 & 51].

also admitted that his scheme transferred ownership of condominiums without the knowledge of the investors and diverted escrow funds to Norton for his personal benefit. *Id.* at 5, ¶ 11(c). On that same day, Norton's associate Greer admitted that he had notarized signatures on grant deeds and other closing documents though he knew the purported signers had not in fact signed the documents. *See supra* footnote 2.

During that same time, the victims deposed Norton for seven days. *See* Pls.' Ex. 20 at 15-16 (between Aug. 10 and Sept. 7, 2007). Overall, Norton's description of his scheme matched the allegations the victims made in their complaints. Norton credited the success of his scheme to Gainor, who had recruited Nieto's cooperation because she was "accommodating" and kept quiet. Def.'s Opp. Ex. 6 (July 2008 Proof of Loss summarizes Norton's deposition testimony) (Ex. A at 15) (citing Norton's Depo. Vol. III at 531-34). For example, Norton stated that it was Gainor's idea to use straw buyers because lenders offered better loan terms on owner-occupied units. *Id.* (Ex. A at 13) (citing Norton's Depo. Vol. III at 502-04). Norton also testified that Nieto and Gainor had watched him sign other names to escrow documents. *Id.* (Ex. A at 12) (citing Norton's Depo. Vol. I at 15-17, Vol. II at 429). FNF promptly submitted the seven volumes of transcripts and a detailed summary of Norton's testimony to NU. Pls.' Ex. 5 (Kenna Decl., Ex K) (Sept. 17, 2007 index lists Norton's deposition transcripts); Def.'s Opp. Ex. 55 (Oct. 23, 2007 entry).

On October 31, 2007, Wolin prepared an Executive Claims Summary identifying three issues on FNF's "claim for Employee Dishonesty." Def.'s Opp. Ex. 176. The first issue Wolin identified was whether "the employees were knowing participants in the scheme and intended to cause a loss to the insured and gain a financial benefit in the subject loan transactions." *Id.* The second "key" issue was "whether there was an escrow account and did the employees believe the transactions were bona fide." *Id.* The third issue was "quantum," that is, the amount of loss. *Id.* The first and second issues relate to language in the Employee

1    Dishonesty provision.  Pls.' Opp. Ex. 1 (Rider 2); *see* Pls.' Exs. 4 (Wolin Depo. at

2    81-84), 9 (Perry Depo. at 229).

3    "NU retained coverage counsel in October 2007 to provide coverage advice

4    and to provide review and analysis of the underlying actions."  Def.'s Opp. Br. at 5

5    (citations omitted); *cf.* Def.'s Opp. Ex. 64 (Supp. Resp. to Interrog. No. 33) (NU

6    does not rely on affirmative defense that it relied on the advice of counsel).

7    In July 2008, FNF summarized the factual and contractual bases for its claim

8    in its "original" Proof of Loss ("POL") forms.  The forms cited the victims'

9    deposition testimony identifying the forged documents.  *E.g.*, Def.'s Opp. Ex. 8 (Ex.

10   A at 17-19) (Jr. Holdaway).[30]  FNF again identified several grounds for indemnity,

11   including both the Dishonest Employee and Forgery Insuring Agreements.  *Id.* ¶ 2;

12   *see* Def.'s Opp. Ex. 59 (Sept. 4, 2008 Kenna letter); *accord* Def.'s Opp. Exs. 3 (Dec.

13   2006 Kenna letter lists possible bases for coverage), 173 (Loverich Decl., Ex. 1F)

14   (July 2006 notice of original complaints describes forgery allegations).  NU's

15   claims adjustor noted the receipt of the Marino matter, but did not read or review

16   the information.  Def.'s Opp. Ex. 55 (July 22, 2008 entry).

17   On September 8, 2008, NU requested the escrow files relating to each claim.

18   Pls.' Ex. 27.

19   On September 15, 2008, when NU had still failed to pay the benefits due

20   under the FIB, FNF filed this breach of contract lawsuit.  In the course of this

21   litigation, FNF voluntarily narrowed its claims to nine victims and 85 escrow

22   transactions.  Between November 2006 and October 2007, FNF settled these claims

23   for  over $64 million.  Def.'s Opp. Exs. 6, 8, 9, 11-14, 23.  FNF also pleads a claim

24   for tortious breach of the covenant of good faith and fair dealing because NU "failed

25   to deal fairly and in good faith with Plaintiffs by unreasonably failing to

26   acknowledge coverage or take any coverage position, conduct any investigation,

27

28   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [30]As with the other statements in Exhibit A to the Proof of Loss forms, FNF was summarizing allegations from the victims' State Court complaints. *See infra* page 45.

1   evaluate the Proofs of Loss or pay the amounts due."  Compl. ¶¶ 24, 28 (alleging

2   NU disregarded its obligations to "communicate, investigate, evaluate and pay . . .

3   to place its insureds, Plaintiffs, at a disadvantage and not because of any legitimate

4   dispute").  Finally, FNF seeks a declaration of NU's duty to indemnify it.

5         During this combative litigation, FNF withdrew and replaced its original POL

6   forms with revised versions.  Def.'s Exs. 33 (Nov. 5, 2009 letter), 34 (Dec. 29, 2009

7   letter).  The revised POL forms contain a simple, brief statement that "Norton

8   perpetrated his fraud by and through certain escrow transactions closed by Chicago

9   Title."  *Compare* Def.'s Opp. Ex. 35 (4 page Burke revised POL lists 4 escrows)

10  *with* Def.'s Opp. Ex. 6 (22 page Burke original POL).  At that time, FNF withdrew

11  its claim for complete indemnification based upon the amount of each settlement,

12  and replaced its calculation of damages with a much lower amount, based on

13  specific escrow transactions.  *E.g.*, Def.'s Opp. Ex. 41 ¶ 13 (Ludwig Revised POL);

14  *compare* Def.'s Opp. Ex. 6 (Burke original POL claims loss measured by $4 million

15  settlement) *with* Def.'s Opp. Ex. 35 (Burke revised POL claims $993,000 loss based

16  on 4 escrows).  FNF again noted that its claim was potentially covered by four

17  different Insuring Agreements in the FIB, including Forgery.  *E.g.*, Def.'s Opp. Ex.

18  42 (revised Marino POL lists 3 unauthorized escrow transactions).

19        **B.  Law Governing Implied Covenant of Good Faith**

20        "A covenant of good faith and fair dealing is implied in every insurance

21  contract."  *White*, 40 Cal. 3d at 885 (citations omitted).  "In general, the standard of

22  good faith and fairness calls for consideration of the reasonableness of the insurer's

23  conduct."  *Shade Foods, Inc. v. Innovative Prods. Sales & Marketing, Inc.*, 78 Cal.

24  App. 4th 847, 879 (2000) (footnote omitted); *accord Austero v. Nat'l Cas. Co. of*

25  *Detroit, Mich.*, 84 Cal. App. 3d 1, 26 n.22 (1978) ("the words 'bad faith' are

26  actually an imprecise label for what is essentially some kind of *unreasonable*

27  insurer conduct."), *disapproved on another ground in Egan v. Mutual of Omaha*

28  *Ins. Co.*, 24 Cal. 3d 809, 824 (1979).

1    The duty of good faith continues even after the insured sues the insurer

2    because the contractual relationship "does not terminate with commencement of

3    litigation." *White*, 40 Cal. 3d at 885.  A different rule would allow the insurance

4    company to delay serious investigation until suit is filed and insulate its post-

5    litigation conduct from the duty of good faith.  *Id.* at 886; *Jordan v. Allstate Ins.*

6    *Co.*, 148 Cal. App. 4th 1062, 1076 n.7 (2007).

7    "Among the most critical factors bearing on the insurer's good faith is the

8    adequacy of its investigation of the claim." *Shade Foods*, 78 Cal. App. 4th at 879.

9    "'An insurance company may not ignore evidence which supports coverage.'"

10   *Jordan*, 148 Cal. App. 4th at 1074 (quoting *Mariscal v. Old Republic Life Ins. Co.*,

11   42 Cal. App. 4th 1617, 1624 (1996)).

12   "[I]t is essential that an insurer fully inquire into possible bases that might

13   support the insured's claim." *Egan*, 24 Cal. 3d at 815.

14   "The implied promise requires each contracting party to refrain from doing

15   anything to injure the right of the other to receive the agreement's benefits.  To

16   fulfill its implied obligation, an insurer must give at least as much consideration to

17   the interests of the insured as it gives to its own interests.  When the insurer

18   unreasonably and in bad faith withholds payment of the claim of its insured, it is

19   subject to liability in tort. *Jordan*, 148 Cal. App. 4th at 1071-72 (citations omitted).

20   The tort involves more than a breach of contract or mistaken judgment, but is based

21   on conscious and deliberate act that unfairly frustrates the common purpose of the

22   policy. *Century Surety Co. v. Polisso*, 139 Cal. App. 4th 922, 948 (2006); *Shade*

23   *Foods*, 78 Cal. App. 4th at 879-80.

24   The reasonableness of the insurer's actions and decisions "must be evaluated

25   at the time that they were made; the evaluation cannot fairly be made in the light of

26   subsequent events that may provide evidence of the insurer's errors." *CalFarm Ins.*

27   *Co. v. Krusiewicz*, 131 Cal. App. 4th 273, 286 (2005).

28   "The reasonableness of an insurer's claims-handling conduct is ordinarily a

1   question of fact." *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1161 (9th

2   Cir. 2002) (citations and alterations omitted). In some instances, however, the

3   evidence may demonstrate as a matter of law that the insurer breached the implied

4   covenant. *Silberg v. Cal. Life Ins. Co.*, 11 Cal. 3d 452, 457 (1974).

5       The Court concludes that the undisputed evidence establishes that NU

6   breached the implied covenant. The Court finds that NU ignored coverage for

7   Forgery even though its insured raised the issue and the forgery was apparent from

8   the outset. Moreover, NU had all the essential information as early as August 2007,

9   and certainly by July 2008, but had not determined coverage as late as March 2011.

10   NU's excuses are not supported by the record or the law. The genuine dispute

11   doctrine is not applicable to this case. The Court concludes that FNF is entitled to

12   summary adjudication that NU acted in bad faith for the following, interrelated and

13   overlapping, reasons.

14   **C. <u>Analysis</u>**

15       **1. <u>NU Had All Necessary Information to Analyze the Norton</u>**

16   **<u>Claim Before FNF Filed this Lawsuit in September 2008</u>**

17      NU defends itself by contending that it conducted the best investigation it

18   could with the information it had. Def.'s Opp. Exs. 153 (Expert Report), 158

19   (Wolin Depo.), 176 (Executive Claim Summary). NU blames FNF for failing to

20   identify and explain its claim. *E.g.*, Def.'s Br. at 6 (arguing it did not have the

21   "factual basis of FNF's fidelity bond claim"). NU states that it repeatedly requested

22   "information" so it could begin to investigate. *E.g.*, Def.'s Ex. 55 (Jan. 5, 2007,

23   June 12, 2007, Jan. 10, 2008, and Feb. 29, 2008 requests); Pls.' Ex. 16 (Breazeale

24   Depo. at 19-20, 70).

25       The record belies this unsubstantiated excuse. The evidence is overwhelming

26   that FNF fulfilled its duty to cooperate with the insurance company, yet NU utterly

27   failed to analyze the available facts. From the time it first notified NU of the Norton

28   claim in July 2006 based on the initial State Court complaints, FNF kept NU fully

1    informed about the nature and status of the victims' lawsuits.  *See* Pls.' Opp. Ex. 21

2    (Felton Depo. at 123-26).  For example, FNF sent the amended pleadings that

3    contained additional allegations about Chicago Title's role in allowing Norton to

4    defraud investors for three years.

5        The discovery process was active.  The victims pursued Chicago Title and

6    thoroughly explored its business relationship with Norton and the Crown Point

7    condos.  The victims had a strong incentive to examine the escrow company's

8    standard practices and uncover evidence that Chicago Title ignored "red flags" such

9    as the Kaplan and Medhi transactions.  *E.g.*, Def.'s Opp. Exs. 13 (Ex. A at p. 2), 14

10   (Ex. A at pp. 1-8).  The victims had alleged in their pleadings that Nieto and Gainor

11   had watched Norton forge signatures on escrow documents as support for their

12   breach of fiduciary duty and negligence claims against the escrow company.  *E.g.*,

13   Def.'s Opp. Ex. 9 (Ex. A at p. 4 ¶ 22).  As this First Wave of underlying lawsuit

14   progressed, FNF promptly provided NU with the deposition transcripts of dozens of

15   witnesses.  Many employees and victims testified for several days.  *E.g.* Pls.' Br. at

16   15-16 (Godwin, 6 days; Richmond, 5 days; Slover-Lindsey, 5 days; Ray, 4 days; K.

17   Holdaway, 3 days).  These are the same facts that NU now relies upon to advance its

18   arguments that the Discovery and Termination provisions apply.

19       Aside from spending one day reading the voluminous complaints in

20   November 2006, the evidence does not show that NU actually processed the

21   information that FNF provided.[31]  During his deposition, Wolin acknowledged that

22   FNF gave the fidelity bond claims department information about any developments

23   in the underlying litigation.  Yet, there is scant indication that the claims adjustor

24   reviewed the extensive deposition transcripts themselves or the summaries prepared

25   by FNF's attorney.  Pls.' Ex. 20 (list of new case documents and a 24-page

---

[31]Initially, Wolin thought Norton was an employee.  Def.'s Opp. Ex. 55 (Jan. 5, 2007 entry).  FNF had to correct Wolin's mistake by pointing out that Norton did not work for the insured.  Def.'s Opp. Ex. 132 (July 6, 2007 Kenna letter).

The Court discusses NU's contention that it was waiting for "signed and notarized" Proof of Loss forms below.  Def.'s Opp. Ex. 55 (Feb. 28, 2008 entry).

deposition log); *cf.* Pls.' Ex. 4 (Wolin Depo. at 258-61) (claims adjustor recalls that Norton testified about Nieto's involvement, but Wolin did not prepare a written analysis or chart of those facts in relation to either Employee Dishonesty or Forgery coverage).

This lack of attention is especially troubling as to two critical items.  Once Norton entered his guilty plea in August 2007, FNF immediately submitted a summary of his deposition testimony from the victims' civil cases.  *See* Def.'s Opp. Ex. 55 (Oct. 23, 2007 entry) (confirming receipt).  Norton unabashedly detailed his scheme over the course of seven days.  He specifically described using forged escrow documents, and claimed both Nieto and Gainor watched him do so.  Norton's compelling testimony corroborated the victims' allegations in their pleadings that Norton had signed his investors' names on escrow documents without their knowledge or permission.  Norton's candid deposition was devastating evidence against Chicago Title.  No one else could have described the operation of the fraud scheme as well as Norton did, even if Nieto and Gainor had waived their Fifth Amendment rights.  Second, FNF also gave NU a copy of Norton's plea agreement, and that of his associate, Greer.  The short and simple factual statements in these documents clearly establish that Norton's associates notarized forged signatures to process sham escrows.  The guilty pleas conclusively establish the material facts of the fraud charges.  *Cazares*, 121 F.3d at 1246-47.

Wolin did not prepare any written summaries of the voluminous information, and did not analyze whether the witnesses' testimony would potentially support a coverage decision one way or the other.  *E.g.*, Pls.' Ex. 4 (Wolin Depo. at 46-49, 54-58, 69) (did not consider forgery coverage).  Instead, he reviewed "the voluminous documentation provided on the CDs *in order to avoid duplication* in our future request for documents."  Def.'s Opp. Ex. 55 (Aug. 29, 2007 entry) (emphasis added).  Cataloguing the receipt of information does not satisfy the insurer's duty to investigate the foundation of a claim.  *Egan*, 24 Cal. 3d at 819; *Frommoethelydo v.*

1  *Fire Ins. Exchange*, 42 Cal. 3d 208, 219-20 (1986) (failure to follow up on known

2  facts violates duty to investigate); *Mariscal*, 42 Cal. App. 4th at 1624-25.

3       NU missed another opportunity to educate itself about the underlying facts in

4  July 2008 when FNF submitted 31 original Proof of Loss Forms.  Def.'s Opp. Exs.

5  6-24, 55 (July 22, 2008 entry).  FNF outlined its claim for coverage for its direct

6  loss under several possible Insuring Agreements and sought indemnity for

7  settlement payments it made to First Wave litigants.  FNF provided a

8  comprehensive summary of the facts and attached supporting exhibits for each

9  claimant.  Exhibit A organized the raw data into a detailed statement of the

10  allegations that victim made in his individual complaint and the relevant deposition

11  testimony concerning his financial investment with Norton's Crown Point project

12  and the various unauthorized escrow transactions.  *E.g.*, Def.'s Opp. Exs. 8 (Ex. A

13  at 2, 6-9, 17-19 to Jr. Holdaway), 11 (Ex. A at 2-4, 10-12 to Euro-Canadian), 12

14  (Ex. A at 7-8 to Ludwig).  The summary contains extensive quotations from

15  Norton's 2007 depositions.  The claims adjustor recorded every task performed in

16  his "Tool Kit Notes," but that log does not indicate Wolin spent any time reading

17  these lengthy documents.  Pls.' Ex. 4 (Wolin Depo. at 182); Def.'s Opp. Ex. 55

18  (July 16 & 22, 2008 entries and lack of entries in August 2008).

19       In sum, NU's assertion that it did not understand the "factual basis" or the

20  "nature of the claim" defies common sense.  *White*, 40 Cal. 3d at 886 (insurer's duty

21  of good faith includes prompt investigation); *Jordan*, 148 Cal. App. 4th at 1074

22  (ignoring evidence that supports coverage indicates bad faith) (citing *Mariscal*, 42

23  Cal. App. 4th at 1624); *Shade Foods*, 78 Cal. App. 4th at 879 (insurer's primary

24  duty is to conduct an adequate investigation).

25       **2.  <u>NU Ignored Insuring Agreement D (Forgery or Alteration)</u>**

26       Furthermore, the Court finds that the basis of the escrow company's claim

27  was always the same – Norton's fraud.  And while the facts were complicated, NU

28  knew that Norton, an non-employee, forged documents to process sham escrows.  It

is not necessary to identify the exact date on which NU breached the contract, but the Court observes that FNF was well within its rights to file this complaint alleging bad faith in September 2008.  As just discussed, NU had the facts by that date.  NU should have analyzed whether those facts supported FNF's claim for benefits under the terms of the FIB's Forgery Insuring Agreement.  It did not do so.  The insurer's duty to investigate includes "activities related to the determination of coverage . . . for which benefits are afforded by an insurance policy."  Cal. Ins. Regs., tit. 10, § 2695.2(k) (definition of investigation).[32]  NU overlooked the Forgery provision, thus did not perform any evaluation of the benefits available to FNF.  *Cal. Shoppers, Inc. v. Royal Globe Ins. Co.*, 175 Cal. App. 3d 1, 57 (1985) (duty to investigate arises when insured has actual notice of claim for benefits); *cf. Lunsford v. Am. Guarantee & Liab. Ins. Co.*, 18 F.3d 653, 656 (9th Cir. 1994) (after insurer investigated claim, it based denial on a reasonable construction of the policy).  The inexplicable oversight is objectively unreasonable because FNF's first communication with NU described Norton's use of forged escrow documents.  Def.'s Opp. Ex. 173 (Loverich Decl., Ex. 1F) (July 7, 2006 notice of original complaints).  The record demonstrates that NU had actual notice of the basis of FNF's claim for benefits under Insuring Agreement D(5).  *Cal. Shoppers*, 175 Cal. App. 3d at 56-57.

Moreover, *the insured* raised the issue.  NU's failure to analyze the Forgery provision violates its well-established obligation to consider all possible bases.  *Cal. Shoppers*, 175 Cal. App. 3d at 56 (insurer has a "law-imposed duty to investigate *any* viable theory" of coverage); Croskey, *supra*, Ch. 12C ¶ 12:869:11 (2012).  It was NU's job, not the insured's, to identify potential coverage.  *Jordan*, 148 Cal. App. 4th at 1072-73; Pls.' Ex. 4  (Wolin Depo. at 152-53) (Wolin knew NU had a duty to look for coverage even if insured did not identify an applicable clause); *cf.*

---

[32]Although  California's regulations and statutes do not provide a private right of action, the Court may consider evidence that the insurer violated industry standards. *Jordan*, 148 Cal. App. 4th at 1078.  [Doc. No. 420]

*Cal. Shoppers*, 175 Cal. App. 3d at 55-56 (when an insured's own mistake causes insurer to deny claim, there is no breach of the implied covenant).   Despite the fact that FNF highlighted several Insuring Agreements, including Forgery and Alteration, NU always treated the claim solely as one for Employee Dishonesty. Def.'s Opp. Exs. 3, 55 (Oct. 11, 2007 entry & Nov. 13, 2009 General Note).

Wolin, the claims adjustor in charge of complex claims, cannot explain why he treated the claim only as one for Employee Dishonesty and ignored the other Insuring Agreements.  Pls.' Ex. 16 (Breazeale Depo.) (testifying that Wolin was responsible for claim).  When asked at his deposition why he did not indicate that FNF listed other types of coverage, Wolin said, "I'm not sure I know the answer to that."  Pls.' Ex. 4 (Wolin Depo. at 69).  The absence of any explanation confirms NU's error.  On this record, the oversight is wholly unacceptable.  *Amadeo*, 290 F.3d at 1161-62 (summary judgment appropriate when a court can conclude as a matter of law that an insurer acted unreasonably); *cf. Walbrook Ins. Co. v. Liberty Mutual Ins. Co.*, 5 Cal. App. 4th 1445, 1459-60 (1992) (insurer's negligence or mistaken judgment does not establish bad faith).

Even after receiving Norton's deposition testimony and the written plea agreements, NU did not consider whether the Forgery provision could apply to FNF's FIB claim.  Norton and Greer admitted the essential facts that satisfied the elements of Forgery coverage.  NU simply had to apply the language of its own contract to the actions of these non-employees.  Pls.' Opp. Ex. 1 (Amended Insuring Agreement D – Forgery); *see Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 269 (1966) (insurer has stronger bargaining power to draft contract); *Kransco v. Am. Empire Surplus Lines Ins. Co.*, 23 Cal. 4th 390, 400 (2000) ("the availability of tort remedies in the limited context of an *insurer's* breach of the covenant advances the social policy of safeguarding an insured in an inferior bargaining position who contracts for calamity protection, not commercial advantage"), *cited with approval in Amadeo*, 290 F.3d at 1161; Croskey, *supra*, Ch. 6J ¶ 6:4061 (advising insurers to

1   carefully consider language of specific policy that includes special riders drafted for

2   a particular client); DiBiase, *supra*, 3 Fidelity L.J. at 115-16 (same). The Court

3   finds, as a matter of law, that NU did not analyze "*all* of the possible bases" for

4   coverage. *Jordan*, 148 Cal. App. 4th at 1073.

5       Soon thereafter, in October 2007, Wolin prepared a one-page evaluation

6   solely under the Employee Dishonesty Insuring Agreement. *See* Pls.' Ex. 9 (Perry

7   Depo. at 68-72) (Wolin's supervisor reviewed and approved Executive Claim

8   Summary). The report omits any analysis of forgery coverage, even though the

9   same form recites that Norton "allegedly purchased condos in his clients' names

10   and, in many cases, took out loans against the properties *using forged documents*

11   such as powers of attorney, first trust deeds and other loan papers." Def.'s Opp. Ex.

12   176 (Oct. 2007) (describing "claim for Employee Dishonesty") (emphasis added).

13       This blind spot reached the highest-level of the insurance company. As late

14   as 2011, after years of extensive litigation, NU's senior executives were unaware

15   that FNF sought coverage under the Forgery Insuring Agreement. Pls.' Exs. 6

16   (Smith Depo. at 113-15, 158), 10 (Tatulli Depo. at 274-77). Yet, NU would not

17   change its position. *Id.*; *Shade Foods*, 78 Cal. App. at 880 (an insurer's

18   unwillingness to reconsider its position when presented with errors is evidence of

19   bad faith).[33]

20       Because NU failed to investigate whether the factual allegations provided

21   coverage under the Forgery Insuring Agreement, "it has deprived itself of the ability

22   to make a fair evaluation of the claim" and breached the covenant of good faith and

---

23

24      [33]FNF points to testimony that these executives incorrectly believed that FNF was seeking "double recovery" and had taken "contradictory positions" as between the

25   E&O and FIB policies. To some extent, their testimony concerns their subjective motivation, whereas bad faith is an objective standard. *Morris*, 109 Cal. App. 4th at

26   973-74; Croskey, *supra*, Ch. 12C ¶ 12:837.17 ("If an insurer's handling of a claim is *objectively* unreasonable, its subjective intent is immaterial."); *but see Bernstein v.*

27   *Travelers Ins. Co.*, 447 F. Supp. 2d 1100, 1114 (N.D. Cal. 2006) (covenant of good faith includes subjective duty and may be breached if the insurer subjectively lacks

28   belief in the validity of its act). FNF may present that evidence to support its claim for punitive damages. *Neal v. Farmers Ins. Exch.*, 21 Cal. 3d 910, 922-23 & n.6 (1978) (motive and intent are relevant to award of punitive damages).

09CV140

fair dealing. *Jordan*, 148 Cal. App. 4th at 1074; *Amadeo,* 290 F.3d at 1163 (failure to investigate facts surrounding claim is evidence of bad faith); *cf. Blake v. Aetna Life Ins. Co.*, 99 Cal. App. 3d 901, 919-20 (1979) (contrasting a case when the insurance company's response was fairly described as a "run around" with instant facts when it was "difficult to imagine what [insurer] could have done which it did not do"). The record demonstrates that NU's investigation of the complex FIB claim was unreasonable as a matter of law because it is undisputed that NU ignored whether the Norton loss could be covered by Insuring Agreement D(5) for Forgery. *Egan*, 24 Cal. 3d at 815 ("an insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial"); *Jordan*, 148 Cal. App. 4th at 1073 (an insurance company must "thoroughly" investigate "*all* of the possible bases of an insured's claim" and "may not ignore evidence which supports coverage") (citations omitted).

### 3. <u>The Genuine Dispute Doctrine Does Not Apply to this Record</u>

NU invokes the genuine dispute doctrine, but the record does not support this defense to its bad faith conduct.

In California, "an insurer cannot be held liable for bad faith when it has acted to deny or delay policy benefits with proper cause. One of the ways an insurer can negate an insured's claim that it has acted unreasonably or without proper cause is to demonstrate the existence of a 'genuine dispute' regarding coverage or the amount or extent of the insured's claimed loss." *Jordan*, 148 Cal. App. 4th at 1072.

"[A]n insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract. " *Id.* at 1073. "On the other hand, if the insurer denies benefits unreasonably (*i.e.*, without any reasonable basis for such denial), it may be exposed to the full array of tort remedies, including possible punitive damages." *Id.* "The reasonableness of the insurer's decisions and actions

must be evaluated as of the time that they were made; the evaluation cannot fairly be made in the light of subsequent events that may provide evidence of the insurer's errors." *Id.*

Simply stated, NU cannot rely on this defense because it did not adequately or promptly investigate FNF's claim for Forgery benefits.  *Id.*; *Chateau Chamberay Homeowners Ass'n v. Assoc. Int'l Ins. Co.*, 90 Cal. App. 4th 335, 346-49 (2001).[34] "[T]he genuine dispute doctrine presupposes an investigation that led to a determination that while wrong, was not maintained in bad faith."  Pls.' Reply Br. at 10 (citing *Wilson*, 42 Cal. 4th at 723-24).  "The genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim.  A *genuine* dispute [over policy interpretation or facts] exists only where the insurer's position is maintained in good faith and on reasonable grounds."  *Wilson*, 42 Cal. 4th at 723-24 (citations and footnote omitted).  A more complete answer requires the Court to examine NU's excuses concerning coverage, the Proof of Loss forms, and amount of loss.  *Morris v. Paul Revere Life Ins. Co.*, 109 Cal. App. 4th 966 (2003) (when insurer asserts genuine dispute over interpretation of policy terms, the reasonableness of the insurer's legal argument is a question of law).

### a. Coverage Issues

NU defends its conduct by asserting the existence of a genuine dispute as to coverage liability.  Def.'s Opp. Br. at 23-30.  For the reasons stated above, the Court rejected NU's interpretation of the contract terms that might have excused its performance.  *Cf. Am. Cas. Co. v. Krieger*, 181 F.3d 1113, 1123 (9th Cir. 1999) (insurer's actions based on a reasonable construction of ambiguous language).  For

---

[34] In *Wilson  v. 21st Century Ins.  Co.*, 42 Cal. 4th 713, 724 n.7 (2007), the California Supreme Court criticized those Court of Appeal decisions, like *Chateau*, that divided the definition of bad faith into two components.  The Supreme Court emphasized that the genuine dispute doctrine "exists only where the insurer's position is maintained in good faith *and* on reasonable grounds."  *Id.* at 723-24 (citations and footnote omitted) (emphasis added).

09CV140

purposes of applying the genuine dispute doctrine, the focus shifts to whether the insurer maintained its position in good faith and on reasonable grounds. *Wilson*, 42 Cal. 4th at 723-24. "In the insurance bad faith context, a dispute is not 'legitimate' unless it is founded on a basis that is reasonable under all the circumstances." *Id.* at 724 n.7.

The Court concludes that NU's coverage position was unreasonable because it was based on assumptions. Its position is not supported by the actual facts, the language of the FIB, or the governing case law. *See generally Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992-94 (9th Cir. 2001) (insurer may escape bad faith claim when it advanced a reasonable construction of policy language, relied on an independent expert opinion, or information obtained from an independent investigation). The record shows that NU made uninformed assumptions about the application of the FIB to the Norton claim. Employees at every level jumped to conclusions about coverage without reading the language of the FIB. Pls.' Exs. 4 (Wolin Depo. at 69) (complex claims adjustor treated claim only as Employee Dishonesty), 9 (Perry Depo. at 43-45, 136-44, 229) ("I think that is the way the policy works."), 10 (Tatulli Depo. at 322) (believed FNF pursued only Employee Dishonesty claim), 13 (Smith Depo. at 113-14, 158) (never read FIB and treated as only Employee Dishonesty), 16 (Breazeale Depo.). "An insurer cannot escape bad faith liability by adopting an interpretation of its policy grounded only in the subjective perceptions of its unguided claims adjustors." *Amadeo*, 290 F.3d at 1163. The insurer must promptly investigate the factual basis of the insured's claim and evaluate whether coverage is possible under the language of *the particular policy*. *White*, 40 Cal. 3d at 886; *Amadeo*, 290 F.3d at 1163 (an insurer may act in bad faith by making assumptions without evaluating whether insured was due benefits under its interpretation of the policy).

NU's complex claims adjustor, Wolin, understood that the FIB covered claims when the insured "held" the property of a third party, and that FNF was an

escrow company.  Pls.' Ex. 4 (Wolin Depo. at 80-85, 115-17).  NU itself cites the very authority – a controlling Ninth Circuit case – that acknowledged the bailee exception to first party policies.  Def.'s Br. at 22-23 (citing *Vons*, 212 F.3d at 493); *accord* Def.'s Opp. Br. at 15 (citing an unpublished slip opinion from Delaware that a fidelity bond "contemplates coverage for losses resulting from a narrow category of third-party claims, principally those in which the insured held or was legally liable for a third party's property at the time of the loss").  As a result, NU's direct loss argument is equally unreasonable.  Unlike the insured in *Vons*, Chicago Title was legally responsible to keep the escrow accounts safe from employees *and* non-employees.  Therefore, the insured's loss can be measured in relation to the settlement payment to compensate the victims for the value of that stolen property.  If, by operation of law, this seems to transform a "first party" fidelity policy into "third party" liability policy, it may simply be that those terms are not helpful in the context of insured who holds the property of another as a bailee or trustee.

Similarly, NU had the essential information to interpret the Forgery Insuring Agreement in relation to the Discovery and Termination Provisions.  The victims had accurate information when they drafted their State Court complaints.  They alleged that Nieto had watched Norton forge their signatures.  NU did not, however, consider or analyze whether the Forgery Insuring Agreement could apply separately to the non-employee's actions.

FNF correctly notes that NU is now relying on arguments that were not discussed during the claims process.  During the course of this litigation NU developed and presented arguments about the meaning of certain terms in the Forgery provision and the application of the Discovery and Termination clauses.  NU waited too long to evaluate the language of a contract that it drafted.  NU did not advance the arguments about the Forgery Insuring Agreement between 2006 and 2008 because it had not even considered that peril.  The one-page report does not mention an issue concerning discovery during the Kaplan or Medhi transactions, or

whether the Termination provision as to Nieto would impact loss caused by a non-employee's forgery.  Def.'s Opp. Ex. 176.  When an insurer did not rely on certain grounds at the time it made a decision, its subsequent citation to those issues may appear to have been developed for the purpose of litigation.  *Wilson*, 42 Cal. 4th at 725; *see* Croskey, *supra*, Ch. 12C ¶ 12:889 (2012) (failing to evaluate a claim objectively is evidence of bad faith such as when insurer searches for ways to deny coverage while ignoring evidence in file that supports the claim).

### b.  Proof of Loss Forms

NU argues that there can be no bad faith "without actual presentation of a claim in compliance with claim procedures in the policy."  *Cal. Shoppers*, 171 Cal. App. 3d at 57.  NU argues it was impossible to investigate and determine coverage any earlier because even FNF admits that it did not present a proper claim under the Fidelity Bond for the Norton losses as late as February 2010.  Def.'s Opp. Ex. 58 at 3; Def.'s Reply Br. at 9.[35]  NU focuses on language in the FIB that required the insured to submit a "sworn" proof of loss form.  The claims adjustor repeatedly sent blank forms to FNF but had to wait for FNF to complete this task.  FNF submitted sworn Proof of Loss forms in July 2008, but then withdrew and replaced them in December 2009.  NU contends that even the revised Proof of Loss forms were incomplete.

NU's reliance on this excuse is unavailing.

The insurance policy requires two steps, first "notice" followed by "proof."  Pls.' Ex. 1 § 6(a), (b).  "At the earliest practicable moment, not to exceed 30 days, after discovery of loss, the Insured shall give the Underwriter notice thereof."  *Id.* §

---

[35]As an aside, NU argues that FNF "admitted" it had not filed a "claim" as late as 2010 by quoting a letter to the Securities and Exchange Commission ("SEC").  The Court rejects this argument for the reasons stated by FNF in its Reply Brief.  Pls.' Reply Br. at 10 n.19.  The letter reports the history and status of the victims' underlying lawsuits and FNF's claims with all carriers in its "Tower of Insurance."  Def.'s Opp. Ex. 58.  The letter accurately describes the dates of the different steps (including notice of a potential claim in July 2006; but no "claim" as of December 31, 2007 because the Proof of Loss forms were submitted in July 2008; and breach of contract "claim" filed in court in September 2008).  *See id.*

6(a).  "Within 6 months after such discovery, the Insured shall furnish to the Underwriter proof of loss, duly sworn to, with full particulars."  *Id.* § 6(b).

Certainly, FNF was required to comply with the contractual conditions to secure the benefit of indemnity.  *Cal. Shoppers*, 171 Cal. App. 3d at 57. Nonetheless, NU did not need a "sworn" statement to begin its investigation, which includes reading the information the insured provided and considering potential bases for coverage under the FIB.   As described above, by late 2007, NU had sufficient information in its files (the complaints, discovery documents, and settlement information from the First Wave of underlying litigation) to analyze the facts and determine if coverage existed under the language of its policy.  *August v. Provident Life & Acc. Ins. Co.*, 772 F. Supp. 2d 1197, 1207 (C.D. Cal. 2011) (insurers "cannot bury their heads ostrich-like in the sand and pretend that they had no access to the facts").

The law does not support NU's contention that FNF was required to submit a particular type of form to trigger the insurer's duty to investigate and determine coverage.[36]  Croskey, *supra*, Ch. 12C ¶ 12:863 (2012) ("The insurer *cannot delay investigation* pending receipt of a formal proof of loss if the insured has already furnished it with adequate information on a preliminary claim report.") (emphasis added).  The "Fair Claims Settlement Practices Regulations" that govern the insurance industry in California reinforce FNF's position that NU had a duty to begin an investigation.[37]  "Upon receiving notice of claim, every insurer shall immediately, but in not event more than fifteen (15) calendar days later," acknowledge receipt of the claim, provide the insured with "necessary forms, instructions, and reasonable assistance, including but not limited to, specifying the information the claimant must provide for proof of claim;" and "begin any

---

[36]The Court excluded testimony by NU's claims expert on this issue.  [Doc. No. 420]

[37]In the *Daubert* Order, the Court held that evidence that the insurer violated regulations is admissible to show bad faith.  [Doc. No. 420]

09CV140

1   necessary investigation of the claim." Cal. Code Regs. tit. 10 § 2695.5(e)(3) (2014).

2   "Upon receiving proof of claim, every insurer, [except claims arising from policies

3   of disability, mortgage guaranty, or automobile collision], shall immediately, but in

4   no event more than forty (40) calendar days later, accept or deny the claim, in whole

5   or in part.  The amounts accepted or denied shall be clearly documented in the claim

6   file unless the claim has been denied in its entirety." *Id.* § 2695.7(b).  The insurer

7   must provide additional information when it denies "a first party claim." *Id.* §

8   2695.7(b)(1).  The FIB is a first party policy, thus, NU was required to explain in

9   writing "the factual and legal bases for each reason." *Id.*

10   California regulations define a "proof of claim" as "[a]ny evidence or

11   documentation . . . that provides any evidence of the claim and that reasonably

12   supports the magnitude or the amount of the claimed loss."  Cal. Code Regs. tit. 10,

13   § 2695.2(s).   The terms "proof of loss" and "proof of claim" are interchangeable.

14   Agati Decl., Ex. 6 (Felton Depo. at 225-26) [Doc. No. 326].

15   Furthermore, California law allows an insured to present the "best evidence in

16   his power  at the time."  Cal. Ins. Code § 552 (2013).  Thus, courts hold that the

17   insurer's substantive duties begin when the insured substantially complies with its

18   obligation to offer proof of its claim. *McCormick v. Sentinel Life Ins. Co.*, 153 Cal.

19   App. 3d 1030, 1046 (1984); *Paulfrey v. Blue Chip Stamps*, 150 Cal. App. 3d 187,

20   199-200 (1983).  "An insurance company has a duty to pay a claim when it has

21   acquired, through one means or another, sufficient evidence to establish the validity

22   of that claim. . . . [T]he real question is whether there was enough evidence of

23   whatever form and however acquired that it would be unreasonable for the

24   insurance company to refuse to pay the claim." *McCormick*, 153 Cal. App. 3d at

25   1046.

26   FNF gave NU ample evidence about Chicago Title's conduct in relation to

27   Norton's Ponzi scheme from 2006, when the First Wave of litigation commenced,

28   through 2007, when the victims conducted extensive discovery and began to settle.

1   NU's assertion that it lacked information is not supported by the record.

2       The record does not support NU's complaint that FNF's original and revised

3   forms were too general and incomplete.  The original Proof of Loss form contain a

4   complete and well-organized presentation of  information – all of which NU already

5   had in its files – and set forth the grounds for coverage.  Def.'s Opp. Ex. 6 (Ex. A

6   summarized the complaints and deposition testimony).  By comparison, the

7   December 2009 revised forms were *less* detailed than the originals.  The main

8   difference was that by that time FNF had agreed to reduce the amount of loss by

9   referring to specific escrow transactions.  *Compare* Def.'s Opp. Ex. 6 (original

10  Burke proof of loss based on settlement of State Court case for $2,750,000) *with id.*

11  Ex. 35 (revised loss reduced to $993,000 from four unauthorized escrow

12  transactions).

13      Even assuming NU properly waited until it received *sworn*, notarized forms

14  in July 2008, there is no explanation for why it failed to explain its denial of

15  coverage within the 40-day rule established by California regulations.  NU had long

16  known the substance of the Norton fraud in relation to its insured's escrow business.

17  NU had the depositions of all the key players (*i.e.*, Norton, Richmond, Nieto's

18  supervisors) and could have analyzed the Discovery, Termination, and Forgery

19  arguments at that time.

20      As of March 2011, NU had not arrived at a coverage determination.  Pls.'

21  Opp. Ex. 41 (Wolin Depo. at 271); Pls.' Reply Ex. 4 (Wolin Depo. at 311-13).[38]

22  The record establishes that NU unreasonably delayed processing FNF's FIB claim

23  and did not timely determine coverage.

24

25      [38]The Magistrate Judge excluded NU's purported coverage letter (dated August
    4, 2011) because it was produced after the discovery cutoff and the expert reports had
26  been completed.  Pls.' Ex. 42 [Doc. No. 297]; Pls.' Reply Ex. 6 (transcript of hearing)
    ("It can't be relied on in any way by defendants.").  Consequently, NU did not make
27  a timely coverage determination.  Even putting aside the propriety of an affirmative
    statement that NU "never" issued a coverage analysis, it is undisputed that NU had not
28  determined coverage under the FIB by March 2011.  Pls.' Opp. Ex. 41 (Wolin Depo.
    at 271) (referring to date of deposition).

1   By contrast, NU's E & O department had the same information (the victims'

2   allegations, the discovery from the State Court proceedings, and Norton's version of

3   Chicago Title's role in the events) and was able to analyze coverage under that

4   separate policy by late 2007. *See* Pls.' Exs. 5 (Kenna Decl. ¶ 6), 13 (E & O claims

5   file notes); Def.'s Ex. 11 (Stolzenberg Depo. at 333).[39]

6   No reasonable jury could find that NU lacked a factual basis to analyze FNF's

7   claim under the terms of the FIB policy. The genuine dispute doctrine does not

8   assist NU.

9   ### c. Amount of Loss and Measure of Damages

10   As its third example of a genuine dispute, NU argues it cannot be faulted

11   when the amount of FNF's "claim has undergone multiple and dramatic changes."

12   Def.'s Br. at 27. Soon after FNF submitted the July 2008 proof of loss forms, NU

13   requested and reviewed 350 escrow files. Def.'s Opp. Exs. 158, 160. Over time,

14   FNF "transformed" its initial claim for $113 million (31 claimants) into the current

15   $5 million claim (9 claimants). Def.'s Opp. Ex. 109 (Expert Report). NU

16   complains, for example, that FNF changed its theory in December 2009 when it

17   revised the Proof of Loss forms, and again in July 2011. Def.'s Opp. Exs. 60-63,

18   172. NU argues that FNF did not finalize its theory until February 2011, when

19   ordered to respond to interrogatories about the calculation of damages. Def.'s Opp.

20

21   [39]In the *Cumis* order, the Court rejected NU's argument that the departments had
22   different information. [Doc. No. 423] FNF shared the same information about the underlying litigation with every carrier in its "Tower of Insurance."

23   NU appears to now regret its decision to pay benefits on the E & O policy, but that does not impact its contractual obligations under the separate FIB policy. By
24   2007, the E &O department had sufficient information to consider applying its "dishonest, fraudulent, criminal or malicious act" exclusion, namely that Norton
25   corroborated the victims allegations that Nieto and Gainor actively participated in the fraud scheme. Pls.' Exs. 12 (NU "conducted an intensive investigation regarding the knowledge possessed by Fidelity National employees relating to the Ponzi scheme."),
26   13 (E & O claims file entries Sept. 25, 2006, Nov. 30, 2006, Jan. 17, 2007, Sept. 17,
27   2007 & general note Apr. 27, 2007); Def.'s Ex. 11 (Stolzenberg Depo. at 333) ("We reached a conclusion, after conferring with our counsel, that the exclusions were not applicable to preclude coverage. Therefore, coverage applies.").

28   Three years after NU made that coverage decision, in 2010, Nieto was charged and pled guilty to mail fraud. *See supra* footnote 2.

1   Exs. 133, 171.

2       The actual facts expose the fallacy of this argument.  *Wilson*, 42 Cal. 4th at

3   725 (insurer's manufactured concern to lower damages is evidence of bad faith).

4       FNF initially submitted evidence based on the value of its settlement

5   payments.  These cases began settling in November 2006 (Ludwig for $425,000),

6   March 2007 (Burke for $2,750,000), and April 2007 (Marino for $3,200,000

7   million).  *E.g.*, Pls.' Ex. 5 ¶ 3 (Kenna Decl.); Def.'s Opp. Ex. 56 (Kenna letter).

8   Because Chicago Title held the third parties' property at the time Norton forged

9   signatures on escrow instructions, NU had promised to indemnify FNF for those

10  covered losses.  *See supra* pages 15-20 (interpreting FIB under *Vons*' bailee role,

11  the ownership provision that covers amounts paid to third parties).

12      All NU had to do to begin to determine the amount of loss was start with one

13  victim and analyze the evidence according to the actual terms of the FIB policy.

14  NU would not need to address every settlement or examine the hundreds of escrow

15  transactions in Norton's vast fraud.  Any one or two of the First Wave settlement

16  payments could have exhausted NU's exposure under the $15 million FIB policy.

17  "[B]y failing to investigate, [NU] has deprived itself of the ability to make a fair

18  evaluation of the claim."  *Jordan*, 148 Cal. App. 4th at 1074 (citation omitted).

19       FNF compiled with its duty, to the best of its ability, to describe the

20  magnitude of the loss.  Cal. Code Regs. tit. 10, § 2695.2(s) ("[a]ny evidence or

21  documentation . . . that provides any evidence of the claim and that reasonably

22  supports the magnitude or the amount of the claimed loss"); *accord* Cal. Ins. Code §

23  552 (sufficient for insured to present "best evidence in his power  at the time").  It

24  was immediately apparent that Norton operated an immensely complicated scheme

25  that employed many devices.  It naturally would take time to sort out the damage

26  created by interlocking escrows.  Even FNF's expert, who devoted hours to

27  thousands of pages of escrow files, notes that records are missing and it is difficult

28  to trace the money.  Pls.' Notice of Errata Exs. C (Barrett Report at 7) (each escrow

file contains 300 to 700 pages), D (Barrett Rebuttal Report at 17-22) (mysterious disbursements to Norton-controlled entities).  But complexity does not excuse NU's lack of effort.  Prior to hiring a litigation expert in October 2008, NU did not take any steps to investigate the amount of loss in the files in its possession.  A year earlier, in October 2007, NU wanted to investigate the amount of loss.  But the claims adjustor did not even consult with NU's in-house forensic accountant, who worked "right down the hall."  Pls.' Ex. 4 (Wolin Depo. at 182-85).  If NU had wanted to assert another measure of loss than FNF's settlement payment to each victim, it should have explored the issue in a timely manner.

FNF's voluntary reduction of the amount claimed during litigation does more harm to NU's position than to persuade the Court it acted in good faith.  *See Wilson*, 42 Cal. 4th at 725 (insurer raised the issue "not in genuine dispute of her claims value, but as a pretext or rationalization for denying it") (footnote omitted); *Neal*, 21 Cal. 3d at 923 (lever to force settlement more favorable to insurance company than facts warranted).  From the beginning, FNF produced evidence of the amount of loss based on the settlement payments.  *See Paulfrey* 150 Cal. App. 3d at 199-200 (insured must substantially comply with requirement to give proof of extent of its claim).  After several years of litigation, FNF modified its demand.  Its expert measured damages by referring to the escrow statements.  This is largely irrelevant to the bad faith cause of action.  NU breached the contract and engaged in bad faith long before FNF modified its theory of damages for purposes of trial.  In any event, FNF's subsequent downward revisions of the estimated amount of loss during the course of litigation benefitted NU by reducing FNF's demand for compensatory damages.

### 4.  <u>Unreasonable Conduct During Litigation</u>

Evidence of aggressive litigation tactics may show an insurance company's

1    bad faith conduct.[40]  *White*, 40 Cal. 3d at 887-89.

2          The record demonstrates that NU engaged in unnecessarily aggressive

3    litigation tactics.  *Neal*, 21 Cal. 3d at 923.  As stated above, NU had all the

4    information it needed by 2007 or 2008, thus, it cannot "pretend that [it] had no

5    access to the facts at or around the time [FNF] submitted its claim or that no duty to

6    investigate was triggered." *August*, 772 F. Supp. 2d at 1207.  The fact that NU had

7    sufficient information in its files to analyze the FIB, its conduct after FNF filed this

8    litigation served only to burden the insured.

9          NU pre-litigation attitude was equally combative.  In June 2008, NU declined

10   to participate in a mediation on the ground that it did not have all the facts.  Pls.'

11   Opp. Ex. 58.  But NU already had sufficient facts, and it was its own failure to

12   investigate that caused the problem; therefore, this excuse was a sham.  *See id.*

13   (Wolin states that NU had not been able to commence a full investigation of the

14   claim).

15         Two incidents illustrate the validity of FNF's complaint that NU pursued a

16   burdensome and expensive litigation strategy.

17         Between 2006 and January 2008, FNF settled the First Wave lawsuits.

18   Beginning in May 2008, a Second Wave of underlying litigation raised similar

19   claims against Norton and Chicago Title.  Also, in January 2008, NU and FNF

20   entered into a Settlement Agreement concerning the primary and third excess E & O

21   policies.  Pls.' Ex. 14.  That agreement permitted FNF to pursue its separate FIB

22   claim.  This breach of contract and bad faith lawsuit commenced in September 2008

23   against several fidelity carriers.  It was transferred to this district in January 2009.

24   The parties prepared a pretrial schedule to govern discovery and experts.  [Doc. No.

25   87]  They anticipated that the Second Wave of litigation would begin its jury trial in

26   June 2009; however, the State Court continued the trial date several times.  This

27

28         [40]In the *Daubert* Order, the Court discussed the admissibility of evidence of the
     insurer's misconduct during the litigation.  [Doc. No. 420]

1    delay disrupted the parties' plan to complete the underlying litigation before

2    conducting depositions and expert designations and reports in this case.

3        In September 2009, FNF requested a stay, and two carriers agreed.  This

4    standard procedure avoids unfair prejudice to the insured.  *Montrose Chem. Corp.*

5    *v. Superior Ct.*, 6 Cal. 4th 287, 301-02 (1993).  NU refused this reasonable request,

6    which caused FNF to file a formal motion.  NU unfairly conditioned its agreement

7    to a stay on a demand that FNF dismiss the tort claim.  Pls.' Exs. 29 (NU's Br. at 2

8    n.3), 30 (Goldfarb letter at 2-3), 31 (FNF's Br. at 7, 10-11).[41]  NU's indifference to

9    its insured's need to defend the underlying lawsuits violated its duty to refrain from

10   conduct that injures the right of the insured to receive the benefits of the policy.[42]

11   *Egan*, 24 Cal. 3d at 818.  "[A]n insurer's duty of good faith and fair dealing does not

12   evaporate after litigation commenced." *Jordan*, 148 Cal. App. 4th at 1076 n.7

13   (citing *White*, 40 Cal. 3d at 886).

14       Also, NU's conduct increased the expense of litigation while unnecessarily

15   burdening victims, most of them quite elderly, who had been financially ruined by

16   Norton's scheme and had already litigated these same issues in State Court a few

17

18       [41]The Court does not rely on NU's conduct in October 2009 concerning the
19   renewal of FNF's package of policies.  Pls.' Ex. 6 (Smith Depo. at 32, 52); 10 (Tatulli
     Depo. at 62-65, 224, 276, 322-25), 34 (Oct. 2009 email between senior executives
     discusses sending FNF a "message" to dismiss its lawsuit), 38-39, 50-52; Def.'s Opp.
20   Ex. 173 (Loverich Decl. ¶¶ 11-19).  FNF is entitled to summary judgment on its bad
     faith claim without unraveling that situation.  FNF makes a strong case that the senior
21   executives relied on rumor without analyzing the terms of the two policies (*e.g.*, tie-ins,
     Forgery Insuring Agreement separate from Employee Dishonesty). *E.g.*, Pls.' Exs. 4
22   (Smith Depo. at 59, 111-17) (no written document and no awareness of Forgery
     provision), 6 (Tatulli Depo. at 62-69, 277) (relying on conversation with claims
23   adjustor); Pls.' Ex. 11 (Stolzenberg Depo. at 797-99) (E&O claims adjustor testified
     it was inappropriate to consider coverage under one policy when determining coverage
24   under a different policy); *Amadeo*, 290 F.3d at 1163 ("Arbitrary interpretation of
     insurance contracts is the antithesis of the reasonable dealing required by the covenant
25   of good faith.").  But ultimately, the Court cannot assess the credibility of NU's
     explanation that the increase reflected market conditions. Defs.' Opp. Ex. 111 (O'Neill
26   Depo. at 159, 172-73); *Anderson*, 477 U.S. at 255; *Braxton-Secret v. A.H. Robins Co.*,
     769 F.2d 528, 531 (9th Cir. 1985).
27

28       [42]NU exacerbates the situation by contending that FNF "thwarted" the claims
     investigation by requesting a stay.  Def.'s Opp. Br. at 26 (citing Def.'s Opp. Ex. 55
     (May 23, 2008 entry) (FNF explains potential prejudice to underlying lawsuit)).

1   years earlier.  NU could have used the victims' deposition transcripts from the State

2   cases.  Pls.' Br. at 15-16 & nn. 19-20 (chart lists some examples of witnesses who

3   were deposed once or twice in State Court, and again by NU, often for several

4   days).  Instead, NU re-questioned the victims on every escrow.[43]  This futile

5   exercise increased the expense.  NU learned nothing new.

6        In sum, NU's contentious litigation strategies indicate bad faith.  *Wilson*, 42

7   Cal. 4th at 723 ("An insurer's good or bad faith must be evaluated in light of the

8   totality of circumstances surrounding its actions.") (citations omitted).

9        Taken collectively, the above reasons prove, as a matter of law, that NU did

10  not conduct a good faith investigation of the claim and did not have a reasonable

11  basis for genuine dispute.  *Wilson*, 42 Cal. 4th at 716.  Accordingly, FNF is entitled

12  to partial summary judgment on its tort claim because the totality of circumstances

13  shows that NU unreasonably and in bad faith withheld payment from its insured

14  pursuant to the Forgery Insuring Agreement.  *Wilson*, 420 Cal. 4th at 720 (quoting

15  *Frommoethelydo*, 42 Cal. 3d at 214-15).  By 2007 or 2008, FNF had given NU

16  sufficient information to conduct an investigation and make a coverage

17  determination.  NU's after-the-fact explanations do not excuse its clear breach of its

18  basic obligations toward its insured.

19                              **Conclusion**

20       Upon due consideration of the memoranda and exhibits, the arguments of

21  counsel, and for the reasons set forth above, the Court GRANTS Plaintiffs' Motion

22

23       [43]NU also re-deposed Chicago Title employees, Medhi, and Norton.  The Court
    does not rely on those duplicative depositions.  John DiMugno & Paul Glad, Cal. Ins.
24  Law Handbook § 11:143 (2013).  However, another department of NU closely
    monitored the State Court lawsuits.  NU issued a primary and a third excess E&O
25  policy to FNF.  Those liability policies required NU to hire an independent trial
    attorney.  NU and FNF shared a common goal to defeat claims made by Norton and his
26  victims.  Thus, NU's interests were largely protected by the discovery process
    conducted in State Court.  Because this breach of contract suit involves additional
27  issues that were not explored in State Court, it is understandable that NU might need
    to question the insured again.  For the most part, however, NU repeated questions that
28  had already been answered.  At the very least, the depositions should have been limited
    to coverage issues.

for Partial Summary Judgment [Doc. No. 324] and DENIES Defendant's Motion for Summary Judgment [Doc. No. 325].

As this Order resolves all pending motions, the parties may now direct their attention to preparing for a trial on compensatory and punitive damages. The Court encourages the parties to make a final effort to settle their dispute and to make use of the good offices of the magistrate judge. <u>Within 21 days of this Order, the parties shall meet and confer and contact the magistrate judge's chambers to schedule a Mandatory Settlement Conference</u>. The Court requests the magistrate judge's assistance to prepare an amended Case Management Conference Order to schedule the remaining pretrial proceedings, including a Pretrial Conference Date. After conferring with the parties at the Pretrial Conference, the Court will issue a Jury Trial Preparation and Scheduling Order to set the matter for trial.

**IT IS SO ORDERED**.

DATED:  September 30, 2014

HON. GONZALO P. CURIEL
United States District Judge

- 86 -

09CV140