**SEDGWICK LLP**
Susan Koehler Sullivan (SBN. 156418)
susan.sullivan@sedgwicklaw.com
Jenni K. Katzer  (SBN 253684)
jenni.katzer@sedgwicklaw.com
801 South Figueroa Street, 19th Floor
Los Angeles, California  90017-5556
Telephone:  (213) 426-6900
Facsimile:  (213) 426-6921

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
Dana Alden Fox (SBN 119761)
Dana.Fox@lewisbrisbois.com
Rebecca R. Weinreich (SBN 155684)
Rebecca.Weinreich@lewisbrisbois.com
221 North Figueroa Street, Suite 1200
Los Angeles, CA 90012
Telephone: (213) 250-1800
Facsimile: (213) 250-7900

Attorneys for Defendant NATIONAL
UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PA

**HAHN LOESER & PARKS LLP**
Michael J. Gleason (Bar No. 279434)
*mgleason@hahnlaw.com*
Rupa G. Singh (Bar No. 214542)
*rsingh@hahnlaw.com*
One America Plaza, Suite 1500
600 West Broadway
San Diego, California  92101-3384
Telephone:  (619) 810-4300
Facsimile:   (619) 810-4301

Steven A. Goldfarb (*pro hac vice*)
*sagoldfarb@hahnlaw.com*
Andrew Agati (*pro hac vice*)
*aagati@hahnlaw.com*
200 Public Square, Suite 2800
Cleveland, Ohio  44114-2316
Telephone:  (216) 621-0150
Facsimile:   (216) 241-2824

Attorneys for Plaintiffs FIDELITY
NATIONAL FINANCIAL, INC.,
CHICAGO TITLE INSURANCE
COMPANY, and CHICAGO TITLE
COMPANY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIDELITY NATIONAL FINANCIAL, INC., et al.,<br><br>             Plaintiffs,<br><br>      vs.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., et al.,<br><br>             Defendants. | CASE NO. 3:09-CV-00140-GPC-KSC<br><br>Magistrate Judge Karen S. Crawford<br><br>**JOINT MOTION REGARDING DEFENDANT'S MOTION FOR LEAVE TO SUBSTITUTE AN EXPERT WITNESS FOR AN UNAVAILABLE EXPERT WITNESS**<br><br>[Filed concurrently with Declaration of Dean P. Felton; Declaration of Susan Koehler Sullivan; Declaration of Steven A. Goldfarb]<br><br>Action Filed:    September 15, 2008<br>Trial Date:      None Set |

# Table of Contents

JOINT INTRODUCTION ................................................................................... 1

NATIONAL UNION'S STATEMENT OF POINTS AND AUTHORITIES
IN SUPPORT OF SUBSTITUTION OF ITS EXPERT WITNESS ......................... 2

I.        INTRODUCTION ................................................................................. 2

II.       RELEVANT BACKGROUND FACTS ................................................... 3

III.      ARGUMENT ......................................................................................... 5

          A.        Good Cause Exists To Allow NU Leave to Re-designate
                    Its Expert. ............................................................................... 5

                    1.        Substitution will restore NU to the same position it
                              was in prior to Mr. Felton's heart attack. ...................... 5

                    2.        NU's request for substitution is timely. ....................... 8

          B.        NU's Re-designation Will Not Prejudice FNF. ....................... 13

IV.       CONCLUSION ..................................................................................... 14

PLAINTIFFS' STATEMENT OF POINTS AND AUTHORITIES IN
OPPOSITION TO SUBSTITUTION OF NU'S EXPERT WITNESS .................. 15

I.        INTRODUCTION ............................................................................... 15

II.       RELEVANT BACKGROUND FACTS ................................................. 17

          A.        The Court's Orders Significantly Restricted The Disclosed
                    Opinions That Mr. Felton Could Have Presented At Trial
                    If He Were Not Incapacitated .................................................. 17

          B.        NU Waited Nearly A Year After Learning Of  Mr.
                    Felton's Withdrawal And Incapacitation To Disclose It,
                    Knowingly Failing To Raise The Issue On At Least Six
                    Occasions ................................................................................ 21

          C.        NU's Eventual Meet-And-Confer Disclosures About Mr.
                    Felton's Incapacitation Ranged From Unreliable To
                    Misleading .............................................................................. 22

          D.        NU Disclosed The True Facts Underlying Mr. Felton's
                    Incapacitation For The First Time In Its Draft Motion .............. 23

III.      LAW AND ARGUMENT ..................................................................... 24

          A.        NU's Motion Should Be Denied Solely Because It Does
                    Not Seek A True Substitute For Mr. Felton, But A *Better*
                    One ......................................................................................... 25

          B.        NU Fails To Show Good Cause For Even A True

Substitute Given Its Lack Of Diligence And Candor ................29

    C.    Given The Developments In And The Posture Of This Case, Granting *Any* Substitution Risks Severe Prejudice To Plaintiffs Even Though The Court Has Not Yet Set A Trial Date ................................................................................33

    D.    If The Court Is Inclined To Grant NU's Motion, It Should Impose Strict Conditions To Mitigate The Prejudice To Plaintiffs ................................................................................36

IV.        CONCLUSION ...................................................................37

JOINT CONCLUSION ...............................................................39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott v. Lockheed Martin Corp.* 2014 WL 6613148 (S.D. Ill. Nov. 21, 2014) ..................................................................................................... 9

*Abbott v. Lockheed Martin Corp.*, No. 06-cv-0701, 2014 U.S. Dist. LEXIS 163521 (S.D. Ill. Nov. 21, 2014) ...................................... 29

*Adams v. Cooper Indus., Inc.*, No. 03-476, 2007 U.S. Dist. LEXIS 99057 (E.D. Ky. Apr. 5, 2007) ...................................................... 27, 28

*Baumann v. Am. Family Mut. Ins. Co.*, 278 F.R.D. 614 (D. Colo. 2012) ....... 6, 14, 31

*Brooks v. County of San Joaquin*, 2012 WL 5928416 (E.D. Cal. Nov. 26, 2012) .................................................................................... 6

*Doctor's Associates, Inc. v. QIP Holder LLC*, 2009 WL 5184404 (D. Conn. 2009) ........................................................................ 6, 7, 8, 36

*Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.*, 240 F.3d 1 (1st Cir. 2001) ........................................................................................ 6, 35

*Guerra v. Paramo,* 251 F. App'x 424 (9th Cir. 2007) .................................. 13, 35, 36

*Howard v. Securitas Sec. Servs., USA, Inc.*, Case No. 08–2746 (N.D. Ill. June 23, 2011) .................................................................... 6

*Ind. Ins. Co. v. Valmont Elec., Inc.*, No. TH 97-009-C-T/F, 2001 U.S. Dist. LEXIS 23256 (S.D. Ind. Dec. 27, 2001) ........................... 28

*Jenkins v. Bartlett*, 487 F.3d 482 (7th Cir. 2007) ........................................ 26

*Johnson v. Mammoth Recreations, Inc.,* 975 F.2d 604 (9th Cir.1992) ...................... 5

*Jones v. DeVaney*, 107 Fed. Appx. 709 (9th Cir. 2004)................................... 10, 32

*Lennane v. Am. Zurich Ins. Co.*, 2015 WL 882372 (E.D. Cal. Mar. 2, 2015) .................................................................................... 13

*Lincoln Nat. Life Ins. Co. v. Transamerica Financial Life Ins. Co.*, 2010 WL 3892860 (N.D. Ind. September 30, 2010)......................... 6, 28

*LNC Investments, Inc. v. First Fidelity Bank*, 2000 WL 1290615
  (S.D.N.Y. Sept. 12, 2000) ..............................................................*passim*

*LNC Invs. v. First Fid. Bank*, No. 92 Civ. 7584 (CSH), 2000 U.S. Dist.
  LEXIS 13038 (S.D.N.Y. Sept. 11, 2000) ....................................... 32, 35

*Manildra Mill. Corp. v. Ogilvie Mills, Inc.,* 1991 WL 205691 (D. Kan.
  Sept. 23, 1991)........................................................................................ 6, 13

*Morel v. Daimler-Chrysler Corp.*, 259 F.R.D. 17 (D.P.R. 2009) ................... 6, 9, 28

*Nijjar v. Gen. Star Indem. Co.*, No.CV 12-08148 DDP, 2014 U.S. Dist.
  LEXIS 8722 (C.D. Cal. Jan. 23, 2014)................................................25, 31, 35

*Nijjar v. General Star Indem. Co.*, 2014 WL 271630 (C.D. Cal. Jan, 23,
  2014) .......................................................................................................... 9, 10

*Park v. Cas Enters., Inc.*, No. 08-cv-385 DMS (NLS), 2009 U.S. Dist.
  LEXIS 108160 (S.D. Cal. Nov. 19, 2009) ............................................25, 31, 33

*Pfizer, Inc. v. IVAX Pharmaceuticals, Inc.*, 2009 WL 1885100 (D.N.J.
  June 29, 2009)........................................................................................... 9, 12

*Pfizer, Inc. v. IVAX Pharms., Inc.*, No. 07-174 (DMC), 2009 U.S. Dist.
  LEXIS 54910 (D.N.J. June 29, 2009) ........................................................ 33, 34

*In re Rail Freight Fuel Surcharge Antitrust Litig.*, 2014 WL 6684794
  (D.D.C. Nov. 26, 2014) ............................................................................ 7, 36

*In re Rail Freight Fuel Surcharge Antitrust Litig.*, MDL No. 1869,
  2014 U.S. Dist. LEXIS 165769 (D.D.C. Nov. 26, 2014)............................. 36, 37

*Scardine v. Estate of Fleming*, 2014 WL 2918420 (D. Mont. 2014) ...................... 13

*Scheel v. Harris*, No. 3:11-17-DCR, 2012 U.S. Dist. LEXIS 126448
  (E.D. Ky. Sept. 6, 2012) ............................................................................. 34

*United States ex rel. Suter v. Nat'l Rehab Partners, Inc.*, No. CV-03-
  15-S-BLW, 2006 U.S. Dist. LEXIS 88599 (D. Idaho Dec. 6, 2006).................. 37

*TIC - The Indus. Co. Wyoming v. Factory Mut. Ins. Co.*, 2012 WL
  2830867 (D. Neb. July 10, 2012) ............................................................. 6, 14

*United States for the Use & Benefit of Agate Steel, Inc. v. Jaynes Corp.*,
No. 2:13-cv-01907-APG-NJK, 2015 U.S. Dist. LEXIS 45379 (D.
Nev. Apr. 6, 2015) ................................................................................ 26

*Wargnier v. Nat'l City Mortg., Inc.*, No. 09cv2721-GPC-BGS, 2013
U.S. Dist. LEXIS 102376 (S.D. Cal. July 22, 2013) ............................ 25

*Weisgram v. Marley, Co.*, 528 U.S. 440 (2000) ......................................... 27

*Whiteside v. State Farm Fire & Cas. Co.*, 2011 WL 5084981 (E.D.
Mich. Oct. 26, 2011) ............................................................................. 6

*Wong v. Regents of the University of California*, 410 F.3d 1052 (9th
Cir. 2005) ............................................................................................... 5

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101 (9th Cir.
2001) ..................................................................................................... 26

**Other Authorities**

Fed. R. Civ. P. 16 .............................................................................. 5, 6, 25

Fed. R. Civ. P. 26 ................................................................................. 5, 26

Fed. R. Civ. P. 37 ............................................................................. 5, 13, 25

# JOINT INTRODUCTION

Defendant National Union Fire Insurance Company of Pittsburgh, Pa. ("NU") hereby presents, in the form of a "joint motion," its Motion for Leave to Substitute an Expert Witness for its expert, Dean Felton, and the Opposition thereto by Plaintiffs, Fidelity National Financial, Inc., Chicago Title Insurance Company and Chicago Title Company (hereinafter collectively referred to as either "FNF" or "Plaintiffs").  Plaintiffs consent to the filing of NU's Motion in this joint format solely to avoid further delay, but strongly object to NU having belatedly submitted one version of its proposed motion to Plaintiffs on April 17, 2015, and then, after receiving Plaintiffs' Opposition, taking nearly two weeks to rewrite and submit a new version of NU's Motion rather than simply inserting a Reply following Plaintiff's Opposition.

**NATIONAL UNION'S STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF SUBSTITUTION OF ITS EXPERT WITNESS**

**I.      INTRODUCTION**

NU's expert witness, Dean Felton, suffered a disabling heart attack.  Following his doctor's advice, he reluctantly discontinued his consulting business and withdrew as an expert in all matters with which he was involved, including the instant matter. (*See* Declaration of Dean Felton, ¶¶ 2-3).  NU solicited FNF's stipulation to permit the designation of a substitute expert witness, but the parties could not agree on the terms.  Under these unfortunate and unforeseeable circumstances, NU hereby requests leave to designate a substitute expert witness to replace Mr. Felton.

The substitution of another expert – who will testify within the same scope and substance of Mr. Felton's opinions, but pursuant to his own analysis of the case and in his own words – will fairly restore NU to its position prior to Mr. Felton's incapacitation.  NU has already proposed to FNF that the substitute expert would be subject to the same limitations on the scope of his testimony as Mr. Felton would have been.  Given NU's agreement to limit the scope of the substitute expert's testimony, FNF's primary basis for objection to NU's request appears to be that it should have been made sooner.  However, substituting experts sooner would have made no sense. When NU learned of Mr. Felton's incapacity, the parties' cross-motions for summary judgment were pending, the case was essentially in suspense, and there was no reason to replace him immediately.  As FNF notes, the substitution of an expert requires time and expense – all of which might have been obviated or limited by the court's summary judgment rulings, the subsequent motion for reconsideration, and the parties' settlement discussions.

When FNF asserts that NU delayed, FNF is essentially arguing that NU should have organized some type of "fire drill" before this court completed its analysis of the competing motions for summary judgment, and before it was determined that this case could not be resolved by settlement.   Had NU done so, the Court may well have

1   treated such motions as premature.  On the other hand, once it appeared that the case

2   would progress to trial, and that the time and expense of substituting an expert who

3   could testify at trial would be necessary, NU notified FNF that it would seek to do so.

4   Moreover, NU has now notified FNF of the identity of the proposed substitute

5   expert, and has advised that the substitute expert has indicated that he would be able

6   to provide his expert report by June 30, 2015, and that he would be available for

7   depositions thereafter at a location convenient to plaintiff's counsel.  As a result, FNF

8   cannot demonstrate any prejudice from the substitution, apart from the fact that it (and

9   NU) will need to incur some additional expert, deposition, and attorneys' fees.

10  Similarly, FNF does not and cannot cite any authority denying substitution on these

11  facts.

12  Under the facts extant here, the denial of NU's right to present expert testimony

13  at trial would irreparably prejudice NU by permitting FNF to proffer unrebutted

14  expert witness testimony on several critical issues, simply because NU suffered the

15  incapacitation of its original expert.  NU therefore respectfully requests permission to

16  substitute an expert in place of Mr. Felton.

17  **II.    RELEVANT BACKGROUND FACTS**

18  On July 15, 2011, NU designated Dean Felton as an expert on fidelity bonds,

19  claims handling, and bad faith, and Chris Money on escrow transaction losses. Mr.

20  Felton evaluated the coverage issues presented by FNF's claim, and opined on the

21  reasonableness of NU's handling and investigation of the claim.  (*See* Exhibit 4 to

22  ECF No. 326-4.)

23  On March 9, 2012, the parties filed cross-motions for summary judgment and

24  *Daubert* motions.  The Court ruled on the *Daubert* motions on March 28, 2014.  (ECF

25  No. 420).  The Court ruled on the summary judgment motions on September 30, 2014.

26  (ECF No. 427).  In its *Daubert* ruling, the Court acknowledged the role of the claims

27  handling experts, stating that: "[T]his is not a simple case. The jurors may not be

28  familiar with fidelity bonds. The testimony of claims handling experts, like Amoruso,

Haley, and Felton, will help the jury understand the best practices to handle fidelity insurance claims. The adjustment of a complex claim like the Norton fraud is not self-evident to a layperson." (ECF No. 420, 16:6-10.) The Court continued, "Such an expert can inform the jury about the industry standards based on his experience and knowledge of the insurance industry." (ECF No. 420, 16:17-19.)

On or around May 16, 2014, after the *Daubert* ruling and while the cross-motions for summary judgment were still pending, counsel for NU was informed by Mr. Felton that he had suffered a heart attack in February 2014. Mr. Felton further informed counsel for NU that he could no longer serve as its expert, and that he was withdrawing from all matters. (Felton Dec., ¶¶ 2-3.)

On September 30, 2014, the Court denied NU's motion for summary judgment and granted FNF's partial motion, finding liability for breach of contract and bad faith. (ECF No. 427.) On October 28, 2014, NU timely filed a motion for reconsideration which, among other things, requested reconsideration of the Court's granting of plaintiff's motion for partial summary judgment on the issue of bad faith. The Court set hearing for the motion for reconsideration on February 6, 2015.

On October 21, 2014, the parties were ordered to attend a Mandatory Settlement Conference set for December 2, 2014. (ECF No. 428.) The parties were unable to resolve the case at the Mandatory Settlement Conference, and a scheduling order was subsequently entered setting an April 17, 2015 deadline for "pretrial" motions (other than *Daubert* motions which had already been required and ruled upon and motions *in limine*). (ECF No. 435.)

Following oral argument, on February 19, 2015, the Court issued an order denying NU's motion for reconsideration, including as to bad faith. (ECF No. 439.)

On March 31, 2015, during a meet and confer relating to the "pretrial" motions, NU requested that FNF stipulate to permit NU to replace Mr. Felton as an expert, or otherwise not object to the replacement of Mr. Felton. Ultimately, FNF declined to stipulate to substitution of a new expert for Mr. Felton. (Declaration of Susan

1  Sullivan, ¶3).

2  **III.   <u>ARGUMENT</u>**

3      NU hereby seeks leave to replace its expert on the grounds that good cause

4  exists to amend the scheduling order to permit this substitution, and that the requested

5  relief is substantially justified and harmless pursuant to Federal Rules of Civil

6  Procedure 16(b)(4), 26(a)(2), and 37(c).  NU is entitled to a fair defense at trial which

7  here must include the right to present live, affirmative expert testimony on the matters

8  upon which Mr. Felton had been designated, and in rebuttal to FNF's coverage and

9  claims handling experts.  Anything less else would amount to grave injustice,

10  rendering the trial intrinsically unfair.  For the reasons set forth below, NU

11  respectfully requests that this Court grant its request for leave to substitute an expert

12  in place of Mr. Felton.

13      **A.   <u>Good Cause Exists To Allow NU Leave to Re-designate Its Expert.</u>**

14      For good cause, the scheduling order may be modified with the court's consent.

15  Fee. R. Civ. Proc. 16(b)(4).  Good cause exists if the pretrial schedule cannot

16  "reasonably be met despite the diligence of the party seeking the extension."[1]

17  Similarly, Fed. R. Civ. Proc. 37(c) permits an untimely disclosed witness if there is

18  substantial justification *or* the failure was harmless.  Fed. R. Civ. Proc. 37(c).   Good

19  cause exists and substantial justification exists under the circumstances presented

20  here.

21      1.   <u>Substitution will restore NU to the same position it was in prior</u>

22          <u>to Mr. Felton's heart attack.</u>

23      Courts have consistently permitted the substitution of expert witnesses under

24

25  [1] *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir.1992); *see also*

26  *Wong v. Regents of the University of California*, 410 F.3d 1052, 1060 (9th Cir.

27  2005) ("[d]eadlines must not be enforced mindlessly" because a good reason may
exist to permit an identification of additional witnesses after the established

28  deadline.").

Rule 16(b)(4) when unforeseen events render the original expert witness unavailable to testify at trial.[2]  Likewise, Courts have routinely found that an expert's death or disability provides substantial justification for substitution of an expert witness via an untimely designation.[3]

As FNF acknowledges, the purpose of this substitution is to put the movant in the same position as it was prior to the need for substitution.  But this only means that the substitute expert is "generally restricted to the same subject matter as the prior expert."  *TIC*, 2012 WL 2830867, at *9 (quoting *Lincoln*, 2010 WL 3892860, at *2).  Contrary to FNF's implication, the substituted expert is not required to adopt the original expert's report and speak with the original expert's words.  "Rather, the substitute expert should have the opportunity to express his opinions in his own language after reviewing the evidence."  *Id.*

---

[2] *Whiteside v. State Farm Fire & Cas. Co.*, 2011 WL 5084981, at *1 (E.D. Mich. Oct. 26, 2011); *TIC - The Indus. Co. Wyoming v. Factory Mut. Ins. Co.*, 2012 WL 2830867, at *8 (D. Neb. July 10, 2012); *Lincoln Nat. Life Ins. Co. v. Transamerica Financial Life Ins. Co.*, 2010 WL 3892860, at *2 (N.D. Ind. September 30, 2010) (allowing substitution where, during the pendency of the case, the expert was criminally convicted and incarcerated); *Doctor's Associates, Inc. v. QIP Holder LLC*, 2009 WL 5184404, at *4 (D. Conn. 2009) (allowing substitution due to the expert's conflict of interest).

[3] *Brooks v. County of San Joaquin*, 2012 WL 5928416, at *1(E.D. Cal. Nov. 26, 2012) ("Courts have approved supplemental disclosures where a critical expert witness has died after the deadlines have passed for expert discovery disclosure.") *See, e.g., Morel*, 259 F.R.D. at 20 ("the late disclosure is substantially justified because a critical expert witness died after the deadlines for discovery had passed."); *Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.*, 240 F.3d 1, 9 (1st Cir. 2001) (upholding substitution three months before trial when necessitated by the previous expert's death); *Baumann*, 278 F.R.D. at 615 (late disclosure of expert was "substantially justified because of [the expert's] untimely and unexpected death"); *Manildra Mill. Corp. v. Ogilvie Mills, Inc.*, 1991 WL 205691, at *2 (D. Kan. Sept. 23, 1991) ("under the unique circumstances of this case arising from the death of [defendant]'s original expert witness, [the defendant] should be allowed to present testimony of a substitute witness."); *Howard v. Securitas Sec. Servs., USA, Inc.*, Case No. 08–2746 (N.D. Ill. June 23, 2011) (finding substantial justification to substitute party's expert after the disclosure deadline where original expert witness was recovering from leukemia).

1  FNF claims there is "ample authority" limiting NU's substitute expert to

2  "endorsing and defending Mr. Felton's surviving opinions," but neither of the

3  nonbinding cases it cites set forth such a rule.  The first case FNF cites, *In re Rail*

4  *Freight*, does not even involve a substitute expert.  There, the plaintiff class learned

5  that its class certification expert, Mr. Rausser, had "for years, consulted with and

6  invested in companies that buy out class actions claims for profit."  *In re Rail Freight*

7  *Fuel Surcharge Antitrust Litig.*, 2014 WL 6684794, at *1 (D.D.C. Nov. 26, 2014).

8  Plaintiffs therefore moved, not for the "straight substitution of one expert for another,"

9  but "for leave to file a supplemental expert report, limited in scope, to attest to the

10  integrity and reliability of Rausser's expert analysis and methodologies."  *Id.*  In short,

11  class plaintiffs sought a second expert to bolster the opinion of its original, conflicted

12  expert.  The court's language, relied on by FNF as, "confining [the supplemental

13  expert's] opinion to the reliability, integrity, and accuracy of [the] prior expert's

14  work" had nothing to do with the role of a substitute expert – it was the plaintiffs'

15  own proposal for the scope of testimony for its requested "supplemental" expert.  *In*

16  *re Rail Freight* therefore provides no authority for FNF's aggressive effort to unduly

17  limit the opinions and testimony of NU's substitute expert.

18  The second case relied upon by FNF, *Doctor's Associates*, is also vastly

19  different from this case.  *Doctor's Associates* involved a motion for costs and

20  expenses rather than a motion to substitute an expert.  *Doctor's Associates*, 2009

21  WL 5184404 at *1 (D. Conn. December 23, 2009).  There, Subway signed an

22  engagement letter with a consulting firm, Willamette, to retain Dr. Schacter as a

23  damages expert.  *Id.* at *1.  Thereafter, Dr. Schacter was recruited by another

24  consulting firm that was an independent auditor for Subway, and was conflicted out.

25  *Id.* at *2.  The court approved the substitution of Mr. Schweih, another Willamette

26  employee, but Schweih's report "concluded that Subway suffered an additional $1.7

27  million in damages."  *Id.* at *3.  Quiznos then brought a motion to recoup its costs

28  and expenses incurred in rebutting the conclusions of Dr. Schacter's report, on the

1  grounds that Subway's untimely substitution rendered its rebuttal worthless. *Id.*

2  The court denied the motion because it had approved the substitution, but noted that

3  it did not know *Subway had engaged Willamette, not Dr. Schacter individually*, and

4  thus "Willamette could simply have assigned another expert to Subway's case in

5  order to support the conclusions reached in Dr. Schacter's original report." *Id.*

6  Because Subway attempted to take advantage of the substitution by substantially

7  changing and increasing its damage claim, the court ordered "that the new expert's

8  testimony at trial will be limited to establishing the veracity and integrity of the

9  original expert report and the conclusions reached in the original expert's report."

10  *Id.* at *5, *1.

11      Neither of the cases cited by FNF support its attempt to circumscribe NU's

12  proposed substitute expert's opinion to the four corner's of Dean Felton's reports.

13  *At trial, Dean Felton's testimony would not have been limited to exactly what he*

14  *wrote in his reports or exactly what he stated in deposition*, yet FNF suggests that

15  NU's proposed substitute expert should be constrained in this way.  There is no

16  authority supporting such a limitation here.  Rather, *the substitute expert should be*

17  *permitted to testify the same extent that Dean Felton would have been permitted to*

18  *testify*.  This motion seeks only to place NU in the same position as it was prior to

19  Mr. Felton's heart attack, not to place NU in a better position as FNF asserts, but

20  certainly to avoid placing NU in an untenable, and unjust position.

21          2.      <u>NU's request for substitution is timely.</u>

22      NU complied with the original Scheduling Order in providing timely expert

23  disclosures.  This request is required solely because of Mr. Felton's heart attack and

24  resulting inability to testify at trial, which has yet to be scheduled.

25      In 2014, when Mr. Felton advised counsel for NU of his incapacity, the parties

26  were awaiting the Court's order on the cross-motions for summary judgment, which

27  specifically sought adjudication of the bad faith claim.  Accordingly, there was no

28  reason to attempt to obtain a new expert pending a determination of the claim for

which Mr. Felton had been retained as an expert.  When the case is essentially "in suspense," a party is not expected to seek permission to substitute an expert witness.[4]

After the Court ruled against NU on the issue of bad faith, NU promptly moved for reconsideration.  In the meantime, the parties attended the court ordered mandatory settlement conference in December 2014.  NU's motion for reconsideration was denied in February 2015.

Only after the final disposition of the summary judgment motions and the unsuccessful conclusion of settlement negotiations was the case was no longer in suspense, and likely to progress to trial.  At that point, it was reasonably clear that a substitute expert would need to be designated to testify at trial, and the parties scheduled a meet and confer telephone conference in March 2015, during which NU advised FNF that it would need to substitute a new expert for Mr. Felton, and requested FNF's stipulation.

FNF has declined to stipulate to a substitute expert.  However, since the deadline to file motions *in limine* has not yet been set, and in any event will not occur until approximately September 2015, there is more than enough time for FNF to depose the substitute expert in advance of trial.  More significantly, refusing NU's request to substitute an expert where Mr. Felton's medical condition prevents him from acting as such would be fundamentally unfair.

In addition, FNF's cited authorities purported in support of denial due to delay (*Nijjar, LNC Investments* and *Pfizer*) are inapposite and do not control.  The unpublished, nonbinding cases FNF cites involve failure to abide by existing

---

[4] *See, e.g., Morel v. Daimler-Chrysler Corp.*, 259 F.R.D. 17, 20 (D.P.R. 2009) (defendant was not expected to substitute a new expert following the death of its disclosed expert during stay of action);  *Abbott v. Lockheed Martin Corp.* 2014 WL 6613148, at *2 (S.D. Ill. Nov. 21, 2014) ("defendant was not expected to substitute new expert when "the contours" of the case were unclear until the time plaintiff finalized its theories of liability).

1  scheduling deadlines, or inaction culminating in a substitution motion on the eve of

2  trial, or both.  Those circumstances are entirely absent here.

3      In *Nijjar*, Plaintiff first learned his expert was irreparably conflicted at

4  deposition, but let the expert discovery period lapse with no attempt to substitute

5  until approximately 6 weeks later.  *Nijjar v. General Star Indem. Co.*, 2014 WL

6  271630, at *1-*2 (C.D. Cal. Jan, 23, 2014).  The court found a lack of reasonable

7  diligence, primarily because it was "apparent that Plaintiff did not adequately vet"

8  his expert, which "would have uncovered the conflict and prevented the delay

9  leading to the instant motion."  *Id*. at *2.  The court also found fault with Plaintiff's

10 failure to abide by the existing expert discovery deadlines, despite having "more

11 than a week to seek leave of the court to designate another expert prior to the expert

12 discovery cutoff."  *Id*. at *3.  Finally, contrary to FNF's assertion that "there was no

13 trial date set in *Nijjar*," the court noted that reopening expert discovery would

14 "result[ in] postponement of trial," which would in turn prejudice the non-moving

15 party and the court.  *Id*.

16     Here, NU did not carelessly retain an irreparably conflicted witness.  Nor did

17 NU neglect any expert discovery deadlines.  Mr. Felton's heart attack occurred well

18 after all such deadlines expired, and NU raised its request for substitution with FNF,

19 and subsequently with this Court, once it became reasonably clear that an expert

20 who could testify at trial was necessary and that FNF would not stipulate to same.

21 Lastly, there is no trial date set, and thus no need for postponement.  As a result,

22 *Nijjar* does not support denial of a substitute expert here.[5]

23

24 _____

25 [5] FNF's supplemental cite to *Jones* is similarly unhelpful.  The entirety of its analysis of the substitution issue is less than two sentences, and indicates only that

26 the party seeking substitution did nothing for 7 months <u>in the face of an impending trial</u>.  *Jones v. DeVaney*, 107 Fed. Appx. 709, 711 (9th Cir. 2004).  Here, there is no

27 impending trial, and thus there is adequate time to conduct the necessary expert discovery.

28

1    FNF's reliance on *LNC Investments, Inc. v. First Fidelity Bank*, 2000 WL

2   1290615 (S.D.N.Y. Sept. 12, 2000), is also misplaced.  Contrary to FNF's assertion,

3   *LNC* does not stand for the proposition that "awaiting a court's ruling on a motion

4   before raising the issue of expert substitution constitutes imprudence."  There,

5   defendants' expert retired from his practice due to a stress-related heart condition in

6   August 1998, shortly after trial and while the case was on appeal.  *Id*. at *1-*2.  The

7   appellate court reversed and remanded, and re-trial was set for April 2000, then re-

8   set for September 2000, but at no point did defendants contact their expert to

9   ascertain his availability for re-trial.  *Id*. at *2-*3.  It was defendants' delay in

10   contacting their own expert, not in seeking to substitute, that the court labeled

11   "imprudent."  *Id*. at *3.

12    Instead, defendants waited until their motion to exclude opposing experts was

13   denied, on July 24, 2000.  *Id*. at *2.  On August 4, 2000, about one month before

14   trial, defendants finally learned that their expert had retired.  *Id*.  They nevertheless

15   still failed to move the court for substitution by the pretrial motion deadline of

16   August 15, instead filing letters with the court two weeks before trial.  *Id*. at *3.  The

17   court denied the defendants' motion to substitute, ruling that "inquiry should have

18   been made in advance of the late April date originally selected for the second trial."

19   *Id*.  It was the defendants' "inaction" despite rapidly approaching trial dates, and the

20   resulting disruption of plaintiffs' trial arrangements on the eve of trial, which the

21   court found justified denial of the motion to substitute.  *Id*. at *4.

22    Here, NU sought substitution when it became apparent that resolution of the

23   case short of trial was not reasonably likely.  The *LNC* court's analysis is inapposite.

24   NU was not inexcusably ignorant of its expert's availability in the face of an

25   impending trial date, and its substitution request at this point will not inconvenience

26   FNF beyond that occasioned by any substitution, nor does it require the continuance

27

28

1  of a trial date.[6]  To the contrary, there is adequate time to conduct the necessary

2  expert discovery prior to the August 2015 pretrial conference.  As a result, the

3  analysis in *LNC* is inapposite.

4  Finally, *Pfizer* does nothing to support FNF's claim that "many other

5  circumstances" support denial.  There, one of IVAX's experts, Dr. John P. Long,

6  died on June 10, 2007, a fact of which IVAX was aware.  *Pfizer, Inc. v. IVAX*

7  *Pharmaceuticals, Inc.*, 2009 WL 1885100, at *1 (D.N.J. June 29, 2009).  In

8  February 2009, the court set a trial date of June 16, 2009, but IVAX did not seek

9  substitution until May 8, 2009 – one month after the completion of expert discovery

10  and approximately five weeks before trial.  *Id*. at *1-*2.  The court denied the

11  motion because IVAX had "knowledge of Dr. Long's death since June 2007" could

12  have sought substitution "long before the close of expert discovery," but instead

13  made its motion "only five weeks before the original trial date" as an "eleventh hour

14  request" in "'flagrant disregard' of the scheduling order.'"  *Id*. at *3.

15  Here, NU first learned of Mr. Felton's heart attack long after the expert

16  discovery deadline had expired.  And far from disregarding the court's scheduling

17  order, NU sought to file this motion on the assigned April 17 date for pretrial

18  motions.  Moreover, NU's request for substitution cannot be categorized as

19  "eleventh hour."  NU notified FNF of its need for substitution as soon as it became

20  reasonably likely, in March 2015, that trial would proceed and a substitute expert

21  would be required to replace Mr. Felton.  In addition, this motion was filed only

22  after the parties exhausted their efforts to resolve the issue informally, but well

23  before any potential trial date.  *Pfizer* does not support FNF's efforts to unlevel the

24  playing field.

25  —————————————

26  [6] Although it does not believe that a continuance is required, NU has not objected to
   FNF's request for a three-month continuance to avoid any inconvenience occasioned
27  by the expert substitution.

28

### B.   NU's Re-designation Will Not Prejudice FNF.

If unable to present live expert testimony to explain the handling of the instant claim under its fidelity bond, NU would be unjustly and irreparably prejudiced.[7]  This Court has acknowledged that the facts of this case are complex, sophisticated, and beyond the realm of layman understanding, and that some amount of expert testimony will be appropriate.  FNF disclosed two experts to opine on NU's investigation and handling of the claim.  Should NU be precluded from presenting expert testimony to rebut the opinions of FNF's experts, the playing field will not be level.  Rather, NU will be unfairly prevented from presenting a full defense at trial.

On the other hand, should NU be granted leave to substitute an expert for Mr. Felton, FNF will not be prejudiced.  The pretrial conference is scheduled for August 21, 2015, and there is no deadline for motions *in limine* or a trial date.  Accordingly, there is sufficient time to provide FNF with the substitute expert's report and to depose the substitute expert prior to trial.[8]  This is particularly true here as NU has disclosed the name of its substitute expert, advised that it would submit a report by June 30, 2015, and further advised that the expert will be available for deposition thereafter.

---

[7] *See Manildra,* 1991 WL 205691, at *2 ("The court further finds that the testimony of an expert witness … is critical to many issues in this case.  Thus, the court finds that to prevent [defendant] to present such testimony could result in manifest injustice."); *Lennane v. Am. Zurich Ins. Co*., 2015 WL 882372, at *7 (E.D. Cal. Mar. 2, 2015) (declining to exclude untimely plaintiff expert designation because "plaintiffs' reliance on this expert is a crucial element of their case").

[8] *See Guerra v. Paramo,* 251 F. App'x 424, 425 (9th Cir. 2007) (upholding district court's discretion to allow a *new* expert designation, explaining that there was no "ambush" at trial where trial was five months away); *Manildra,* 1991 WL 205691 at *2 (preventing the defendant from replacing a deceased expert could result in manifest injustice is especially true where the court could attempt to accommodate the party's effort to find a substitute expert witness); *Scardine v. Estate of Fleming*, 2014 WL 2918420, at *4 (D. Mont. 2014) (concluding that "the exclusionary sanction of Rule 37(c) is not appropriate under the circumstances" where the late disclosure would not disrupt the schedule and would not provide any unfair advantage).

1    Moreover, FNF will suffer no prejudice because NU's substitute expert will be

2    "generally restricted to the same subject matter as the prior expert." *TIC*, 2012 WL

3    2830867, at *9 (quoting *Lincoln*, 2010 WL 3892860, at *2), any attempt by NU to add

4    to Mr. Felton's opinions would exceed that parameter and would arguably be subject

5    to motion *in limine*.  *Baumann*, 278 F.R.D. at 616.   Accordingly, in no event does the

6    substitution of an expert for Mr. Felton somehow unlevel the playing field for FNF.

7    Failure to permit the substitution, however, irreparably prejudices NU.

8    **IV.    CONCLUSION**

9    As noted above, the loss of National Union's expert was unforseeable and FNF

10   will suffer no prejudice by the substitution of the expert.  Moreover, NU has promptly

11   moved for the substitution of this expert once it became apparent that bad faith would

12   remain in issue, and this case could not otherwise be resolved.  Accordingly, NU

13   respectfully requests that the Court grant it leave to substitute a new expert in the

14   place of Mr. Felton.

## PLAINTIFFS' STATEMENT OF POINTS AND AUTHORITIES IN OPPOSITION TO SUBSTITUTION OF NU'S EXPERT WITNESS

## I.   INTRODUCTION

NU's motion to substitute a new bad faith and claims handling expert for Dean Felton should be denied because (i) it is a disguised attempt to designate a *better* expert and (ii) NU lacks the required good cause. NU's motion mischaracterizes Plaintiffs' position by improperly suggesting that the parties agree on appropriate limitations to the substitute's report and trial testimony when there is a clear disagreement. Besides seeking a new and better expert, unconstrained by the Court's rejection of virtually all of Mr. Felton's opinions, NU resorts to fiction in arguing that it has established good cause for a substitute. NU suggests that it diligently raised its need for a substitute when, in truth, NU intentionally and inexplicably delayed doing so to cause Plaintiffs the very significant prejudice which NU now trivializes.

Contrary to NU's contentions, had Mr. Felton not become medically incapacitated, he would have been limited by applicable law to testifying at trial only regarding the few opinions he timely disclosed that survive, among others, this Court's *Daubert*, summary judgment, and reconsideration r. Under these circumstances, Mr. Felton certainly would not have been permitted to issue a new expert report with new or different opinions, even if they were within the same "scope" of his original or rebuttal report. Ironically, NU concedes that "any attempt to add to Mr. Felton's opinions would exceed" even what it claims is a proper limitation on the scope of a substitute expert. (Mot. at 14:1-5.) But, rather than agree to appropriate limitations on its proposed substitute expert's report, opinions, and testimony at trial, NU seeks to avoid any real limit by suggesting only that its violation of this "parameter" would "*arguably* be subject to a motion in limine." (*Id.* (italics added.)) If NU agrees—as it states—that its proposed substitute expert should be limited to the same opinions that Mr. Felton could still

1   give a trial, then it should have agreed to Plaintiffs' offer to stipulate to a substitute

2   expert whose report and testimony at trial will be limited to Mr. Felton's opinions

3   that survived the Court's orders listed above. The Court should not allow NU's

4   attempted "do-over" with complete disregard for the law of the case at this late

5   stage.

6          Were NU seeking only a true substitute for Mr. Felton, good cause would exist

7   only *if* NU had exercised good faith and diligence in raising the issue, and only *if* the

8   untimely proposed substitution would not prejudice Plaintiffs. But NU fails to meet its

9   burden to establish either of these elements.

10         First, NU is dilatory in bringing this motion because it failed to disclose Mr.

11  Felton's incapacity for nearly a year after learning of it, including remaining silent for

12  *six months* after the Court's September 30, 2014 summary judgment order; failing to

13  raise it at the December 2, 2014 Mandatory Settlement Conference, when Magistrate

14  Judge Crawford set firm pretrial deadlines, including an April 17, 2015 deadline for

15  the filing of all motions other than motions *in limine*; and waiting *six more weeks* after

16  the Court denied its reconsideration motion. NU's cavalier characterization of the case

17  as being in "suspense" until March 30, 2015 is a fallacy that ignores that all of the

18  work arising out of a substitute expert could have been completed during the six

19  months between the Court's summary judgment ruling (on September 30, 2014) and

20  NU's belated disclosure of Mr. Felton's incapacity (on March 30, 2015). That did not

21  happen only because NU intentionally failed to disclose its expert problem and, if NU

22  is to be believed, even failed to seek out a potential substitute until May 2015. Even

23  now, while NU has finally identified a proposed substitute expert, it does not plan to

24  disclose the proposed substitute expert's report and opinions until June 30, 2015.

25         Second, NU's delay in seeking substitution will significantly prejudice

26  Plaintiffs, requiring them to shift in July and August 2015 from their enormously

27  time-consuming pretrial and trial preparation to evaluating and responding to a new

28  expert report and engaging in expert depositions. The two tasks cannot physically be

1  managed simultaneously without severely compromising the quality of both, thereby

2  resulting in extreme prejudice to Plaintiffs. Denial of NU's motion, on the other hand,

3  will cause only minimal prejudice to NU—all of its own making—because nearly all

4  of Mr. Felton's disclosed opinions have already been rejected by the Court, and he

5  would never have been permitted to offer them at trial if he had not become

6  incapacitated.

7        For these reasons, the Court should deny NU's motion. But, if the Court is

8  nonetheless inclined to grant NU some relief, it should minimize the prejudice to

9  Plaintiffs by (1) limiting the substitute expert's report and trial testimony to only the

10 specific opinions disclosed by Mr. Felton, as further restricted by the Court's *Daubert*,

11 summary judgment, reconsideration, and other rulings; and (2) delaying the final

12 pretrial hearing and all pretrial deadlines by three months from when NU produces the

13 substitute expert's report.

14 **II.    RELEVANT BACKGROUND FACTS**

15      **A.    The Court's Orders Significantly Restricted The Disclosed**
            **Opinions That Mr. Felton Could Have Presented At Trial If He**
16          **Were Not Incapacitated**

17       Plaintiffs filed this action nearly seven years ago, on September 15, 2008, for

18 NU's bad faith claims handling and wrongful denial of insurance coverage under a

19 Financial Institution Bond ("FIB") that covered losses in the millions of dollars that

20 Plaintiffs incurred from lawsuits related to a real estate Ponzi scheme. (Dkt. No. 1.)

21 Almost three years later, on the May 5, 2011 deadline for expert disclosures, NU

22 identified Mr. Felton as its bad faith claims handling expert, while Plaintiffs identified

23 Peter Haley and Paul Amoruso as their bad faith claims handling experts. (Decl. of

24 Steven A. Goldfarb ("Goldfarb Decl.") ¶2, Exs. 1 & 2.)

25       The parties' experts each provided simultaneous initial reports on July 15,

26 2011, and simultaneous rebuttal reports on January 27, 2012. (Goldfarb Decl. ¶3.) Mr.

27 Felton's initial report was fifty-five pages long, and contained ten numbered opinions

28 which the Court later excluded or rejected in, among others, its *Daubert*, summary

judgment, and reconsideration rulings (which are attached as Exhibits 17-19, respectively, to the Goldfarb Declaration). Mr. Felton's opinions related to:

- The elimination of Plaintiffs' losses by "other insurance" (Nos. 1 & 10);
- The viability of NU's Discovery and Termination defenses (Nos. 2-5);
- The quality and effect of Plaintiffs' Proofs of Loss, including their impact on NU's "investigation" (Nos. 6 & 8);
- Whether direct loss applies only to a claimant's money paid into escrow (No. 7);
- And a catch-all opinion, which included sub-opinions such as that NU's investigation and claims handling were reasonable, and that genuine disputes existed as to coverage and the amount of the loss, all of which he opined precluded a finding of bad faith (No. 9).

(*Id.* ¶3, Ex. 3; Appendix in Supp. of Pl.'s Opp. ("App.") at i-vi.)[9]

Mr. Felton's rebuttal report was fifty-pages long, and contained thirteen numbered opinions (Rebuttal Opinions Nos. 1-12 and Coverage Opinion No. 1) that substantially overlapped with his original excluded or rejected opinions, including:

- The futility of comparing NU's FIB claim investigation with the investigation of Plaintiffs' claim under NU's Miscellaneous Professional Liability policy ("MPL") (No. 2);
- The reasonableness of NU's investigation and claims handling (Nos. 3, 5 & 12);
- The sufficiency of Plaintiffs' Proofs of Loss (Nos. 6, 9 & 11);
- The reasonableness of NU's pre-litigation refusal to mediate in May/July, 2008 (Nos. 7 & 8);
- NU's classification of the claim only as "employee dishonesty," not as "forgery" under the FIB's insuring agreements (No. 10);

---

[9] The Appendix is attached at the end of the joint motion.

- ▪ The applicability of the genuine dispute doctrine (No. 11);
- ▪ And the lack of evidence supporting coverage of the claim from July 2006-February 2011 (Coverage No. 1).

(*Id.* ¶3, Ex. 4; App. at vii-xii.) Mr. Felton's rebuttal report also contained two other general opinions—that Plaintiffs and NU had "equal bargaining power" (No. 1), and that on-the-job training of a claims adjustor is acceptable in the insurance industry (No. 4). (App. at i-xii.) The former was rendered irrelevant by the Court's summary judgment's ruling, while the latter has not been expressly addressed by the Court. (*Id.*)

Plaintiffs deposed Mr. Felton on February 15, 2012, for more than six hours, resulting in a 240-page deposition transcript. (Goldfarb Decl. ¶4.) Reviewing and analyzing Mr. Felton's reports, working with Mr. Haley and Mr. Amoruso to rebut Mr. Felton's initial report, and preparing for and deposing Mr. Felton essentially consumed key members of Plaintiffs' trial team nearly full time for several months. (*Id.* ¶5.) These tasks as to Mr. Felton required hundreds of billable hours, and hundreds of thousands of dollars in attorney and expert fees. (*Id.*) Expert discovery finally closed three years ago, on February 24, 2012. (Dkt. No. 311.)

In March 2012, the parties filed cross-motions for summary judgment, and Plaintiffs also filed a *Daubert* motion to exclude, among other of NU's experts, Mr. Felton. (Dkt. Nos. 324-326.) This Court partially granted the motion to exclude Mr. Felton, holding in its March 28, 2014 Order that he was not qualified to—and could not—give opinions concerning the impact of "escrow transactions, banking laws, and fraud" on Plaintiffs' claim, or whether Plaintiffs had satisfied any of their losses through payments from "other insurance" policies. (Dkt. No. 420 at 7-8.) The Court then held that Mr. Felton could not base his opinion that NU conducted a reasonable investigation on excluded evidence, including the post-litigation investigation conducted by NU's damages expert, Christopher Money, and NU's August 2011 "coverage" letter. (*Id.* at 2-4.) The Court also excluded Mr.

Felton's "formal proof of loss" opinion—that NU did not have a duty to investigate the FIB claim until Plaintiffs submitted a properly executed Proof of Loss form—because it contradicted applicable California insurance regulations and was based on non-existent "defamation" concerns. (*Id*. at 2-6.) In a separate order shortly afterwards, the Court held that Mr. Felton could not rely on the privileged liability analysis memorandum prepared by Plaintiffs' *Cumis* counsel and produced to NU under regulations applicable to the separate MPL policy. (Dkt. No. 423 at 19-20.)

On September 30, 2014, the Court denied NU's motion for summary judgment, and granted Plaintiffs' motion for partial summary judgment, finding NU liable for breach of contract and bad faith. (Dkt. No. 427.) In doing so, the Court rejected nearly all of Mr. Felton's surviving opinions as a matter of law. (*See* App. at i-xii.) Setting the case for a December 2, 2015 mandatory settlement conference, the Court directed the parties to prepare for trial on compensatory and punitive damages. (Dkt. No. 427 at 86.) When the parties were unable to agree upon a settlement, the Court established firm deadlines for detailed pretrial filings leading up to a final pretrial hearing scheduled on August 21, 2015. (Dkt. No. 435 at 2.) The Court later declined to reconsider summary judgment, including with respect to NU's liability for bad faith, reiterating that the totality of the circumstances left no genuine dispute of material fact on this point. (Dkt. No. 439 at 8-9.) Accordingly, at trial, while Mr. Felton would not have been able to offer testimony regarding opinions that were excluded or rejected by the Court, Plaintiffs' claims handling and bad faith experts remain admissible to explain to the jury—consistent with their previously disclosed opinions—the context of NU's conduct that the Court has already found to be in bad faith, and to testify to other examples of NU's bad faith relevant to compensatory and punitive damages.

/ / /

/ / /

**B.**   **NU Waited Nearly A Year After Learning Of  Mr. Felton's Withdrawal And Incapacitation To Disclose It, Knowingly Failing To Raise The Issue On At Least Six Occasions**

In early 2014, while the cross-motions for summary judgment were still pending, Mr. Felton suffered a stress-induced heart attack. (Decl. of Dean P. Felton in Supp. of Def.'s Mot. ("Felton Decl.") ¶2; Def.'s Mot. at 4.) Upon medical advice, Mr. Felton retired and withdrew as an expert in all his cases, including this one. (Felton Decl. ¶3.) Mr. Felton told NU of his incapacity on or about **May 16, 2014**, returning all materials to NU's counsel the following month. (Def.'s Mot. at 4; Felton Decl. ¶3 (emphasis added).) This was the *first* time NU failed to advise Plaintiffs or the Court of this significant development.

On September 30, 2014, as discussed above, the Court granted Plaintiffs' motion for partial summary judgment, leaving the testimony of the parties' bad faith claims handling experts relevant for trial to the extent it does not conflict with the Court's factual and legal determinations. Notwithstanding its knowledge of Mr. Felton's incapacity and withdrawal, NU failed to raise the issue with Plaintiffs and the Court for the *second* time.

On October 29, 2014, NU moved for reconsideration of summary judgment, rehashing its argument that bad faith was a factual question for the jury and inappropriate for summary judgment. (Dkt. No. 430.) Importantly, whether the reconsideration motion was granted or denied, bad faith claims handling experts would still be relevant for trial. Yet, NU failed to raise the issue of Mr. Felton's withdrawal with Plaintiffs and the Court for the *third* time.

A month later, when the parties were unable to reach a resolution at the December 2, 2014 Mandatory Settlement Conference, the Court turned to scheduling the remaining pretrial proceedings. (Goldfarb Decl. ¶6.) Presumably with the understanding that the parties had completed all fact and expert discovery back in February 2012, the Court set a Final Pretrial Conference on August 21,

2015, at which a trial date would be set. (*Id.*; Dkt. No. 435.) For the *fourth* time, NU remained conspicuously silent, failing to inform Plaintiffs or the Court about Mr. Felton's withdrawal six months earlier, and the potential impact of NU's designation of a substitute expert on the pretrial schedule. (Goldfarb Decl. ¶6.)

A few months later, at the February 6, 2015 hearing on NU's motion for reconsideration of summary judgment, NU passed up a *fifth* opportunity to tell the Court and Plaintiffs of Mr. Felton's withdrawal. (*Id.* ¶7.) And after the Court denied reconsideration on February 19, 2015 (Dkt. No. 439), NU ignored a *sixth* chance to raise the issue, choosing to stay mute for another six weeks.

## C.  NU's Eventual Meet-And-Confer Disclosures About Mr. Felton's Incapacitation Ranged From Unreliable To Misleading

On March 19, 2015, *Plaintiffs* suggested that the parties meet and confer to address upcoming pre-trial issues, including the April 17, 2015 deadline for pretrial motions. (Goldfarb Decl. ¶8.) During the initial meet-and-confer call on March 31, 2015, NU first asserted that bad faith claims handling experts were unnecessary at trial based on the summary judgment ruling. (*Id.* ¶9.) When Plaintiffs disagreed, NU finally—and for the first time—raised the issue of expert substitution. (*Id.* ¶10.) Advising Plaintiffs that *Mr. Felton had died*, NU asked Plaintiffs to stipulate to NU's designation of an unidentified substitute expert if the Court were to permit bad faith claims handling experts at trial. (*Id.*)

Plaintiffs researched the timing of Mr. Felton's death to evaluate NU's diligence in raising the issue. (*Id.* ¶11.) Unable to find any information, Plaintiffs asked NU in an April 7, 2015 email to provide evidence confirming Mr. Felton's death. (Goldfarb Decl. ¶12, Ex. 6.) NU responded that it had been mistaken, and that Mr. Felton had not died, but instead had become medically unavailable due to a heart attack. (*Id.*) Given the circumstances, Plaintiffs fairly assumed Mr. Felton's incapacity was a recent event. (*Id.* ¶13.) Based on that assumption and trying to be reasonable, Plaintiffs asked NU on an April 13, 2015 meet-and-confer call whether

it would agree to limit its proposed substitute expert to Mr. Felton's remaining opinions and testimony. (*Id.*) When NU refused, stating that it would only agree to limit the new expert to the subjects of Mr. Felton's initial designation and that the new expert would "give whatever opinions he has," Plaintiffs had no choice but to decline the proposed stipulation as overbroad and prejudicial. (*Id.* ¶14.)

### D. NU Disclosed The True Facts Underlying Mr. Felton's Incapacitation For The First Time In Its Draft Motion

On April 17, 2015, NU provided Plaintiffs a draft of its Motion for Leave to Substitute Expert Witness For An Unavailable Expert Witness, with an accompanying declaration from Mr. Felton. (Goldfarb Decl. ¶15, Exs. 7 & 8.) To their surprise, Plaintiffs learned for the first time that Mr. Felton had informed NU of his incapacitation and withdrawal on **May 16, 2014**—*eleven months earlier*. (*Id.* ¶15.) Understandably troubled, Plaintiffs sent NU a detailed letter on April 21, 2015, suggesting that NU's omission regarding the timing of its disclosure in the meet-and-confer process from its motion may give the Court a false impression of the situation and the reason for Plaintiffs' unwillingness to stipulate to a substitute expert. (*Id.* ¶16, Ex. 9.) Plaintiffs also noted that, in the draft motion, NU seemingly abandoned its initial meet-and-confer position that bad faith claims handling experts were not necessary at trial. (*Id.*) Laying out the prejudice they would suffer from expert substitution at this late stage, Plaintiffs requested NU to further meet and confer, in good faith this time, about the scope of its proposed substitute expert's opinions, and to immediately produce the substitute expert report and other information for Plaintiffs to formulate a reasoned response. (*Id.*)

In its response on April 23, 2015, NU declined to engage in further meet and confer, saying only that it disagreed with Plaintiffs' "characterization" of the meet-and-confer process, that Plaintiffs would not be prejudiced because a trial date had yet to be set in the case, and that there was no expert report to produce because NU had yet to identify and retain a substitute expert. (*Id.* ¶17; Ex. 10.) Plaintiffs

1   attempted another meet and confer on April 30, 2015, confirming that they

2   correctly understood NU's intended scope for the new expert's opinions. (*Id.* ¶18.)

3   Without addressing the scheduling prejudice that would also need to be resolved,

4   Plaintiffs again suggested that NU consider a stipulation that a substitute would not

5   seek to offer additional opinions beyond those Mr. Felton would have been able to

6   offer at trial had he not become incapacitated. (*Id.*) NU's counsel promised a

7   response on May 1, 2015, but then asked for an extension until May 4, 2015 to

8   provide a proposal and for Plaintiffs to serve their opposition to the motion. (*Id.*

9   ¶19, Ex. 11.) In response, Plaintiffs' counsel sent a May 1, 2015 email detailing

10  potential terms to resolve the dispute without Court intervention. (*Id.* ¶20, Ex. 12.)

11  On May 4, 2015, NU's counsel stated that NU was still unable to respond, and

12  asked for an extension until May 7, 2015 to provide a proposal and for Plaintiffs to

13  serve their opposition to the motion. (*Id.* ¶21, Ex. 13.)

14          On May 5, 2015, NU rejected Plaintiffs' suggested stipulation and proposed

15  an alternative. (*Id.* ¶22, Ex. 14.) Plaintiffs rejected NU's proposal because it would

16  have forced Plaintiffs to essentially redo expert disclosures and discovery based on

17  a substitute expert report that would not be limited to Mr. Felton's previously

18  disclosed opinions or constrained by the Court's prior orders, and then require

19  Plaintiffs to pursue burdensome motion practice before trial to enforce the Court's

20  prior orders. (*Id.* ¶23; Ex. 15.) As a result, on May 6, 2015, Plaintiffs submitted to

21  NU an opposition to its motion, and expected NU to promptly file, as a joint

22  motion, NU's original motion and Plaintiffs' opposition. (*Id.* ¶24; Ex. 15.) On May

23  18, 2015, NU instead transmitted a joint motion substantially revising its motion

24  and requiring Plaintiffs to revise this opposition, which Plaintiffs delivered to NU

25  on May 22, 2015. (*Id.* ¶25; Ex. 16.)

26  **III.   LAW AND ARGUMENT**

27          Although there is little published law on this issue in the Ninth Circuit,

28  courts in this Circuit generally evaluate motions to substitute an expert as requests

1   under Federal Rule of Civil Procedure 16(b) to amend a scheduling order for good

2   cause. *See Park v. Cas Enters., Inc.*, No. 08-cv-385 DMS (NLS), 2009 U.S. Dist.

3   LEXIS 108160, at *6-7 (S.D. Cal. Nov. 19, 2009). In order of importance, the two

4   critical considerations are the (1) moving party's diligence and (2) prejudice to the

5   opposing party. Though some courts do analyze expert substitution motions under

6   Federal Rule of Civil Procedure 37, which authorizes the exclusion of an expert

7   due to untimely disclosure, their analysis encompasses the Rule 16 factors. *See*

8   *Nijjar v. Gen. Star Indem. Co.*, No.CV 12-08148 DDP (JCGx), 2014 U.S. Dist.

9   LEXIS 8722, at *5 (C.D. Cal. Jan. 23, 2014) (analyzing whether delay in seeking

10  expert substitution is substantially justified and harmless to the other party).

11  Here, NU has not shown good cause, and the Court should deny its motion.

### A.   NU's Motion Should Be Denied Solely Because It Does Not Seek A True Substitute For Mr. Felton, But A *Better* One

14          Admittedly, the Court's *Daubert*, summary judgment, and other orders are

15  interlocutory. However, by denying reconsideration of summary judgment, and

16  considering only evidence that it did not exclude in its discovery rulings or

17  otherwise deem inadmissible, the Court has signaled that its factual findings and

18  legal conclusions on summary judgment are to be considered determined for

19  purposes of trial. As this Court has itself held, subject to limited exceptions not at

20  issue here, the law of the case doctrine ordinarily precludes a court "from

21  reexamining an issue previously decided by the same court, or a higher court, in

22  the same case." *Wargnier v. Nat'l City Mortg., Inc.*, No. 09cv2721-GPC-BGS,

23  2013 U.S. Dist. LEXIS 102376, at *4-6 (S.D. Cal. July 22, 2013) (internal

24  quotation marks and citation omitted). Given this, and particularly after the

25  enormous time and expense devoted in this seven-year litigation to expert

26  disclosures, expert discovery, as well as *Daubert* and summary judgment motion

27  practice, it would be an unprecedented disregard of the law of the case to let NU

28  use Mr. Felton's unfortunate incapacity to its advantage by securing an expert who

1    could opine beyond what Mr. Felton himself would have been allowed.

2        In this regard, NU makes two baffling and mutually contradictory assertions.

3 On the one hand, it asserts that Mr. Felton's "*[trial] testimony would not have been*

4 *limited to exactly what he wrote in his reports or exactly what he stated in his*

5 *deposition.*" (Mot. at 8 (emphasis in original).) On the other hand, it offers what

6 appears to be a meaningless limitation—that "*the substitute expert should be*

7 *permitted to testify [to] the same extent that Dean Felton would have been*

8 *permitted to testify.*" (*Id*. (emphasis in original).) But the reason that testifying

9 experts like Mr. Felton must provide detailed reports and be available for

10 deposition is so that they fully disclose their anticipated trial testimony to the

11 opposing party, and prevent unfair surprise at trial. *See* Fed. R. Civ. P. 26(a)(2)(B);

12 *Jenkins v. Bartlett*, 487 F.3d 482, 487 (7th Cir. 2007) (expert report must provide

13 "the substance of the direct examination" at trial). A necessary corollary to this

14 requirement is that experts like Mr. Felton cannot testify *beyond* the specific

15 opinions disclosed in their reports and discussed at their depositions. *See Yeti by*

16 *Molly, Ltd. v. Deckers Outdoor Corp*., 259 F.3d 1101, 1106 (9th Cir. 2001) (expert

17 discovery rules have "teeth" because parties are forbidden from using at trial

18 information expert did not disclose). Because Mr. Felton would necessarily be

19 limited to testifying only as to his disclosed opinions—to the extent they survived,

20 among others, the Court's *Daubert*, summary judgment, and reconsideration

21 rulings—NU's argument that its proposed substitute need not be circumscribed to

22 "the four corners of Dean Felton's reports" appears to be an *undisguised* attempt to

23 gain an unfair advantage.

24        But courts recognize that substitution of an expert is not supposed to

25 advantage the moving party by allowing it to secure a better expert:

26      The purpose of allowing substitution of an expert is to put the movant
in the *same* position it would have been in but for the need to change

27      experts; it is not an opportunity to designate a *better* expert.

28 *United States for the Use & Benefit of Agate Steel, Inc. v. Jaynes Corp*., No. 2:13-

cv-01907-APG-NJK, 2015 U.S. Dist. LEXIS 45379, at *5-6 (D. Nev. Apr. 6, 2015) (emphases added); *see also Adams v. Cooper Indus., Inc.*, No. 03-476, 2007 U.S. Dist. LEXIS 99057, at *8 (E.D. Ky. Apr. 5, 2007) (substitution is not intended to allow the designation of a "superior" expert). By refusing to limit its substitute expert's report and opinions to Mr. Felton's surviving opinions, NU seeks exactly what courts find impermissible—a "better" and "superior" expert.

To set the broadest possible foundation for this better substitute expert, NU states that Mr. Felton evaluated "coverage issues" and "opined on the reasonableness of" NU's handling and investigation of Plaintiffs' claim. (Mot. at 3.) But, as discussed above, the Court excluded or rejected virtually all of Mr. Felton's coverage and claims handling opinions. (*See* App. at i-xii.) This is an example of why NU's proposal to limit its substitute expert to the "same scope and substance of Mr. Felton's opinions" is meaningless because it would allow NU to revive bad faith claims handling opinions to which Mr. Felton could not have testified but for his medical incapacitation. Indeed, had he not become medically incapacitated, Mr. Felton would have had little, if any, relevant and admissible expert testimony to offer the jury, and NU would have no way to fix or augment Mr. Felton's opinions. As the United States Supreme Court has recognized, albeit in a different context, "[i]t is implausible to suggest, post-*Daubert*, that parties will initially present less than their best expert evidence in the expectation of a second chance should their first try fail." *Weisgram v. Marley, Co.*, 528 U.S. 440, 455 (2000) (affirming appellate court's entry of judgment for defendant after reversing denial of motion to exclude plaintiff's experts, and rejecting argument that a remand should have been ordered so plaintiff could present new experts). NU's "first try" at a bad faith claims handling expert—Mr. Felton—could not have offered much in the way of relevant and admissible testimony at trial. Thus, his incapacitation should not entitle NU to a second chance to designate a new and "better" substitute expert.

1    Though NU cites a few cases where courts permitted expert substitution and

2  only limited the substitute expert report to the same subject matter as—but not the

3  exact opinions of—the prior expert, these cases undermine, rather than support

4  NU's position. For example, in *Lincoln National Life Insurance Co. v.*

5  *Transamerica Financial Life Insurance Co.*, defendant's prior damages expert in

6  consolidated patent infringement cases became unavailable after being convicted

7  of unrelated embezzlement. Nos. 1:04-CV-396, 1:06-CV-317, 2010 U.S. Dist.

8  LEXIS 103744, at *1 (N.D. Ind. Sept. 30, 2010). Finding "persuasive" plaintiff's

9  argument that the substitute's testimony must be limited, the court instructed that

10  the substitute damages expert could "review all of the evidence, conduct his own

11  independent analysis, and express his opinion in his own words," *as long as* he had

12  a similar area of expertise, employed the same methodology as the prior expert,

13  and did not make "meaningful changes" to the prior expert report. *Id.* at *11.

14  Unlike the substitution request before this Court, in *Lincoln National* there had

15  been no *Daubert* ruling limiting the prior expert's testimony, nor a ruling on the

16  parties' pending cross-motions for summary judgment, but the court still noted that

17  an expert's unavailability does not provide a party "with *carte blanche* to generate

18  an entirely new damages theory after approximately five years of litigation and less

19  than six months from trial." *Id.* at *1, 3, 11; *cf. also, e.g.*, *Ind. Ins. Co. v. Valmont*

20  *Elec., Inc*., No. TH 97-009-C-T/F, 2001 U.S. Dist. LEXIS 23256, at *4 (S.D. Ind.

21  Dec. 27, 2001) ("[A]llowing this supplement is **NOT** an invitation . . . to introduce

22  new and different theories in this case." (emphasis in original)). *Lincoln National*,

23  therefore, does not help NU.

24    Courts in the remaining cases that NU cites implicitly recognize that a true

25  substitute is limited to the prior expert's opinions by holding that the original

26  expert's report and testimony can be used to impeach the substitute expert. *See,*

27  *e.g.*, *Morel v. Daimler-Chrysler Corp*., 259 F.R.D. 17, 22 (D.P.R. 2009)

28  (permitting impeachment of the substitute expert through the prior expert's report

so that the moving party would not be able to "escape" from the prior expert's "concessions or admissions"); *accord Abbott v. Lockheed Martin Corp.*, No. 06-cv-0701, 2014 U.S. Dist. LEXIS 163521, at *2-4 (S.D. Ill. Nov. 21, 2014). Here, safeguards such as limiting the substitute expert report to the same methodology and subject matter as Mr. Felton; allowing Plaintiffs to use Mr. Felton's reports and deposition transcript for impeachment; or inviting Plaintiffs to use motions in limine to restrict the substitute expert's trial testimony to Mr. Felton's surviving opinions, are not sufficient given how little Mr. Felton could have offered in the way of admissible testimony. NU casually argues that Plaintiffs will not be prejudiced by the proposed substitution because "any attempt by NU to add to Mr. Felton's opinions would . . . arguably be subject to motion in limine." (Mot. at 13-14.) But the unfairness and prejudice lies in forcing Plaintiffs to shoulder the burden of full discovery depositions on new opinions and previously rejected opinions, and of then enforcing the law of the case at trial as to Mr. Felton's surviving opinions.

For this reason alone, NU's motion should be denied.

### B.    NU Fails To Show Good Cause For Even A True Substitute Given Its Lack Of Diligence And Candor

Even if NU were seeking a true substitute, it has not established good cause to do so. NU failed to disclose Mr. Felton's incapacitation and withdrawal to Plaintiffs and the Court for almost a year, including for six months after the Court's summary judgment order. It remained studiously silent about the issue in moving for reconsideration; at a settlement conference when it would have been natural and appropriate to address the impact of this issue on pretrial deadlines; at the hearing on its reconsideration motion; and weeks after the denial of reconsideration. When it finally broached the issue—at a meet-and-confer *initiated by Plaintiffs* to discuss pretrial issues—NU began by providing inaccurate and incomplete information, possibly to hide its intentional failure to disclose Mr.

Felton's incapacity for nearly a year. Indeed, it was only when Plaintiffs disagreed with NU's position that Plaintiffs' bad faith claims handling experts were not necessary at trial that NU said that Mr. Felton was dead, and pressed Plaintiffs to stipulate to a substitute expert. Then, it was only when Plaintiffs could find no proof of Mr. Felton's death that NU retracted its statement, saying that Mr. Felton was actually medically incapacitated, and again pressed for a stipulation *without agreeing to limit the substitute's opinions and report to Mr. Felton's remaining opinions*. Even so, instead of telling Plaintiffs that Mr. Felton's incapacitation and withdrawal occurred nearly a year earlier, NU gave Plaintiffs the false impression that these were recent developments about which it was understandably confused.

And finally, in its draft motion—which it revised substantially after reviewing Plaintiffs' opposition before inclusion into this "joint motion"—NU omitted this history, and implied instead that Plaintiffs were callous and unreasonable in refusing to stipulate to a substitute expert despite being aware of the unfortunate facts surrounding Mr. Felton's incapacitation. NU now argues that it appropriately waited to seek a substitute expert until it became clear after various court rulings that claims handling bad faith experts would still be relevant at trial. But NU makes no effort to refute that these experts' relevance was certain on September 30, 2014 (when the court issued its Summary Judgment Order), or that NU's motion for reconsideration would not have altered that relevance whether it was granted or denied. Nor does NU explain why it did not immediately advise Plaintiffs and the Court of Mr. Felton's incapacity as soon as the Court denied NU's motion for reconsideration on February 19, 2015, which even NU contends is the watershed event. At that time, NU admits it knew that all motions (except motions in limine) were due on April 17, 2015. But instead of immediately coming forward—and seeking out a substitute expert—NU first made misleading and incomplete disclosures about the true circumstances, dragged out this motion process, and made no effort to even identify a potential substitute expert until May

2015, *after* Plaintiffs objected to the NU's continual delay. Under these circumstances, NU's conduct has every indicia of bad faith and gamesmanship, an unfortunate continuation of the "unnecessarily aggressive" litigation tactics that the Court found to be bad faith in its summary judgment order. (Dkt. No. 427 at 83).

Therefore, as courts routinely do when a party delays raising an expert's incapacitation for much less than the time involved here, this Court should find that NU failed to act diligently, and deny its motion for even a true substitute. For example, in *Nijjar v. General Star Indemnity Co.*, the district court denied substitution of plaintiff's claims handling expert after plaintiff waited more than a month after discovering that the expert had a conflict of interest, and more than five weeks after defendant rejected its proposed stipulation, because even this short delay constituted failure to "exercise reasonable diligence . . . after the conflict was brought to his attention." 2014 U.S. Dist. LEXIS 8722, at *7-8. Notably, and contrary to NU's assertion, there does not appear to have been a trial date set in *Nijjar*, as here, so the court focused exclusively on plaintiff's lack of diligence and how that would inevitably delay *trial* proceedings. NU compares its conduct favorably with that of the plaintiff in *Nijjar* (Mot. at 10), but the attempt falls flat because NU's conduct is worse. NU did not merely "neglect" something or make a "careless" mistake, it *carefully* and *deliberately* failed to raise the issue for nearly a year when the parties could have avoided wasting time and interrupting trial preparation.

Under certain circumstances, as in a few cases NU cites, this Court could give credence to a party's explanation that it honestly (if mistakenly) believed that it could wait a short while to disclose and raise its expert's incapacitation while the court ruled on dispositive motions. *See, e.g.*, *Park*, 2009 U.S. Dist. LEXIS 108160, at *8-9 (granting substitution because, while plaintiff could have acted sooner, it did not show bad faith by failing to move for substitute damages expert for two months); *Baumann v. Am. Family Mut. Ins. Co.*, 278 F.R.D. 614 (D. Colo. 2012)

1   (granting expert substitution three weeks before trial because plaintiff's expert died

2   recently and he quickly moved to substitute). Here, however, Mr. Felton was not

3   incapacitated recently and NU did not move to substitute quickly or wait only a

4   few short months. Rather, it waited nearly a year, until pretrial motions were due,

5   claiming that it first needed the Court to rule on the parties' cross-motions for

6   summary judgment, and then on its reconsideration motion—the outcome on the

7   latter of which would not impact the need for a bad faith claims handling expert.

8   But, as another court found under analogous circumstances, awaiting a court's

9   ruling on a motion before raising the issue of expert substitution constitutes

10  imprudence, not diligence. *See LNC Invs. v. First Fid. Bank*, No. 92 Civ. 7584

11  (CSH), 2000 U.S. Dist. LEXIS 13038, at *5-9 (S.D.N.Y. Sept. 11, 2000) (denying

12  substitution because defense counsel's failure to stay in touch with its expert and

13  learn about his death, believing that expert testimony would be unnecessary due to

14  a pending motion to exclude plaintiffs' experts, was "imprudent"). It is true that,

15  unlike defendants in *LNC*, at least NU was not "inexcusably ignorant" of its

16  expert's availability in the face of an impending trial date. (Mot. at 11.) Even

17  worse, though, NU was *inexcusably* silent for eleven months about its expert's

18  incapacitation in the face of at least half a dozen opportunities to disclose the issue,

19  and maintain the level playing field that it now conveniently invokes to support its

20  request for a substitute expert.

21      Admittedly, no trial date is set in the case yet, and the Court won't set one

22  until the final pretrial conference currently scheduled on August 21, 2015. (Dkt.

23  No. 435.) Thus, a circumstance that many courts deem important in denying an

24  expert substitution motion—an impending trial date—is not an issue here. *See,*

25  *e.g.*, *Jones v. Devaney*, 107 F. App'x 709, 711 (9th Cir. 2004) (affirming denial of

26  motion to substitute medical expert, filed on the eve of trial, because plaintiff

27  provided "no good cause for the seven-month delay"). But, NU should not be

28  heard to rely on the lack of a trial date to explain or excuse its intentional lack of

diligence. Moreover, there are many other circumstances present here to make up for the fact that the parties are not on the *literal* eve of trial, such as the seven-year pendency of this litigation; the procedural posture of this case after the Court's *Daubert*, summary judgment, and reconsideration rulings; the operative pre-trial schedule; and NU's inexplicably long delay, lack of candor, and eventual unreliable disclosures during meet and confer. *C.f., e.g.*, *Pfizer, Inc. v. IVAX Pharms., Inc.*, No. 07-174 (DMC), 2009 U.S. Dist. LEXIS 54910, at *8 (D.N.J. June 29, 2009) (timing of defendant's disclosure was "fatal," and there was "[n]o reasonable justification for defendants' delay" of two years after learning of expert's death to raise the issue).

**C.    Given The Developments In And The Posture Of This Case, Granting *Any* Substitution Risks Severe Prejudice To Plaintiffs Even Though The Court Has Not Yet Set A Trial Date**

After the moving party's diligence, prejudice to the opposing party is the next important consideration in addressing a motion to substitute an expert. *Park*, 2009 U.S. Dist. LEXIS 108160, at *6. This factor also weighs in favor of denying NU's motion, even if NU had sought a true substitute, because Plaintiffs will be severely prejudiced by the substitution regardless of whether the Court maintains the current pre-trial schedule, or delays it and the scheduling of a trial date.

Under the first scenario, Plaintiffs will suffer severe prejudice even though no trial date is set. Significant evidence regarding NU's multidimensional bad faith, including its motives and intent, remains highly relevant at trial. Given the importance of this case, Plaintiffs' counsel made arrangements to juggle their schedules and their remaining cases to put in the work necessary to prepare for trial based on the Court's December 8, 2014 pre-trial order and upcoming Final Pretrial Conference on August 21, 2015. But now—after NU retains the substitute expert and, if permitted, provides his report by June 30, 2015—Plaintiffs' counsel will be forced to pivot to the significant task of evaluating a potentially lengthy and

complex expert report, preparing rebuttal reports, deposing the substitute expert, defending further depositions of Plaintiffs' experts, and likely bringing another *Daubert* motion instead of focusing on the important required pretrial filings and the usual, time-intensive trial preparation. Without knowing what limits the Court will impose, and without evaluating the proposed substitute expert's report, it is hard to determine whether rebuttal reports and a *Daubert* motion will be necessary, predict how long it will take to prepare for and conduct the substitute expert's deposition, and generally evaluate the impact of the proposed substitution. But, if past practice is any indication, these tasks will consume Plaintiffs' lead lawyers for hundreds of hours that will indisputably and irreparably interfere with trial preparation. NU fails even to acknowledge that its strategic delay will prevent Plaintiffs from effectively preparing for trial at the most critical stage, pretending that there will be no prejudice. NU's gamesmanship should be viewed in the context of the Court's finding on summary judgment that NU has repeatedly engaged in unnecessarily aggressive and bad faith litigation conduct.

Alternatively, under the second scenario, having finally obtained summary judgment on NU's liability for breach of contract and bad faith more than seven years after the fact, NU's lack of diligence will cause Plaintiffs further delay in finally vindicating their rights at trial. This type of prejudice to the opposing party—either with respect to its trial preparation or as a result of trial continuation—is exactly what other courts rely on to deny expert substitution, even if, unlike NU, the moving party is diligent. *See, e.g.*, *Scheel v. Harris*, No. 3:11-17-DCR, 2012 U.S. Dist. LEXIS 126448, at *36-37 (E.D. Ky. Sept. 6, 2012) (while delay in supplementing expert disclosures was an "honest mistake," allowing substitution would be "unfair" because discovery would be re-opened, a new round of *Daubert* motions allowed, and the trial date continued); *Pfizer, Inc.*, 2009 U.S. Dist. LEXIS 54910, at *12-14 (denying expert substitution three months before final pretrial conference and five months before trial as it would interfere with

1    plaintiff's "trial preparation and presentation of its case," and require it to "engage
2    in discovery[,] . . . secure rebuttal reports and incorporate its findings into its
3    pretrial submissions"); *LNC Invs.*, 2000 U.S. Dist. LEXIS 13038, at *8-10
4    (denying substitution because it would either disturb plaintiff's trial preparation or
5    require continuance).

6         The procedural posture of the case only increases the prejudice to Plaintiffs.
7    During the initial round of expert discovery, both parties' experts produced their
8    reports simultaneously, without seeing their counterpart's report, although each
9    had an opportunity to issue a rebuttal report. Here, by contrast, NU's substitute
10   expert would have the benefit of seeing Plaintiffs' experts' initial and rebuttal
11   reports, as well as the Court's *Daubert*, summary judgment, reconsideration, and
12   other rulings to the extent he wanted to try and work around them. But as another
13   court recognized, allowing "the new expert to craft a report with the benefit of
14   seeing the contentions of the opposing expert in advance" is a factor in evaluating
15   prejudice from the substitution. *Nijjar*, 2014 U.S. Dist. LEXIS 8722, at *8-9
16   (denying substitution of claims handling expert because of prejudice to defendant,
17   including from reopening discovery and postponing trial proceedings).

18        Not surprisingly, the cases that NU cites to support allowing substitution
19   bear little resemblance to the circumstances here. For example, in *Ferrara &*
20   *DiMercurio v. St. Paul Mercury Insurance Co.*, the First Circuit affirmed the
21   decision to allow plaintiff to replace its cause-and-origin expert in a case involving
22   insurance coverage of a fire because the original expert died, the substitute was
23   already an expert on the related issue of the electrical systems underlying the fire,
24   and there would be no "meaningful change" in the substitute expert's testimony.
25   240 F.3d 1, 10-11 (1st Cir. 2001). Unlike the plaintiff in *Ferrara & DiMercurio*,
26   NU has not chosen an existing expert; rather, it only identified (but has not yet
27   retained) one after reviewing Plaintiffs' opposition to its draft substitution motion.
28   Similarly, NU's reliance on *Guerra v. Paramo* is misplaced because the court there

affirmed a decision to allow defendants to designate a forgery expert after the discovery cutoff because it only recently became clear that plaintiff may have forged evidence. 251 F. App'x 424 (9th Cir. 2007). Here, there are no such recent or belated developments to explain NU's lack of diligence.

In short, NU fails to establish good cause even for a true substitute, both due to its lack of diligence and the prejudice Plaintiffs would suffer.

### D.   If The Court Is Inclined To Grant NU's Motion, It Should Impose Strict Conditions To Mitigate The Prejudice To Plaintiffs

If the Court is nonetheless inclined to provide NU some relief, it should minimize the prejudice to Plaintiffs by imposing the following conditions: (1) limiting the substitute expert's report and trial testimony to providing only the specific opinions disclosed by Mr. Felton, as appropriately narrowed by the impact of, among others, the Court's *Daubert*, summary judgment, and reconsideration rulings; and (2) delaying all pretrial deadlines and the final pretrial hearing by three months from the date the substitute expert report is produced.

First, there is ample authority to limit NU's substitute expert to Mr. Felton's surviving opinions. *See, e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, MDL No. 1869, 2014 U.S. Dist. LEXIS 165769, at *27-28 (D.D.C. Nov. 26, 2014) (prohibiting substitute expert from giving "any new theory of liability, impact, or damage" and confining "his or her opinions to the reliability, integrity, and accuracy of" prior expert's work); *Doctor's Assocs., Inc. v. QIP Holder LLC*, No. 06-cv-1710(VLB), 2009 WL 5184404, at *1-2 (D. Conn. Dec. 23, 2009) (limiting new damages expert's testimony to "establishing the veracity and integrity of the original expert and the conclusions reached in the original expert's report"). NU's arguments to distinguish these authorities ring hollow. NU itself cites *Doctor's Associates* to support its request for substitution (Mot. at 8 n. 2), yet claims that Plaintiffs' reliance on it is misplaced because the case is "vastly different." (*Id.* at 9-10.) Moreover, though plaintiffs in *In re Rail Freight* did seek a supplemental

1   expert, and not a substitute, NU fails to mention that the court analyzed the request

2   under the "good cause" standard for expert substitution: "Although plaintiffs have

3   moved to add a supplemental expert—as opposed to a straight substitution of one

4   expert for another—the analysis *remains the same*: does good cause exist to alter

5   the scheduling order and reopen discovery for this purpose?" *In re Rail*, 2014 U.S.

6   Dist. LEXIS 165769, at *21 (emphasis added; footnote omitted).

7        <u>Second</u>, the Court retains discretion to continue pretrial deadlines to

8   accommodate Plaintiffs' and their experts' review of NU's substitute expert report

9   and potential rebuttal reports; the deposition of the substitute expert; and the

10   preparation and hearing on a potential *Daubert* motion regarding the substitute

11   expert. *See United States ex rel. Suter v. Nat'l Rehab Partners, Inc.*, No. CV-03-

12   15-S-BLW, 2006 U.S. Dist. LEXIS 88599, at *2, 7 (D. Idaho Dec. 6, 2006)

13   (granting expert substitution subject to extending pretrial deadlines). Without

14   having the substitute expert's report, three months is Plaintiffs' best estimate of the

15   additional time by which pretrial deadlines should be extended.

16   **IV.**    **<u>CONCLUSION</u>**

17        Plaintiffs understand and appreciate that NU did not cause Mr. Felton's

18   medical incapacitation or withdrawal. And, all things being equal, Plaintiffs are not

19   seeking to have NU placed in a worse position than it would have been but for Mr.

20   Felton's unfortunate incapacitation. However, a substitute expert who may issue a

21   report and opine beyond what little Mr. Felton could have offered at trial would not

22   put NU in the same position it would have been, but in a better position. And that

23   is neither the purpose of allowing expert substitution, nor consistent with the law

24   of the case doctrine. Moreover, NU has not acted with diligence and candor, has

25   rejected proper limitations on its substitute expert report, and is essentially seeking

26   to have Plaintiffs shoulder all the prejudice of its strategic decision to repeatedly

27   delay raising this issue for nearly a year. To avoid both validating NU's lack of

28   diligence and prejudicing Plaintiffs, the Court should deny NU's motion.

1   / / /

2       Alternatively, if the Court is inclined to grant NU some relief, Plaintiffs

3   respectfully request that the substitute expert's report and trial testimony be limited

4   only to the specific opinions disclosed by Mr. Felton, as narrowed by, among other

5   rulings, the Court's *Daubert*, summary judgment, and reconsideration rulings; and

6   that all pretrial deadlines and the final pretrial hearing be delayed by three months

7   from the time NU produces the substitute expert report.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## JOINT CONCLUSION

NU's Motion is being submitted in the format of a "Joint Motion", and each of the undersigned counsel agree that the positions of their respective client(s) are contained in the corresponding sections above.

DATED:  May__, 2015                          SEDGWICK LLP


                                            By: _____
                                                Susan Koehler Sullivan
                                                Attorneys for Plaintiffs FIDELITY
                                                NATIONAL FINANCIAL, INC., CHICAGO
                                                TITLE INSURANCE COMPANY, and
                                                CHICAGO TITLE COMPANY

DATED:  May __, 2015                         LEWIS BRISBOIS BISGAARD &
                                            SMITH LLP


                                            By: _____
                                                Dana Alden Fox
                                                Attorneys for Defendant NATIONAL
                                                UNION FIRE INSURANCE
                                                COMPANY OF PITTSBURGH, PA

DATED:  May __, 2015                         HAHN LOESER & PARKS LLP


                                            By: _____
                                                Steven A. Goldfarb
                                                Attorneys for Plaintiffs FIDELITY
                                                NATIONAL FINANCIAL, INC., CHICAGO
                                                TITLE INSURANCE COMPANY, and
                                                CHICAGO TITLE COMPANY

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**APPENDIX IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO DEFENDANT'S MOTION FOR LEAVE TO
SUBSTITUTE AN EXPERT WITNESS FOR AN
UNAVAILABLE EXPERT WITNESS**

**PLAINTIFFS' APPENDIX**

| Mr. Felton's 10 Initial Opinions | Relevant Court Ruling |
|---|---|
| <div align="center">"Other Insurance" – Opinion Nos. 1 and 10</div> | |
| Plaintiffs sought insurance for the escrow transaction losses at issue from both their Miscellaneous Professional Liability ("MPL") insurers and Financial Institution Bond ("FIB") insurers. (Ex. 3 to Goldfarb Dec., Felton Report at 47-50.) Pursuant to the "Other Insurance Or Indemnity" provision of the Financial Institution Bond ("FIB"), coverage under the FIB is only "excess over any valid and collectible Insurance or Indemnity obtained by" Plaintiffs. (*Id*. at 46.) Plaintiffs ultimately obtained certain recoveries from the MPL insurers. (*Id*. at 47-50.) These recoveries constitute other "valid and collectible Insurance" under the FIB's "Other Insurance Or Indemnity" provision, thereby reducing (and essentially zeroing) Plaintiffs' potential insurable losses under the FIB. (*Id*. at 47-51.) | Mr. Felton's opinions on the topic of "Other Insurance" are unreliable. "The Court grants the motion to exclude Felton's opinions about the application of the "Other Insurance or Indemnity" provision. (Dkt. No. 420, *Daubert* Ruling at 7-8 (citing Felton Report at 47-50 and Felton Rebuttal Report at 45-46).) |
| <div align="center">The viability of NU's Discovery and Termination defenses – Opinion Nos. 2-5</div> | |
| Pursuant to the FIB's discovery provision, the FIB generally covers only those losses discovered during the bond period. (Felton Report at 29.) Discovery of a loss can occur when Plaintiffs receive notice of an actual or potential claim in which there is an allegation that | Mr. Felton is "not qualified to testify that the Medhi escrow transaction was or was not fraudulent." (*Daubert* Ruling at 7.) "NU has not shown that Felton has the necessary experience or training to give an opinion about escrow transactions, banking laws, or fraud." |

Plaintiffs are liable to a third party under circumstances which, if true, would constitute a loss under the FIB. (*Id.*) Further, if the claim involves an employee's dishonest or fraudulent act, the FIB terminates coverage as to all losses caused by that employee. (*Id.* at 30.)

On November 15, 2004, one of Plaintiffs' escrow attorneys received a letter from a party to the "Mehdi" transaction. Based on the attorney's escrow experience and knowledge, the letter should have put Plaintiffs on notice of a claim for bank fraud and Zuzzette Nieto's, one of Plaintiffs' employees, participation in the fraud. This discovery terminated the FIB as to all losses caused by Ms. Nieto after November 15, 2004. Further, because the loss was discovered during the 2003-2004 FIB period and before the at-issue FIB came into place, Plaintiffs cannot recover for any losses caused by Ms. Nieto before November 15, 2004. (*Id.* at 29-30, 51-53.)

(*Id.*)

Moreover, the Discovery Provision in the FIB was not triggered because it only applies if there is discovery of dishonesty of a loss of the type covered by the FIB. (Dkt. No. 427, SJ Order at 49.) "The Court agrees that NU has failed to present evidence showing that either the Kaplan or Medhi transaction involved a type of loss covered by the FIB." (*Id.*)

Furthermore, while there may be issues of material fact concerning when, and even if, Plaintiffs discovered a dishonest or fraudulent act of Ms. Nieto, and if coverage was terminated for her as a result, these material facts are irrelevant. This is because Plaintiffs are entitled to judgment as a matter of law under the FIB's Forgery Insuring Agreement. (*Id.* at 47-48, 56-57.)

## The quality and effect of Plaintiffs' Proofs of Loss - Opinion Nos. 6 and 8

Within six months after Plaintiffs' loss was discovered, the FIB required Plaintiffs to furnish to NU a proof of loss, duly sworn to, with full particulars. (Felton Report at 45.) Without this proof of loss, an insurer, like NU, cannot begin an investigation into the claims. (*Id.* at 45, 53-54.) Further, an insured, like Plaintiffs, cannot fulfill its proof of loss obligation simply by producing a

Mr. Felton's "formal proof of loss opinion", namely, "that an insurance company does not have a duty to investigate until the insured submits a 'properly executed proof-of-loss' form is inadmissible because it "contradicts California law." (*Daubert* Ruling at 5.) Indeed, under California law, a proof of loss is simply "[a]ny evidence or documentation . . . that provides any

mound of evidence with an expectation that the insurer will somehow find all that is necessary to prove the insured's claim. (*Id.* at 28.)

The Proofs of Loss that Plaintiffs submitted to NU in 2008 and, then amended in 2009, were insufficient and did not rise to the standards of making or substantiating a claim for a loss covered by the FIB. (Felton Report at 53-54.) Because the Proofs of Loss were insufficient, NU was not able to issue a coverage decision and is entitled to continue investigating the claims during this litigation. (*Id.*) Another reason NU was not able to issue a coverage decision and is entitled to continue investigating the claims is because Plaintiffs' claims have undergone significant changes.

evidence of the claim and that reasonably supports the magnitude or the amount of the claimed loss." (*Id.*)

NU did not need a sworn proof of loss "to begin its investigation, which includes reading the information the insured provided and considering potential bases for coverage under the FIB." (SJ Order at 77.) Additionally, Plaintiffs were not "required to submit a particular type of form to trigger the insurer's duty to investigate and determine coverage." (*Id.*) The evidence in the case "overwhelming" shows that Plaintiffs fulfilled their proof of loss obligation by providing NU the original and revised proofs of loss, as well as all of the at-issue escrows and pleadings and discovery from the underlying litigation. (*Id.* at 65-68, 78-79, 81-82.)

Moreover, NU has failed to explain why it did not issue a coverage opinion "within the 40-day rule established by California regulations." It had long known about Norton's fraud, had all of the relevant depositions, and could have analyzed the discovery, termination, and forgery arguments at any time. (*Id.* at 79.) Thus, "[t]he record establishes that NU unreasonably delayed processing FNF's FIB claim and did not timely determine coverage." (*Id.*)

NU argues that "it cannot be faulted" for failing to investigate or determine coverage when the amount of Plaintiffs' loss has "undergone multiple and dramatic changes." But, "[t]he actual facts expose the fallacy of this argument." All NU had to do "to begin

| | |
|---|---|
| | to determine the amount of loss was start with one victim and analyze the evidence according to the actual terms of the FIB policy." Plaintiffs' "voluntary reduction of the amount claimed during litigation does more harm to NU's position than to persuade the Court it acted in good faith." (*Id.* at 80-82.) |

**Whether direct loss could only apply to a claimant's money paid into escrow - Opinion No. 7**

| | |
|---|---|
| The FIB only provides indemnity for direct losses suffered as a result of a covered peril. (Felton Report at 31, 32, 53.) Funds lost by the investors based on their partnerships with Norton or through loans with Norton are not covered. Further, any funds that Plaintiffs paid to settle the investors claims which were paid for "indirect or consequential losses" or "punitive or multiple damages" are not covered. (*Id.*) | The FIB broadly defines "property" to include the interest held in escrow. (SJ Order at 17.) The funds in escrow represent the value of the real estate, and Plaintiffs were responsible for those assets when they were wrongfully diverted to a criminal enterprise by forging the signature of victims who had entrusted title and monies in escrow for safekeeping by Plaintiffs until the transactions closed. (*Id.*)<br><br>The FIB provides coverage for "any portion of a settlement payment to a third party that is 'attributable to a loss directly resulting from one of the insuring agreement." (*Id.* at 18.) The Forgery Insuring Agreement covered Plaintiffs for transferring, paying, or delivering "any funds or Property" based on forged documents. (*Id.*) Because Plaintiffs relied on forged documents in closing the escrows, Plaintiffs have "satisfied the direct loss element." (*Id.*) Thus, Plaintiffs' loss, including its "third-party settlement[s]", are covered. (*Id.* at 18-19.) Plaintiffs' |

| | |
|---|---|
| | losses include those suffered by both investors of Norton and non-investors as these losses resulted from Norton's actions in forging the investors' names to process escrows. (*Id.* at 19-27.) |

| The "Catch-all" – Opinion No. 9 | |
|---|---|
| There is no foundation for Plaintiffs' bad faith claim for a number of reasons, including: (1) because the proofs of loss Plaintiffs submitted were deficient and, as such, NU's investigation continues; (2) there are genuine disputes as to coverage issues, including termination and discovery; (3) there are genuine disputes as to the quantum of loss; and (4) as NU's investigation was reasonable from 2006 through 2008 and continues to be reasonable to this day. (Felton Report at 54-55.) | The evidence in the case "overwhelming" shows that Plaintiffs fulfilled their proof of loss obligation by providing NU the original and revised proofs of loss, as well as all of the at-issue escrows and pleadings and discovery from the underlying litigation. (SJ Order at 65-68, 78-79, 81-82.) NU cannot rely on the genuine dispute doctrine "because it did not adequately or promptly investigate [Plaintiffs'] claim for Forgery benefits." (*Id.* at 73; *see also* Dkt. 439, Reconsideration Order at 8-9 (rejecting argument the genuine dispute doctrine applied because "[t]he record showed NU had the necessary facts but never considered whether it was liable for the claim as forgery by a non-employee")). Additionally, NU's "coverage position was unreasonable because it was based on assumptions" (SJ Order at 74) and, in any event, "the Court rejected NU's interpretation of the contract terms that might have excused its performance." (*Id.* at 73.) Finally, as for its quantum of loss argument, "[t]he actual facts expose the fallacy of this argument." (*Id.* at 81.) Indeed, "[a]ll NU had to do to begin to determine the amount of loss was start with one victim and analyze the evidence according to the actual terms |

| | of the FIB policy . . . Any one or two of the First Wave settlement payments could have exhausted NU's exposure under the $15 million FIB policy." (*Id.*)<br><br>The totality of circumstances shows that NU unreasonably and in bad faith withheld payment from its insureds. By 2007 or 2008, Plaintiffs had given NU sufficient information to conduct an investigation and make a coverage determination. NU's after-the-fact explanations do not excuse is clear breach of its basic obligations towards its insureds. (*Id.* at 85; *see also* Reconsideration Order at 8.) |
|---|---|

| Mr. Felton's 13 Rebuttal Opinions | Relevant Court Ruling |
|---|---|
| An MPL claim investigation is different from a FIB claim investigation – Opinion No. 2 ||
| Plaintiffs suggest NU should have completed its investigation of Plaintiffs' claim earlier and issued a coverage decision as, with the same information, NU's MPL claims handler made a coverage determination in 2007. A claim investigation under a FIB, however, is different from a claim investigation under a MPL. (Ex. 4 to Goldfarb Dec., Felton Rebuttal Report at 13-14.) This is because unlike a FIB, MPLs have absolute dishonesty exclusions. (*Id*. at 14.) This makes insureds less likely to search for dishonesty in their MPL claims as it would preclude coverage. (*Id*.) Further, proofs of loss are required for a FIB employee dishonesty claim before an investigation commences due to defamation concerns. (*Id*. at 34.) This is unlike an MPL claim where there are no proof of loss requirements. Here, Plaintiffs continuously revised their claims through proofs of loss and other changes during the course of litigation making it more difficult to undertake and complete an investigation. (*Id*. at 15-16.) | "The record establishes that NU unreasonably delayed processing FNF's FIB claim and did not timely determine coverage. By contrast, NU's E & O department had the same information (the victims' allegations, the discovery from the State Court proceedings, and Norton's version of Chicago Title's role in the events) and was able to analyze coverage under that separate policy by late 2007." (SJ Order at 79-80.) It is clear "[n]o reasonable jury could find that NU lacked a factual basis to analyze FNF's claim under the terms of the FIB policy." (*Id*. at 80; *see also* Reconsideration Order at 8.)

Additionally, Mr. Felton's opinion that formal proofs of loss are required for an employee dishonesty claim due to defamation concerns is unwarranted because "there is simply no evidence to support [the] opinion." (*Daubert* Ruling at 5.)

Finally, as for Mr. Felton's opinion that Plaintiffs' changes to the proofs of loss made it difficult to complete an investigation, "[t]he actual facts expose the fallacy of this argument." (SJ Order at 81.) Indeed, "[a]ll NU had to do to begin to determine the amount of loss was start with one victim and analyze the evidence according to the actual terms of the FIB policy . . . Any one or two of the First Wave settlement |

| | |
|---|---|
| | payments could have exhausted NU's exposure under the $15 million FIB policy." (*Id.*) And Plaintiffs' "voluntary reduction of the amount claimed during the litigation does more harm to NU's position than to persuade the Court it acted in good faith." (*Id.* at 82.) |

| NU's investigation and claims handling - Opinion Nos. 3, 5, and 12 | |
|---|---|
| NU's investigation, claims handling, and conduct both before and during litigation were consistent with sound business practices and done in good faith. (Felton Rebuttal Report at 20, 22, 40-41.) For example, Plaintiffs suggestion that NU failed to conduct an investigation during the Tolling Agreement is false. (*Id.* at 22.) It was Plaintiffs' failure to provide NU with a proof of loss as required by the policy that prevented NU from undertaking a full investigation during the Tolling Agreement. (*Id.* at 22-23.) NU still, however, conducted an investigation during the period consisting of intake and digestion of Plaintiffs' thousands of pages of material. (*Id.* at 22.) | "[T]he totality of circumstances shows that NU unreasonably and in bad faith withheld payment from its insured[s]." (SJ Order at 85.) "By 2007 or 2008, [Plaintiffs] had given NU sufficient information to conduct an investigation and make a coverage determination. NU's after-the-fact explanations do not excuse its clear breach of its basic obligations towards its insured[s]." (*Id.*; *see also* Reconsideration Order at 8 (denying motion to reconsider bad faith ruling).) |

| Plaintiffs' Proofs of Loss – Opinion Nos. 6, 9, and 11 | |
|---|---|
| The Proofs of Loss that Plaintiffs submitted to NU in 2008 and, then amended in 2009, were insufficient and did not rise to the standards of making or substantiating a claim for a loss covered by the FIB. (Felton Rebuttal Report at 27-28, 32-33.) Because the | Mr. Felton's "formal proof of loss opinion", namely, "that an insurance company does not have a duty to investigate *until* the insured submits a 'properly executed proof-of-loss' form is inadmissible because it "contradicts California law." (*Daubert* Ruling at 5.) |

| | |
|---|---|
| Proofs of Loss were insufficient, NU was not able to investigate the claim or issue a coverage decision, and is entitled to continue investigating Plaintiffs' claims during this litigation. (*Id.*) | Under California law, a proof of loss is simply "[a]ny evidence or documentation . . . that provides any evidence of the claim and that reasonably supports the magnitude or the amount of the claimed loss." (*Id.*)<br><br>NU did not need a sworn proof of loss "to begin its investigation, which includes reading the information the insured provided and considering potential bases for coverage under the FIB." (SJ Order at 77.) "[O]verwhelming" evidence shows that Plaintiffs satisfied their obligation by providing original and revised proofs of loss, and all the at-issue escrows, pleadings, and discovery from the underlying litigation. (*Id.* at 65-68, 78-79, 81-82.) |
| The reasonableness of NU's refusal to mediate in May/July, 2008 – Opinion Nos. 7-8 | |
| NU showed no bad faith in rejecting mediation in June 2008, before this action was filed, because Plaintiffs' mediation request was a strategic ploy to force NU into a premature settlement without providing sufficient proofs of loss. (Felton Rebuttal Report at 31-32.) Without proofs of loss, Plaintiffs were in breach of the FIB and NU's full investigation was not required. (*Id.* at 31.) Without the ability to conduct a full investigation, NU had no basis to properly evaluate Plaintiffs' claims at the mediation. (*Id.*) | NU's "pre-litigation attitude was equally combative. In June 2008, NU declined to participate in a mediation on the ground that it did not have all the facts. But NU already had sufficient facts, and it was its own failure to investigate that caused the problem; therefore, this excuse was a sham." (SJ Order at 83.) |

| NU's classification of the claim only as "employee dishonesty" – Opinion No. 10 | |
|---|---|
| NU acted properly in classifying Plaintiffs' claim as one for employee dishonesty. (Felton Rebuttal Report at 34-36.) In particular, when possible defamation issues are apparent, as they were in this case, it is best practices to classify the claim as employee dishonesty. (*Id.* at 34.) Further, all of the allegations related to Forgery dealt with Ms. Nieto, Mr. Godwin, and Mr. Gainor, so these Forgery acts "would be associated with employee dishonesty and therefore inclusive under the peril." (*Id.* at 35.) | Mr. Felton's opinion concerning defamation is unwarranted because "there is simply no evidence to support [the] opinion." (*Daubert* Ruling at 5.) Moreover, insurance companies have an absolute right under California law to report alleged fraud. (*Id.* at 6.)<br><br>NU's FIB claims adjustor, Mark Wolin, "cannot explain why he treated the claim only as one for Employee Dishonesty and ignored the other Insuring Agreements. When asked at his deposition why he did not indicate that FNF listed other types of coverage, Wolin said, 'I'm not sure I know the answer to that.' The absence of any explanation confirms NU's error. On this record, the oversight is wholly unacceptable." (SJ Order at 70.) |
| The applicability of the genuine dispute doctrine – Opinion No. 11 | |
| NU did not act in bad faith because there are genuine disputes concerning: (1) coverage for certain escrow transactions; (2) whether the claims constitute a direct loss; (3) whether employee dishonesty affects coverage; and (4) the timing of discovery under the FIB. (Felton Rebuttal Report at 37.) | NU cannot rely on the genuine dispute doctrine "because it did not adequately or promptly investigate [Plaintiffs'] claim for Forgery benefits." (SJ Order at 73; *see also* Reconsideration Order at 8.) Additionally, NU's "coverage position was unreasonable because it was based on assumptions" (SJ Order at 74) and, in any event, "the Court rejected NU's interpretation of the contract terms that might have excused its performance." (*Id.* at 73.) |

| | |
|---|---|
| | The Forgery Insuring Agreement covered Plaintiffs for transferring, paying, or delivering "any funds or Property" based on forged documents. (*Id*. at 18.) Because Plaintiffs relied on forged documents in closing the escrows, Plaintiffs have "satisfied the direct loss element." (*Id*.) Thus, Plaintiffs' loss, including its "third-party settlement[s]", are covered. (*Id*. at 18-19.)<br><br>Employee dishonesty is irrelevant because Plaintiffs are entitled to judgment as a matter of law under the FIB's Forgery Insuring Agreement. (*Id*. at 47-48, 56-57.) |
| **Equal bargaining power – Opinion No. 1** | |
| NU and Plaintiffs had equal bargaining power when negotiating the FIB, among other polices, and the FIB was a mutually agreed to contract. (Felton Rebuttal Report at 10-11.) | This opinion related to the interpretation of the phrase "Legal Department" from the FIB, particularly whether certain escrow claim attorneys were within Plaintiffs' Legal Department. The Court found that the attorneys fell within the Legal Department, as NU advanced. But, the issue as a whole is no longer relevant because the Court granted Plaintiffs judgment as a matter of law under the FIB's Forgery Insuring Agreement, and because the issue of whether Plaintiffs' Legal Department "discovered" employee dishonesty or fraud was not triggered by the Kaplan and Medhi transactions, neither of which involved the type of loss covered by the FIB. (SJ Order at 47-51, 56-57.) |

| On the job training – Opinion No. 4 | |
|---|---|
| Plaintiffs suggest NU failed to issue a timely coverage opinion because NU does not have a claims manual for complex FIB claims and its adjustors lack formal training. (Felton Rebuttal Report at 21.) NU has a sound claims handling practice despite the lack of a claims manual. (*Id.* at 20.) In particular, all FIB claims involve the same fundamentals and adjusters address the claims over a continuing process. (*Id.* at 20-21.) Further, in general, the FIB policy terms and local regulations are enough to ensure the timely adjustment of a claim. (*Id.* at 21.) | The Court did not directly address this opinion in its *Daubert*, summary judgment, or reconsideration rulings. |

## CERTIFICATE OF SERVICE

*Fidelity National, et al. v. National Union, et al.*

Case No.: 3:09-cv-00140-GPC-KSC

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

At the time of service, I was over 18 years of age and not a party to the action. My business address is 801 S. Figueroa Street, 19th Floor, Los Angeles, California 90017-5556. I am employed in the office of a member of the bar of this Court at whose direction the service was made.

On May 28, 2015, I served the following document(s):

**JOINT MOTION REGARDING DEFENDANT'S MOTION FOR LEAVE TO SUBSTITUTE AN EXPERT WITNESS FOR AN UNAVAILABLE EXPERT WITNESS**

I served the documents on the following persons at the following addresses (including fax numbers and e-mail addresses, if applicable):

**SEE ATTACHED SERVICE LIST**

The documents were served by the following means:

☒  (BY COURT'S CM/ECF SYSTEM) Pursuant to Local Rule, I electronically filed the documents with the Clerk of the Court using the CM/ECF system, which sent notification of that filing to the persons listed above.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on May 28, 2015, at Los Angeles, California.

/s/ Susan Koehler Sullivan
Susan Koehler Sullivan

20237450v1

1  **SERVICE LIST**

2  **3:09-CV-00140-GPC-KSC**

3  Cary B. Lerman
Eric J. Lorenzini
4  MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
5  Thirty-Fifth Floor
Los Angeles, CA 90071-1560
6  Tel:  (213) 683-9168
Fax:  (213) 683-5163
7  E-Mail:  cary.lerman@mto.com
E-Mail:  eric.lorenzini@mto.com
8  E-Mail:  joseph.ybarra@mto.com

9  *Attorney for Plaintiff Fidelity National
Financial, Inc.*

10

11

12  Joni Todd
SIKORA LAW LLC
13  8532 Mentor Avenue
Mentor, OH  44060
14  Tel:  (440) 266-7777
Fax:  (440) 266-7778
15  E-Mail:  jtodd@sikoralaw.com

16  *Attorneys for Plaintiff Fidelity National
Financial, Inc.*

17

18

19

Steven A. Goldfarb
Oliver J. Dunford
Andrew Agati
Jon Paul Anthony
HAHN, LOESER & PARKS LLP
200 Public Square, Suite 2800
Cleveland, OH 44114
Tel:  (216) 621-0150
Fax:  (216) 241-2824
E-Mail:  sagoldfarb@hahnlaw.com
E-Mail:  odunford@hahnlaw.com
E-Mail:  aagati@hahnlaw.com
E-Mail:  janthony@hahnlaw.com

*Attorneys for Plaintiff Fidelity National
Financial, Inc.*

Dana Alden Fox
Rebecca R. Weinreich
LEWIS BRISBOIS BISGAARD &
SMITH LLP
221 North Figueroa Street, Suite 1200
Los Angeles, CA 90012
Telephone: (213) 250-1800
Facsimile: (213) 250-7900
E-Mail:  Dana.Fox@lewisbrisbois.com
E-Mail:
rebecca.weinreich@lewisbrisbois.com

*Attorneys for Defendant National Union
Fire Insurance Company of Pittsburgh,
PA*

20

21

22

23

24

25

26

27

28